**Appeal No. 2015-2011**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

### THE BOARD OF TRUSTEES OF THE
### LELAND STANFORD JUNIOR UNIVERSITY,

*Plaintiff-Appellant*,

**v.**

### THE CHINESE UNIVERSITY OF HONG KONG,

*Defendant-Appellee.*

*Appeal from the United States District Court for the*
*Northern District of California in Case No. 3:12-cv-00865-SI,*
*Judge Susan Y. Illston.*

## PLAINTIFF-APPELLANT'S OPENING BRIEF

Edward R. Reines
Derek C. Walter
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065
(650) 802-3000

*Attorneys for Plaintiff-Appellant*
The Board of Trustees of the
Leland Stanford Junior University

# TABLE OF CONTENTS

Page

STATEMENT OF RELATED CASES ................................................................1

JURISDICTIONAL STATEMENT ...................................................................1

STATEMENT OF THE ISSUES PRESENTED ...............................................2

PRELIMINARY STATEMENT .......................................................................2

STATEMENT OF THE CASE...........................................................................7

I.      THE INVENTION................................................................................7

II.     THE INTERFERENCE PROCEEDINGS .......................................12

        A.      The Evidence Presented To The Board...............................14

        B.      The Board's Final Written Decision ...................................19

III.    THE § 146 APPEAL IN THE DISTRICT COURT...........................21

IV.     THE TRANSFER OF THIS CASE TO THIS COURT ...................27

SUMMARY OF THE ARGUMENT ...............................................................29

ARGUMENT ...................................................................................................31

I.      STANDARD OF REVIEW................................................................31

II.     THE BOARD'S WRITTEN DESCRIPTION DECISION SHOULD
        BE REVERSED...................................................................................31

        A.      The Board Committed Legal Error In Its Application Of The
                Written Description Doctrine ...............................................31

        B.      The Board Ignored Key Evidence.......................................43

        C.      The Board Ignored Evidence Proving That The Skilled Artisan
                Would Not Have Understood The Specification To Refer To
                Targeted Sequencing To The Exclusion Of Random
                Sequencing ...........................................................................47

III.    THE COURT SHOULD AT LEAST REMAND TO THE PATENT
        OFFICE FOR CONSIDERATION OF THE EVIDENCE
        COLLECTED DURING THE § 146 PROCEEDINGS ................................52

IV.     THE DISTRICT COURT'S TRANSFER FOR LACK OF SUBJECT
        MATTER JURISDICTION WAS ERRONEOUS ........................................59

CONCLUSION ....................................................................................................62

# TABLE OF CONTENTS

**Page(s)**

## Cases

*Advanced Fiber Techs. Trust v. J&L Fiber Servs.*,
  674 F.3d 1365 (Fed. Cir. 2012)..........................................................35

*Alcon Research Ltd. v. Barr Labs., Inc.*,
  745 F.3d 1180 (Fed. Cir. 2014)..........................................................46

*Application of Fischer*,
  360 F.2d 230 (C.C.P.A. 1966) ...........................................................55

*Biogen IDEC MA, Inc. v. Japanese Found. for Cancer Research, et al.*,
  No. 13-13061-FDS, 2014 WL 2167677 (D. Mass. May 22, 2014)....................27

*Biogen MA, Inc. v. Japanese Found. for Cancer Research*,
  785 F.3d 648 (Fed. Cir. 2015)...................................................... passim

*Boston Sci. Corp. v. Johnson & Johnson*,
  647 F.3d 1353 (Fed. Cir. 2011)..........................................................35

*Falko-Gunter Falkner v. Inglis*,
  448 F.3d 1357 (Fed. Cir. 2006)............................................... 31, 35, 41

*Home Prods. Int'l, Inc. v. United States*,
  633 F.3d 1369 (Fed. Cir. 2011)..........................................................58

*In re Hayes Microcomputer Prods., Inc. Patent Litig.*,
  982 F.2d 1527 (Fed. Cir. 1992)................................................... 34, 35

*Lampi Corp. v. Am. Power Prods., Inc.*,
  228 F.3d 1365 (Fed. Cir. 2000)..........................................................42

*LizardTech, Inc. v. Earth Resource Mapping, Inc.*,
  424 F.3d 1336 (Fed. Cir. 2005)..........................................................38

*Pandrol USA, LP v. Airboss Ry. Prods., Inc.*,
  424 F.3d 1161 (Fed. Cir. 2005)..........................................................34

*Rockwell Int'l Corp. v. United States*,
  549 U.S. 457 (2007) ........................................................................60

*Schwartz v. Sawhney*,
    Patent Interference No. 105,317, 2006 WL 1621782 (B.P.A.I. Feb. 8, 2006)....56

*Scriptpro, LLC v. Innovation Assocs., Inc.*,
    762 F.3d 1355 (Fed. Cir. 2014).................................................................. 40, 42

*Tobinick v. Olmarker*,
    753 F.3d 1220 (Fed. Cir. 2014)........................................................................41

*Troy v. Samson Mfg. Corp.*,
    758 F.3d 1322 (Fed. Cir. 2014)........................................................................59

*United States v. Lahey Clinic Hosp., Inc.*,
    399 F.3d 1 (1st Cir. 2005)................................................................................60

*Wang Labs., Inc. v. Toshiba Corp.*,
    993 F.2d 858 (Fed. Cir. 1993)..........................................................................34

**Statutes**

28 U.S.C. § 1295(a)(1)........................................................................................1

28 U.S.C. § 1295(a)(4)(A)...................................................................................2

28 U.S.C. § 1331...............................................................................................21

28 U.S.C. § 1338...............................................................................................21

28 U.S.C. § 1631.................................................................................... 1, 28, 59

28 U.S.C. § 2106...............................................................................................55

35 U.S.C. § 112.................................................................................................12

35 U.S.C. § 141.................................................................................................61

35 U.S.C. § 146........................................................................................ passim

37 C.F.R. § 41.104(a)........................................................................................56

Fed R. Civ. P. 62.1...........................................................................................58

M.P.E.P. § 608.01(p).........................................................................................35

## <u>STATEMENT OF RELATED CASES</u>

This case may be directly affected by Supreme Court review of this Court's decision in *Biogen MA, Inc. v. Japanese Found. for Cancer Research*, 785 F.3d 648 (Fed. Cir. 2015). In *Biogen*, this Court held that, under the America Invents Act ("AIA"), district courts no longer have jurisdiction to review interference decisions pursuant to 35 U.S.C. § 146. Biogen filed a petition for *certiorari* of this Court's decision on November 9, 2015, and the Supreme Court is expected to make a decision on Biogen's petition shortly. If the Supreme Court reviews *Biogen* and determines that this Court's decision was erroneous, this case should be remanded to the District Court for further proceedings pursuant to § 146. *See id.* at 653-54 ("In short, we have jurisdiction under § 141 as a result of the transfer if § 146 review was unavailable, but we lack jurisdiction if this case was properly brought to the district court under § 146.").

## <u>JURISDICTIONAL STATEMENT</u>

This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1) to review the District Court's decision to transfer this matter to this Court pursuant to 28 U.S.C. § 1631 due to lack of subject matter jurisdiction. This Court also has jurisdiction

pursuant to 28 U.S.C. § 1295(a)(4)(A) (pre-TCA)[1] to review the decision of the U.S. Patent Trial and Appeal Board ("the Board") in the interferences that are the subject of this case.

## STATEMENT OF THE ISSUES PRESENTED

1.  Whether the Board erred in determining that The Board of Trustees of the Leland Stanford Junior University's ("Stanford") claims are unpatentable for lack of written description.

2.  Whether the interference proceedings should be reopened so that the Board may consider evidence developed during the District Court appeal proceedings pursuant to 35 U.S.C. § 146, which were cut short just before trial in view of this Court's decision in *Biogen*.

3.  Whether the District Court, based on this Court's decision in *Biogen*, erred in finding that it lacked subject matter jurisdiction to review the Board's interference decisions pursuant to 35 U.S.C. § 146.

## PRELIMINARY STATEMENT

This is an appeal of three interference decisions involving foundational intellectual property at the center of the revolution in non-invasive prenatal

---

[1] This Court has jurisdiction over an appeal from a decision of the Board in an interference declared after September 15, 2012 pursuant to the version of 28 U.S.C. § 1295(a)(4)(A) as it existed on September 15, 2012. Leahy-Smith America Invents Technical Corrections Act, Pub. L. 112-274, § 1(k)(3), 126 Stat. 2456, 2457-58.

diagnostics. The primary inventors competing in these interferences are Stephen Quake of Stanford and Dennis Lo of the Chinese University of Hong Kong ("CUHK").

The interference record proves that Lo always trailed Quake, in both research and patent prosecution. Before the interferences, Quake had multiple issued patents and pending applications. Dr. Lo did not even consider patenting until after he had learned that the Stanford group was already "likely to have filed a patent application." Appx5952. Spurred by this news about Dr. Quake's progress, Dr. Lo reached out to his patent prosecutors to suggest that they attempt to patent "from one or more 'unusual' angles to increase our chance of having a new angle that is not covered by our competitiors." *Id.*

Dr. Lo, however, was unable to include any genuinely new "angle" in his patent filing. Years later, after the Patent Office declared interferences, Dr. Lo did not even try to claim that he invented before Quake. The earliest priority date CUHK asserted in the interferences was weeks **after** the filing date of Quake's utility application, and over a year after Quake filed the provisional application to which his patents and applications deserve priority.

Making no claim to prior invention, CUHK used the interferences to attack Quake's patents and applications as allegedly failing the written description requirement. CUHK presented no other attack against Quake's patents and

applications—tacitly acknowledging that Quake had enabled his revolutionary invention. CUHK's basic argument was that Quake's specification did not include enough detail to describe the claimed random sequencing embodiment of the invention. But Quake's specification undisputedly describes three different platforms that support random massively parallel DNA sequencing. And the specification refers to "***randomly*** fragmented genomic DNA," and "***random*** sequence information," leaving no doubt that random sequencing was the intended embodiment. *See* Appx108(19:59-20:20).[2]

Given the clear disclosure in the specification, CUHK was forced to present an awkward written description theory. Specifically, CUHK argued that written description may be assessed by weighing the disclosure of the various embodiments against one another, and then selecting a champion embodiment that corresponds to the "main focus" of the specification. According to CUHK, all embodiments must take on the characteristics of the champion embodiment, and claims that fail to correspond to the champion embodiment are invalid under § 112. Thus, CUHK argued that the description of random sequencing in Stanford's patents and applications was insufficient not so much because it failed to adequately disclose random sequencing, but because it was outweighed by other

---

[2] Emphasis supplied unless otherwise noted.

embodiments in the specification that are non-random, which use digital PCR instead of DNA sequencing.

The Board, in its final written decision, acknowledged that the specification "could have been interpreted as either random or targeted sequencing." Appx19-20. While this should have favored Stanford given the quality of the random sequencing disclosure, the Board instead followed CUHK's champion embodiment approach and ruled for CUHK. As the Board stated, "given the main focus of the Quake '018 patent on diagnosing aneuploidy with digital PCR, those of skill in the art would have understood the discussion of massively parallel sequencing to refer to sequencing targeted, predetermined portions of the DNA in a sample, not sequencing of random DNA." Appx20.

This rationale is legally erroneous, and the Board also committed several subsidiary factual and legal errors in reaching its conclusions. While the Board concluded that Quake's specification lacked sufficient detail to describe to the skilled artisan his ownership of the random sequencing embodiment of the invention, the Board totally failed to identify the level of skill of the skilled artisan. The Board ignored undisputed evidence demonstrating that the skilled artisan would have been deeply familiar with random sequencing. Likewise, the Board ignored CUHK's admission in its own priority document that the random sequencing approach was a "variant" of the digital PCR approach. *See, e.g.*,

-5-

Appx5959. This admission negates any contention that the non-random digital PCR embodiments would have led the skilled artisan away from recognizing the claimed random sequencing embodiment. Thus, the Board's champion embodiment approach was not just legally erroneous, but was also based on a foundation of factual error. Based on the interference record, the Board's decision should be reversed.

In no event, however, should this Court affirm the Board. As documented below, before this case arrived at this Court, it was the subject of appeal proceedings before the Northern District of California pursuant to 35 U.S.C. § 146. With both parties and the Court believing jurisdiction was proper, the parties used the § 146 proceedings to develop substantial additional evidence, including, most notably, the admission of CUHK's expert that a "person of ordinary skill in the art reading the patent" would understand from Quake's specification that random sequencing *would be* used with the invention. Appx14548(59:18-24). This, and other telling admissions, speak directly to the ultimate issue that is currently before this Court and are irreconcilable with CUHK's position and the Board's decision.

Yet, given this Court's jurisdiction-terminating decision in *Biogen*, the § 146 proceedings were suspended right before trial, and this enlightening evidence has never been considered on the merits. It would be wasteful and unjust to resolve this matter against Professor Quake without the consideration of such incredibly

direct admissions developed by the parties, all believing that the § 146 proceeding was proper.  Under these extraordinary circumstances that arose before *Biogen*, if this Court were not intending to reverse the Board based on the interference record alone—although that record decidedly supports such a reversal—the Court should at least remand so that the Board may reopen the interference proceedings to consider the evidence developed during the § 146 proceedings.

## STATEMENT OF THE CASE

### I.     THE INVENTION

The invention enables the non-invasive detection of genetic abnormalities in a growing fetus that avoids the harms of amniocentesis.  In its most impressive form so far, it allows the detection of fetal chromosomal aneuploidies, such as Down's syndrome, in which the fetus carries an abnormal number of a given chromosome.  Appx115.

The presence of fetal DNA in the maternal bloodstream (*i.e.*, cell-free fetal DNA) allows one to access the DNA of the fetus through a simple blood draw. Although the phenomenon of cell-free fetal DNA in maternal blood had been reported in 1997, the ability to test for aneuploidy based on this discovery remained elusive for almost a decade.  A 2005 news article in *Science* magazine called a solution to this problem "the big prize."  Appx815.  Early efforts to develop a non-invasive method for diagnosing chromosomal aneuploidies using

cell-free fetal DNA were unsuccessful.  Because "aneuploidies do not present a mutational change in sequence, and are merely a change in the number of chromosomes," researchers—including Dennis Lo himself—wrongly believed that determining whether the fetus was carrying an extra chromosome required distinguishing fetal DNA from maternal DNA.  *See* Appx99['018 patent](2:7-9).  Put another way, researchers believed one needed a method of distinguishing the copies of chromosome 21 coming from the fetus from those that came from the mother.  Without some way of making this distinction, researchers thought it would be impossible to diagnose Down's syndrome.

For nearly ten years, researchers pursued an aneuploidy test based on this misdirection, to no avail.  By early 2006, however, Dr. Quake realized that there was another way.  Specifically, Dr. Quake realized that one could use sophisticated molecular counting techniques to detect small changes in the quantity of an aneuploid chromosome relative to the quantity of one or more normal chromosomes **without** distinguishing between the mother's and fetus's blood.

For instance, in a normal pregnancy, the ratio of the number of DNA fragments arising from chromosome 21 to the number of DNA fragments arising from chromosome 12 will take on a normal, standard value.  Yet, in a pregnancy where the fetus has Down syndrome, and hence has an extra copy of chromosome 21, the ratio will be **slightly** higher due to the presence of the extra chromosome in

the fetal DNA. The ratio will be elevated only by a tiny amount because the fetal DNA makes up only a small fraction (about 3-6%) of the total DNA in the mother's blood. *See* Appx99(1:35-38). Dr. Quake recognized that using molecular counting techniques to detect the tiny over- or under-representation of a chromosome would reveal aneuploidy—without having to distinguish fetal DNA from maternal DNA. *See, e.g.*, Appx109(21:17-20) ("While this difference is small, it can be measured."). This concept forms the foundation of nearly every cell-free DNA based prenatal test on the market today. Even CUHK's expert acknowledged it was "an impressive and surprising finding." Appx1952(44:6-19).

It is undisputed that Dr. Quake's breakthrough invention has ***nothing*** to do with how one carries out the counting of DNA fragments to detect this small difference. Although Dr. Quake's patents exemplify the invention using a particular counting method (digital PCR) based on what was most accessible in the Stanford lab, the specification is clear that the invention is not so limited, stating, for instance, that it "should be appreciated that methods involving PCR or other amplification are not the only way to detect or enumerate the molecules in a given discrete reaction sample." Appx108(19:5-7). The description of the preferred embodiment in the specification includes a table of contents making clear that a range of disparate techniques may be used for "Detection and Quantification," including digital PCR, emulsion PCR, and sequencing:

-9-

DETAILED DESCRIPTION OF THE PREFERRED
EMBODIMENT

Outline
I. Overview
II. Description of Steps
   A. Tissue Preparation
   B. Distribution of DNA molecules
   C. Detection and Quantification
      1. Digital PCR Methods
      2. Bead emulsion PCR
      3. Microfluidic Dilution with PCR
      4. Single molecule detection and/or sequencing
   D. Quantitative evaluation
III. Specific applications
   A. Preparation for trisomy with frequency analysis.
   B Sample Protocol
IV. Examples

Appx102(7:11-28).[3]

When counting the chromosomes via DNA sequencing, the specification discloses as the embodiment multiple massively parallel sequencing platforms, including, most notably, the Illumina sequencing platform, which can sequence millions of DNA fragments simultaneously:

> A methodology useful in the present invention platform is based on massively parallel sequencing of millions of fragments using attachment of randomly fragmented genomic DNA to a planar, optically transparent surface and solid phase amplification to create a high density sequencing flow cell with millions of clusters, each containing ~1,000 copies of template per sq. cm. These templates are sequenced using four-color DNA sequencing-by-synthesis technology. See, products offered by Illumina, Inc., San Diego Calif.

Appx108(19:59-67). In the described sequencing method of counting, "randomly fragmented genomic DNA" is used. *Id.* Consequently, one does not have *a priori*

---

[3] Red annotation and highlighting supplied.

knowledge that the fragments arise from any particular chromosome or set of chromosomes.

The specification thus explains that "[o]nly about 30 bp of random sequence information are needed to identify a sequence as belonging to a specific human chromosome." Appx108(20:6-9). It is undisputed that there were numerous prior art techniques for identifying the particular chromosome to which the sequenced random fragments align (a process that is referred to as "sequence alignment") within the knowledge of one skilled in the art. Indeed, both experts in the case **defined** the person of ordinary skill in the art as one who would have had knowledge of sequence alignment techniques for identifying the chromosome from which a piece of sequence information arises. *See* Appx1260 ¶ 48; Appx1291 ¶ 24.

The claims at issue in the interference proceedings covered embodiments in which DNA fragments were counted using massively parallel DNA sequencing. A representative claim is as follows. In addition to the sequencing step, the claims include steps directed to determining the chromosomes from which the sequence fragments arise, and comparing the amounts of fragments to determine the presence of aneuploidy:

> **1.** A method for determining presence or absence of fetal aneuploidy in a maternal tissue sample comprising fetal and maternal genomic DNA, wherein the method comprises:
> a. obtaining a mixture of fetal and maternal genomic DNA from said maternal tissue sample;

    b. conducting massively parallel DNA sequencing of DNA fragments randomly selected from the mixture of fetal and maternal genomic DNA of step a) to determine the sequence of said DNA fragments;

    c. identifying chromosomes to which the sequences obtained in step b) belong;

    d. using the data of step c) to compare an amount of at least one first chromosome in said mixture of maternal and fetal genomic DNA to an amount of at least one second chromosome in said mixture of maternal and fetal genomic DNA, wherein said at least one first chromosome is presumed to be euploid in the fetus, wherein said at least one second chromosome is suspected to be aneuploid in the fetus, thereby determining the presence or absence of said fetal aneuploidy.

Appx115.

## II.     THE INTERFERENCE PROCEEDINGS

In Spring 2013, the Patent Office declared three interferences between Quake's patents and applications and Lo's after-filed patent applications. In the interferences, CUHK stated that its earliest possible priority date was *after* the February 2007 filing of Quake's full utility application. Appx5950. CUHK thus used the interference proceeding solely as a vehicle to attack the validity of Quake's IP as lacking written description under 35 U.S.C. § 112. Notably, while CUHK contended that Quake's patents failed the written description requirement, it never denied that the full scope of the invention was enabled by the Quake disclosure. CUHK's written description attack was the sole way CUHK could prevail in the interferences.

CUHK's written description argument may be summarized as follows. The claims cover the use of Quake's aneuploidy detection invention using *random* sequencing as the molecular counting method. CUHK, however, contended that the specification demonstrates that Quake was actually in possession of the use of his invention only with a far more complicated molecular counting technique that is now referred to in the art as "targeted sequencing." *See, e.g.*, Appx6321:26-22:1 (CUHK states that "the sequencing embodiments disclosed in the '018 Patent and related applications are all limited to targeted sequencing to detect the presence of predetermined target sequences"); Appx6138:29-30 (CUHK asserts that "the '018 Patent and the '833, '803, and '686 Applications disclose the use of targeted sequencing to detect the presence or absence of a predetermined target sequence").

In the targeted sequencing counting method, one must first biochemically or physically select specific DNA fragments from specific chromosomes, such as chromosome 21, before using massively parallel sequencing to carry out the counting. *See, e.g.*, Appx6592:24-6593:19; *see also* Appx6335:6-7 ("Lo admits that whether a sequencing reaction is considered targeted or random is determined by the library preparation that precedes sequencing."); Appx6101:18-20 ("In targeted sequencing, predetermined target sequences are selected prior to sequencing to generate a library of target sequences.").

Thus, the parties' dispute was whether the specification described for the invention only a ***targeted sequencing*** counting approach (CUHK's position) or if it described a ***random sequencing*** approach (Stanford's position).

## A.    The Evidence Presented To The Board

In the interference proceeding, Stanford relied on the disclosure of the Quake specification as understood by one skilled in the art. The specification describes random massively parallel sequencing under the title "Single Molecule Detection/Sequencing Methods":

> A methodology useful in the present invention platform is based on massively parallel sequencing of millions of fragments using ***attachment of randomly fragmented genomic DNA to a planar, optically transparent surface*** and solid phase amplification to create a high density sequencing flow cell with millions of clusters, each containing ~1,000 copies of template per sq. cm. These templates are sequenced using four-color DNA sequencing-by-synthesis technology. See, products offered by Illumina, Inc., San Diego Calif. Also, see US 2003/0022207 to Balasubramanian, et al., published Jan. 30, 2003, entitled "Arrayed polynucleotides and their use in genome analysis."

> Sequencing may be combined with amplification-based methods in a microfluidic chip having reaction chambers for both PCR and microscopic template-based sequencing. ***Only about 30 bp of random sequence information are needed to identify a sequence as belonging to a specific human chromosome***. Longer sequences can uniquely identify more particular targets. An algorithm for designing unique sequences is described in Yamada, et al. "PrimerStation: a highly specific multiplex genomic PCR primer design server for the human genome," Nucleic Acids Res., Jul. 1, 2006; 34 (Web Server issue): W665-W669, ***illustrative of software methods that can be used to identify a sequence in comparison to the known genome sequence***. See, also Zhu et al., "Single molecule profiling of

alternative  pre-mRNA  splicing,"  Science.  2003  Aug.  8;
301(5634):836-838, describing a single-molecule-based technology
for studying mRNA.

Appx108(19:59-20:20).  This passage describes random sequencing by referring to

"randomly  fragmented  genomic  DNA,"  "random  sequence  information,"

"identify[ing] a sequence as belonging to a specific human chromosome," and

"software methods that can be used to identify a sequence in comparison to the

known genome sequence."  Indeed, when asked what the term "a random sequence

information" means, CUHK's expert testified that a "random sequence is sequence

fragments that are obtained that are random in nature, meaning they aren't targeted

to be a specific region or from a specific region."  Appx1955(56:3-8).

In prior district court proceedings involving CUHK's licensee (Sequenom,

Inc.) and Stanford's licensee (Verinata Health, Inc.), the District Court reviewed

the block-quoted language above and concluded that it was "aligned with random,

not targeted, sequencing."  Appx1894.  CUHK's expert, Dr. Stacey Gabriel of the

Broad Institute, was at times inconsistent, but she agreed with the District Court

that this description had to include random sequencing:

**The District Court Claim Construction Order**



Additionally, the Court finds that the specification supports Verinata's proposed construction:

A methodology useful in the present invention platform is based on *massively parallel sequencing of millions of fragments using attachment of randomly fragmented genomic DNA* to a planar, optically transparent surface and solid phase amplification to create a high density sequencing flow cell with millions of clusters, each containing ~1,000 copies of template per sq. em. These results are sequenced using four-color DNA sequencing-by-synthesis technology. *See, products offered by Illumina, Inc.*, San Diego Calif. Also, see US 2003/0022207 to *Balasubramanian*, et al., published Jan. 30, 2003, entitled "Arrayed polynucleotides and their use in genome analysis." . . . *Only about 30 bp of random sequence information are needed to identify a sequence* as belonging to a specific human chromosome.

The '017 Patent 20:1-18 (emphasis added). The specification's description of sequencing millions of fragments of randomly fragmented DNA, and then identifying the sequence as belonging to a specific human chromosome, is aligned with random, not targeted, sequencing. Moreover, Sequenom does not dispute that the Illumina platform and the Balasubramanian patent application both support random massively parallel sequencing.

Appx1894

**Dr. Gabriel's Testimony**



Q.   So this description here that's lines 13 through 17, you're saying that that description would include both random sequencing and targeted sequencing; is that right?

MR. WISE:  Objection.  It mischaracterizes her testimony.

A.   Yes.

Appx1956(60:11-17)

During the interference proceedings, CUHK's position was that the use of sequence alignment algorithms to identify the particular chromosome from which a random DNA sequence arises was the *sine qua non* of random sequencing. *See, e.g.*, Appx3131 ("Aligning sequence reads to a reference genome is how a random massively parallel sequencing process would identify chromosomes based on the sequencing data."). Although Dr. Gabriel took the position that the Quake specification did not disclose sequence alignment and hence did not disclose random sequencing, she agreed at her deposition that the specification's reference to "identifying a sequence as belong to a specific chromosome," (*see* Appx108(20:14-16)), was the very definition of sequence alignment:

> Q.   Now in the context of the present invention, alignment means identifying a sequence as belonging to a specific chromosome, right?
>
> A.   Alignment isn't referred to in the '018. But if you're asking me if that's how I'd define it, I would say yes.

-16-

Appx1953(49:6-11).    Likewise, Dr. Gabriel testified that alignment means comparing a sequence to a known sequence:

**Q.**    Does alignment mean comparing a sequence to a known sequence?
**A.**    Yes.

Appx1953(48:17-19).  This understanding matches the specification's description of software methods that can be used to identify "a sequence in comparison to the known genome sequence."  Appx108(20:15-17).  And Dr. Gabriel agreed that the specification cited the Yamada reference for this specific purpose. Appx1965(97:14-17) ("**Q.** Certainly Yamada is cited here for the use of identifying sequences in comparison to a known genome sequence, right?  **A.** It is.").

As to the analytical steps required to determine aneuploidy using random sequencing data, Stanford pointed to the specification's description of a common statistical tool, the Student's t-test, to compare normal and abnormal samples and assess the presence of aneuploidy.  *See* Appx1342-43 ¶ 151 (citing the description of the algorithms that appear at ¶¶ 141-49 of the Quake specification); Appx307-10 ¶¶ 141-49 (describing the algorithms used for aneuploidy detection).  Although the exemplar in the specification is based on digital PCR data, both experts agreed that one of skill in the art would understand that this technique could also be applied to random sequencing data.  *See* Appx1342-43 ¶ 151; Appx1954-55(52:9-55:12) (testimony of Dr. Gabriel regarding how a t-test or z-test could be used to

-17-

determine aneuploidy using massively parallel sequencing data and confirming her understanding that this was how "the Lo and Quake processes work").

Notably, Dr. Gabriel relied on the specification at issue here as prior art in an *inter partes* review proceeding relating to one of Quake's later filed patents directed to improvements to the invention at issue here. There, Dr. Gabriel opined that Quake's later-filed patents were obvious.[4] As Stanford explained during the interferences, Dr. Gabriel opined in the *inter partes* review that the disclosure in Quake's specification of using a t-test was "conventional in the art." Appx2593 ¶ 98. One of skill in the art, Dr. Gabriel opined, "would have applied conventional statistical analyses, such as a t-test statistic" to the technique disclosed in Dr. Lo's specification "with a reasonable expectation of success." Appx2584 ¶ 80. The Board in the *inter partes* review agreed with Dr. Gabriel, pointing to Quake's teaching of the "conventional nature of using a t statistic to measure statistical significance in this art," and relying upon Gabriel's "credible testimony as to the suitability of analytical techniques applicable to" Lo's disclosure of using random massively parallel sequencing to detect aneuploidy. Appx2458.

---

[4] The *inter partes* review where Dr. Gabriel presented these opinions was IPR2013-00390, and the patent at issue was U.S. Patent No. 8,195,415. The Board ultimately ruled in favor of Stanford, concluding that none of Quake's claims in this patent were invalid.

### B.    The Board's Final Written Decision

The parties' briefing and arguments during the interference proceedings focused on whether the Quake specification disclosed the individual steps of the claims.  *See, e.g.*, Appx5970 (CUHK argues that "The '018 Patent Fails to Describe the Sequencing, Alignment, or Comparison Steps of Claims 1-4").  The Board, however, never found that the Quake specification failed to disclose any of the individual components of the claims.  If anything, the Board appeared to acknowledge they were all there.  *See* Appx22 ("Though the Quake inventors may have possessed parts of such a method, including massively parallel sequencing, randomly fragmenting DNA, and aligning sequences to genomic sequences….").

According to the Board, the Quake specification "does not preclude targeted massively parallel sequencing."  Appx19.  The detailed disclosure in the specification, the Board stated, "could have been interpreted as either random or targeted sequencing."  Appx19-20.  To invalidate the patent, the Board looked to the other embodiments disclosed in the specification, specifically, the embodiments based on digital PCR.  According to the Board, digital PCR is a targeted approach. Since these embodiments were supposedly the "distinct main focus" of the specification, the sequencing embodiments were in the Board's view regarded as being targeted, despite the fact that the description in the specification referred to "randomly fragmented genomic DNA," "random sequence

information," "identify[ing] a sequence as belonging to a specific human chromosome," and "software methods that can be used to identify a sequence in comparison to the known genome sequence."  *See* Appx8-9, 21.

The Board disregarded this language as "isolated words and references." Appx21.  According to the Board, "[e]ven if the Quake '018 patent includes the correct language, it fails to convey Quake's claimed invention because it is not explained with sufficient detail."  Appx22.  The Board analogized the situation to an attempt to use the word "automobile" to describe a car at the turn of the century, at which time the word "automobile" might not have been understood without a description of a chassis, an engine, seats, wheels on axles, etc.  Appx21.

The Board made this analogy despite undisputed evidence that the components of the invention were, in fact, well-known and conventional to skilled-artisans.  Indeed, CUHK's own expert had described the level of ordinary skill in the art as follows:

> A hypothetical person of ordinary skill in the art relevant to the subject matter of claims 1 through 4 of the '018 Patent would have a multi-disciplinary background.  That person would have at least a bachelor's degree in a life sciences area (e.g., biology, cell biology, genetics, molecular biology) and at least a master's degree or Ph.D. in computational biology, mathematics or statistics, or equivalent training.  ***One of ordinary skill in the art should understand both the operation and application of massively parallel DNA sequencing platforms, and have significant direct experience at performing and applying these techniques.  Further, one of ordinary skill in the art should understand and have experience with techniques for aligning***

*sequence reads generated by massively parallel sequencing to a reference genome*.

Appx1260 ¶ 48.  Stanford's expert agreed with this definition of the skilled artisan.

Appx1291 ¶ 24.  The Board's final written decision never addressed this level of ordinary skill in the art.  Nor did the Board take into consideration how it would have impacted the skilled artisan's understanding of the specification.

## III.    THE § 146 APPEAL IN THE DISTRICT COURT

Stanford appealed the Board's unfavorable ruling to the Northern District of California pursuant to 35 U.S.C. § 146.  In its Answer, CUHK agreed that the District Court had jurisdiction over Stanford's appeal pursuant to § 146.  *See* Dkt. No. 28, Exh. A ¶ 11 ("CUHK admits that this Court has subject matter jurisdiction over federal questions pursuant to 28 U.S.C. § 1331, over civil actions arising under the Patent Act pursuant to 28 U.S.C. § 1338, and pursuant to 35 U.S.C. § 146.").

In the District Court, the parties litigated Stanford's § 146 claims nearly to completion based on their agreement that the District Court had jurisdiction:

- The parties stipulated to a trial date and a case schedule.
- The parties prepared opening expert reports.
- CUHK submitted a rebuttal expert report.
- The parties conducted expert witness depositions.
- The parties submitted summary judgment briefing.
- The Court held a summary judgment hearing.

During the § 146 proceedings, Stanford obtained overwhelming additional evidence establishing that the Patent Office's decision was indeed erroneous.  This

evidence came mostly in the form of admissions from CUHK's technical expert from the Patent Office's interference proceedings, Dr. Stacey Gabriel of the Broad Institute.  It thus has great probative value.

First, CUHK's expert agreed that Dr. Quake's invention lies not in a specific technique for counting DNA molecules (whether it be targeted or random sequencing), but in the recognition that fetal genetic abnormalities can be detected via molecular counting:

> **Q.** Do you believe the '017 and '018 patents as part of the invention is a new way of quantifying nucleic acids?
> **A.** No. I think the invention is applying quantification methods, namely, digital PCR, but other examples are given to a mixed sample to perform aneuploidy detection.
> **Q.** But the digital analysis techniques discussed in the '018 patent are – they're all known and standard, right? There is not any – that's not the part of what's inventive about the claims of the '018 patent?
> **A.** I'd say in general they're well-known, particularly digital PCR is well-known.  There are some other methods in Section 4 like direct linear analysis is one of the things that is more new.  So I wouldn't call that one necessarily that well-known. But I don't think those methods are the invention.
> **Q.** Your understanding from the '018 patent is that the invention is using the established molecular counting techniques for aneuploidy detection, to turn that into a way to detect aneuploidy?
> **A.** Right. Using digital analytic methods in combination with a mixed sample to conduct aneuploidy detection.

Appx14620-21(131:2-132:5).  Dr. Gabriel admitted that this was indeed "highly inventive":

> **Q.**    When you say 'highly inventive,' what are you referring to?
> **A.**    The entire specification as an invention.
> **Q.**    The '018 patent?
> **A.**    Yeah.
> **Q.**    So you're referring to Professor Quake's invention?
> **A.**    Uh-huh.
> **Q.**    You have to answer with a word.
> **A.**    Yes, I am.

Appx14582-83(93:14-94:6).

Consistent with the "highly inventive" nature of the Stanford patents, Dr. Gabriel further agreed that one of ordinary skill in the art would "would be motivated to try different methods of detection" based on what was disclosed in the specification.    Appx14584(95:1-18).    Ultimately, Dr. Gabriel gave focused testimony that effectively negates CUHK's written description argument that the specification does not support a random sequencing approach.    Specifically, Dr. Gabriel agreed that one of ordinary skill in the art would understand from "reading the patent" that *random sequencing* would indeed be used with the invention:

> **Q.**    And a person of ordinary skill in the art reading the patent would understand that in terms of massively parallel sequencing for the invention, you would use either random or targeted?  They would have that understanding, right?
> **A.**    Yes.

Appx14548(59:18-24); *see also* Appx14540-41(51:10-52:3); Appx14548(59:8-17).

This was not the only point-blank testimony to this effect.    CUHK's exclusive licensee, Sequenom, Inc., had its own expert in the district court

litigation who also opined on the written description issue. Sequenom's expert, Dr.

Michael Metzker, echoed Dr. Gabriel's admission:

> **Q.**    A person of ordinary skill in the art in February of 2007 reading this specification you're saying now, given the claim construction order and all the subsequent work that you have done, would understand that sequencing could be used with the claimed inventions, and they would understand that both for targeted sequencing and random sequencing; is that correct?
>
> **A.**    Yes.  Because the person of ordinary skill in the art would understand the operation of massively parallel sequencing, and therefore they would understand that they can do either method with an Illumina sequencer or a Solexa sequencer at that time period.

Appx15350(444:4-18); *see also* Appx15374(468:9-18) ("**Q.** Would a person of

skill in the art with the possession of the '017 patent be able to successfully

perform the method of claim 17 based just on what's disclosed in this specification

using randomly – random sequencing on a massively parallel DNA sequencer?  **A.**

Yeah, I think so.  I think given the general knowledge of Lo, buying a sequencer,

and then doing counting, statistics, and aneuploid, I think a person of ordinary skill

in the art could do that.").   CUHK's expert reviewed Dr. Metzker's testimony

during her deposition in the § 146 proceedings and confirmed that she did not

disagree with it.  *See* Appx14544-45(55:18-56:11).

    As to the analytical steps needed to determine aneuploidy, which appear in

step (d) of claim 1 of Dr. Quake's '018 patent, Dr. Gabriel confirmed that she had

no quibble with the quality of the written description because the comparison step was "described throughout the patent specification":

> **Q.** So the written description issue you have with Step D of Claim 1 relates to the fact that the data comes from Step C, not anything else in Step D, right?
> **A.** Step B and C.
> **Q.** Step B and C, okay. But nothing else in Step D. It's not the comparison in Step D that's the problem, right? Because that's described throughout the patent specification.
> **A.** Yes.

Appx14601(112:9-20).

Dr. Gabriel's testimony further revealed *why* the skilled artisan would understand the Quake specification as describing random sequencing. During the interferences, CUHK argued that the defining feature of targeted sequencing was the pre-selection of specific sequences through amplification prior to sequencing. *See, e.g.*, Appx6592:24-6593:19 ("In targeted sequencing, you take those same two targets, you amplify them up, and then you massively parallel sequence."). This is referred to in the art as a "library preparation" step. *See* Appx6335:6-7 ("Lo admits that whether a sequencing reaction is considered targeted or random is determined by the library preparation that precedes sequencing."); Appx6101:18-20 ("In targeted sequencing, predetermined target sequences are selected prior to sequencing to generate a library of target sequences.").

As to this library preparation step, Dr. Gabriel testified that the "only" approach one would divine from the specification was PCR amplification of the "target" sequences of interest prior to massively parallel sequencing:

> **Q.** Thank you. If you turn to column 19 and 20 again. In terms of the targeted sequencing, one of the things that would be required before the sequencing step would be an amplification step for the sequences of interest?
>
> **A.** Yes.
>
> **Q.** And the – and that's the only targeted sequencing approach that one skilled in the art would be – would know of from the '018 disclosure; is that right?
>
> . . .
>
> **A.** I think so.

Appx14644-45(155:25-156:12). Yet, Dr. Gabriel was unable to identify any actual disclosure of such a protocol in the specification:

> **Q.** Right. But in terms of an enrichment step, or presequencing enrichment step to preferentially target particular sequences, that's not disclosed in the '018 patent as part of massively parallel sequencing, correct?
>
> **A.** Not specifically.
>
> **Q.** When you say "not specifically," what do you mean by that? I mean can you identify anywhere where it's disclosed in that patent? That step?
>
> **A.** No.

Appx14645-46(156:23-157:8). That is, although CUHK argued that the specification described targeted sequencing (*see, e.g.*, Appx6321:26-22:1; Appx6138:29-30), Dr. Gabriel agreed that the library preparation steps that define targeted sequencing are ***not*** actually disclosed anywhere in the Quake specification. As such, the Quake specification could only be describing random sequencing.

-26-

## IV.    THE TRANSFER OF THIS CASE TO THIS COURT

On January 23, 2015, after the parties had completed expert discovery and summary judgment briefing in the § 146 proceedings, the District Court held a summary judgment hearing.    At the summary judgment hearing, Stanford presented the evidence it collected during the § 146 proceedings.    Based upon the hearing, it was clear that the District Court could not affirm the Patent Office given the overwhelming evidence supporting Stanford, including the stark expert admissions.

Two days after the summary judgment hearing, CUHK submitted to the District Court a notice regarding a decision that had issued roughly eight months earlier from the District of Massachusetts: *Biogen IDEC MA, Inc. v. Japanese Found. for Cancer Research, et al.*, No. 13-13061-FDS, 2014 WL 2167677 (D. Mass. May 22, 2014).    Appx14040-42.    Although the Massachusetts court had issued its decision before the § 146 proceedings in this matter had even started, this was the first mention CUHK had made of the *Biogen* decision—indeed it had unequivocally admitted jurisdiction was ***proper*** based on its reading of the jurisdictional statutes.

Apparently concerned about the outcome of the summary judgment hearing, CUHK requested a teleconference with the District Court, suggesting for the first time that the case should be stayed pending appeal of the *Biogen* decision.    The

next business day, the District Court denied the parties' summary judgment motions.   Noting the substantial additional evidence presented by Stanford, the District Court concluded that summary judgment was inappropriate.  Appx14065-69.   Instead of proceeding with the scheduled March trial date, however, the District Court *sua sponte* stayed the case pending appeal of the *Biogen* decision.  Appx14069-70.

On May 7, 2015, this Court affirmed the decision of the Massachusetts' District Court in *Biogen*.  The next day, CUHK requested dismissal with prejudice of Stanford's § 146 action.  Appx14367-69.  Stanford responded that this Court's mandate in *Biogen* had not even issued and district court action was premature.  Roughly six weeks later, the District Court issued an order stating that, if the Federal Circuit declined to rehear the *Biogen* decision, it would transfer the action to this Court pursuant to § 1631, which provides that when a "court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed…."  Appx14399-401.  On August 12, 2015, this Court declined to rehear the *Biogen* case and the District Court transferred this action to this Court shortly thereafter.  *See* Appx88-89.

## SUMMARY OF THE ARGUMENT

The Board's written description analysis was infected with error from the very beginning. The Board's errors began when it failed to analyze written description from the viewpoint of the skilled artisan. The Board—which made no findings as to the level of ordinary skill—ignored detailed evidence that the components of the claimed invention would all have been within the competency of the skilled artisan. Conducting its written description analysis with a watered-down view of what the skilled artisan would have understood at the relevant time, the Board erroneously mandated an unduly high level of detail in the specification.

The specification's detailed disclosure of the claimed random sequencing embodiment should be beyond serious dispute. The Board seemingly recognized this in its final written decision. Nevertheless, the Board transformed the specification's disclosure of random sequencing into a non-random embodiment based on its finding that the "distinct main focus" of the specification was other digital PCR embodiments. This approach is unsupported in law and constituted reversible error.

Even if there were legal support for the Board's approach to written description, the Board's decision was unsupported by substantial evidence. The key factual assumption underlying the Board's analysis—that the digital PCR embodiments would lead one of skill in the art only to understand the disclosure as

relating to targeted sequencing—is proven false by the admissions of CUHK and its exclusive licensee, all of which the Board ignored.

Based on the record presented to the Board during the interferences, this Court should reverse the Board's decision as contrary to law and unsupported by substantial evidence. In no circumstances, however, should this Court affirm the Board. The substantial evidence collected during the § 146 proceedings provides proof positive that the Board's decision was erroneous. Indeed, CUHK's expert squarely admitted that the specification discloses the use of random sequencing as part of the invention:

> **Q.** And a person of ordinary skill in the art reading the patent would understand that in terms of massively parallel sequencing for the invention, you would use either random or targeted? They would have that understanding, right?
> **A.** Yes.

Appx14548(59:18-24). This admission demonstrates beyond peradventure that the Board reached the wrong conclusion. This Court should, at the very least, remand this case to the Board so it may consider whether to reopen the interferences and consider the compelling evidence collected during the § 146 proceedings.

Finally, Stanford believes that this Court's decision in *Biogen* was wrongly decided. As such, the District Court's decision to transfer this case for lack of subject matter jurisdiction was error. If this Court does not reverse the Board, and does not remand for further consideration of the evidence collected during the §

146 proceedings, the Court should correct its decision in *Biogen* and remand to the District Court for a trial pursuant to § 146.

## ARGUMENT

## I.     STANDARD OF REVIEW

"Written description is a question of fact, judged from the perspective of one of ordinary skill in the art as of the relevant filing date." *Falko-Gunter Falkner v. Inglis*, 448 F.3d 1357, 1363 (Fed. Cir. 2006). This Court will set aside actions of the Board if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and will set aside factual findings that are unsupported by substantial evidence. *Id.* In assessing whether a factual finding is supported by substantial evidence, the Court carries out "an examination of the record as a whole, taking into account both the evidence that justifies and detracts from an agency's opinion." *Id.*

## II.     THE BOARD'S WRITTEN DESCRIPTION DECISION SHOULD BE REVERSED

### A.     The Board Committed Legal Error In Its Application Of The Written Description Doctrine

The Board's final written decision includes countless findings and statements that are difficult to square with its conclusion that Quake was not in possession of a random sequencing approach to aneuploidy detection.

The Board found that the "references to massively parallel sequencing in the Quake '018 patent could have been interpreted as either random or targeted

-31-

sequencing," and the Board ostensibly acknowledged that the specification includes "the correct language." Appx19-20, 22. Likewise, throughout its decision, the Board acknowledged substantial expert testimony and admissions confirming that the Quake specification describes the technology applicable to random sequencing. *See, e.g.*, Appx10-11 ¶ 10; Appx12 ¶¶ 15-17; Appx13 ¶¶ 21-23; Appx14 ¶ 30; Appx16 ("Lo argues that Illumina products and the methods taught in Balasubramanian could have been used with either random or targeted sequencing…."); Appx17 ("**Q.** Okay. And the Illumina sequencing platform is useful for both random and targeted sequencing, right? **A.** Yes."). The Board even found that CUHK's expert "acknowledged that the references to massively parallel sequencing in the specification teach random sequencing." Appx17. And, at the conclusion of its opinion, the Board seemingly observed that the inventors were indeed in possession of the key components of the claimed random sequencing method. Appx22 ("Though the Quake inventors may have possessed parts of such a method, including massively parallel sequencing, randomly fragmenting DNA, and aligning sequences to genomic sequences….").

Because, as the Board's decision acknowledges, the specification "could have"—and should have—been interpreted to support random sequencing, and the relevant technical details for random sequencing were indeed taught, it is difficult to see how CUHK could have met its burden of demonstrating that Quake's claims

were invalid for lack of written description. The Board was able to reach such a decision only through a legally erroneous application of the written description doctrine that failed to take into account the level of ordinary skill in the art and that interpreted the specification in a manner contrary to law. These legal errors require reversal.

### a. The Board Failed To View The Specification Through The Lens Of The Skilled Artisan

The Quake specification: (1) calls for "sequencing millions of fragments using attachment of ***randomly fragmented genomic DNA***," (2) explains that only "about 30 bp of ***random sequence information*** are needed to identify a sequence as belonging to a specific human chromosome," and (3) refers to "software methods that can be used to identify a sequence in comparison to the known genome sequence." Appx108(19:59-20:20). This describes random sequencing. The Board, however, discarded these teachings as "isolated words and references." Appx21. According to the Board, even "if the Quake '018 patent includes the correct language, it fails to convey Quake's claimed invention because it is not explained with sufficient detail." Appx22.

The Board's finding that there was insufficient detail in the specification was a direct result of legal error, in particular, the Board's failure to conduct the written description inquiry from the viewpoint of the skilled artisan. It is black letter law that written description must be evaluated from this viewpoint. *See, e.g.*, *Pandrol*

*USA, LP v. Airboss Ry. Prods., Inc.*, 424 F.3d 1161, 1165 (Fed. Cir. 2005) ("The possession test requires assessment from the viewpoint of one of skill in the art."). During the interferences, Stanford emphasized the importance of the level of skill in the art to the written description inquiry. *See, e.g.*, Appx6600(17:8-10) ("I'm going to explain how Lo's definition of a person of ordinary skill in the art makes it clear that the Quake patents are talking about random massively parallel sequencing."); Appx6600-01(17:20-18:21); Appx7608. Yet, the Board ignored this important aspect of the analysis in its final written decision. It made no findings on this key issue.

Because the Board's decision was based on the notion that the specification lacked "sufficient detail," the Board was obligated to make findings as to the level of skill in the art and include them expressly into its decision making. Indeed, the level of skill in the art and the required level of disclosure are inextricably coupled. Where those of skill in the art have an abundance of knowledge, logically fewer words are needed to convey possession of the invention in the written description. *In re Hayes Microcomputer Prods., Inc. Patent Litig.*, 982 F.2d 1527, 1533-34 (Fed. Cir. 1992); *Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858, 866 (Fed. Cir. 1993). In fact, because "the specification is viewed from the perspective of one of skill, in some circumstances, a patentee may rely on information that is 'well-known in the art' for purposes of meeting the written description requirement."

*Boston Sci. Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1366 (Fed. Cir. 2011);

*see also Falko-Gunter Falkner*, 448 F.3d at 1367 ("Recitation of Known Structure

Is Not Required").

Consistent with these principles, any decision that a specification lacks

sufficient detail must be given careful scrutiny because the general rule is that there

is no "length requirement" in the written description inquiry:

> [The defendant] also focuses on the fact that the heart of the claimed invention of the '302 patent is described in only twenty-seven lines. Certainly no length requirement exists for a disclosure to adequately describe an invention. While some inventions require more disclosure, the adequacy of the description of an invention depends on its content in relation to the particular invention, not its length.

*In re Hayes*, 982 F.2d at 1534. "A disclosed embodiment is a disclosed

embodiment, no matter the volume of ink required to adequately describe it."

*Advanced Fiber Techs. Trust v. J&L Fiber Servs.*, 674 F.3d 1365, 1385 (Fed. Cir.

2012). "Indeed, as a general matter, brevity in a patent disclosure should be

applauded, not impugned." *Id.* at 1375. The Patent Office even advises applicants

that the description of the invention "should be as short and specific as is necessary

to describe the invention adequately and accurately." M.P.E.P. § 608.01(a). When

processes are "conventional and generally widely known in the field of the

invention described, and their exact nature or type is not necessary for an

understanding and use of the invention by a person skilled in the art, they should

not be described in detail." *Id.*

The Board ignored these principles. And this legal error was not harmless. The undisputed evidence was that the components of the claimed method—the disclosure of which the Board viewed as insufficiently detailed—were well within the competency of the skilled artisan. Three different experts—including CUHK's expert and CUHK's licensee's expert—acknowledged that the level of skill in the art was such that a person of even ordinary skill in the art would understand the "operation and application" of massively parallel sequencing and who would also "understand and have experience with techniques for aligning sequence reads generated by massively parallel sequencing to a reference genome." Appx1260 ¶ 48 (testimony of CUHK's expert); Appx1010(150:8-152:22) (testimony of CUHK's licensee's expert); Appx1291 ¶ 24 (testimony of Stanford's expert).

Likewise, all experts agreed that the skilled artisan would have training in the computational techniques associated with the analysis of sequence data. CUHK's expert, for instance, opined that the skilled artisan would have "at least a master's degree or Ph.D. in computational biology, mathematics or statistics, or equivalent training." Appx1260 ¶ 48; *see also* Appx1291 ¶ 24 (Stanford's exert opines that the skilled artisan "would understand the operation and application of basic bioinformatics techniques"). Dr. Gabriel further testified that the skilled artisan would have been aware of the specific statistical tests disclosed in the

Quake specification that may be used to analyze massively parallel sequencing data to test for aneuploidy. *See* Appx1954-55(52:7-55:12); Appx1959-60(73:13-74:18).

The extent of the harm from the Board's failure to consider this evidence and make explicit findings as to the level of skill in the art is vividly demonstrated by the analogy that appears in the Board's decision. According to the Board, the disclosure in the Quake specification was akin to attempting to use the word "automobile" to describe a car at the turn of the century. Appx21. At the turn of the century, the Board said, the word "automobile" would have been insufficient without further description of all the parts of an automobile, including a chassis, engine, sets, wheels, axles, etc. *Id.* Here, however, the undisputed testimony demonstrated that massively parallel sequencing technology was well-established in the art, and accordingly the relevant machinery for random sequencing on such a platform was all within the basic competency of the skilled artisan. This case thus presents facts and circumstances that are the ***exact opposite*** of the Board's analogy.

Because the counting techniques used with the claimed invention were so well-known, it would not have made any sense for Quake to include any more

detail beyond what appears in the specification.[5]  Indeed, Quake includes specifics and numerous references to the literature.  The specification includes an 84-line disclosure of random sequencing.  *See* Appx108(19:4-20:20).  This disclosure encompasses a description of three different platforms that all undisputedly support random sequencing.  *See* Appx1956(60:18-22) (Dr. Gabriel confirms that the cited Balasubramanian patent application supports random massively parallel sequencing);  Appx1964-65(92:18-94:2) (Dr. Gabriel confirms that the cited Braslavsky reference describes the Helicos sequencing platform,  which could be used for random sequencing); Appx1957(62:5-10) (Dr. Gabriel confirms that the disclosed Illumina sequencing platform may be used for random sequencing).

Likewise, the specification explains that "[o]nly about 30 bp of random sequence information are needed to identify a sequence as belonging to a specific human chromosome," citing the Yamada reference "for the use of identifying sequences in comparison to a known genome sequence."  Appx108(20:6-9); Appx1965(97:14-17).  As Dr. Gabriel's testimony confirmed, this would have been a clear disclosure of sequence alignment to the skilled artisan.  *See supra* pp. 15-

---

[5] Consistent with this, CUHK never argued that the Quake specification failed to enable random massively parallel sequencing for aneuploidy detection, which further confirms that the Quake specification satisfies the written description requirement.  *See, e.g.*, *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005) (the written description and enablement requirements "usually rise and fall together" and "a recitation of how to make and use the invention across the full breadth of the claim is ordinarily sufficient to demonstrate that the inventor possesses the full scope of the invention, and vice versa").

17. Finally, the specification describes statistical techniques, such as a Student's t-test, which may be used to analyze sequence data to determine the presence of aneuploidy. *See, e.g.*, Appx112['018 patent](28:5-34); Appx1954-55(51:2-55:12); Appx1959-60(73:13-74:18).

Although the Board found that one "could have" interpreted the foregoing as a disclosure of random sequencing, the Board improperly discarded it as "isolated words and references." This was a direct result of the Board's legal error in failing to assess written description from the viewpoint of the skilled artisan.

### b. The Board Erroneously Used The Digital PCR Embodiments To Suppress The Random Sequencing Embodiments

Having failed to view the specification from the viewpoint of the skilled artisan, the Board failed to grasp the import of the specification's references to the Illumina sequencing platform, "random sequence information," and the sequencing of "randomly fragmented DNA." The Board erroneously discarded this disclosure as "isolated words and references," and thus attempted to carry out its written description analysis based on an incomplete and undeveloped view of the specification. Handicapped in this manner, the Board inevitably engaged in an unsupportable and legally erroneous written description analysis.

The Board's erroneous analysis began with its finding that the specification "does not preclude targeted massively parallel sequencing." Appx19. The Board's

decision that Quake's claims were unpatentable hinged on this finding.  The Board's reliance on what the specification "does not preclude," however, was unsupported by any authority.  A disclosure need not "preclude" a particular set of embodiments to adequately describe other embodiments.  So long as the Quake specification could be understood by those of skill in the art to describe random sequencing (the Board seemed to recognize that it could have been), the fact that it supposedly "does not preclude" targeted sequencing is irrelevant.  "It is common, and often permissible, for particular claims to pick out a subset of the full range of described features, omitting others."  *Scriptpro, LLC v. Innovation Assocs., Inc.*, 762 F.3d 1355, 1359 (Fed. Cir. 2014); *see also id.* ("[T]he specification's description of embodiments having sensors for providing information about slot allocations and availability does not necessarily mean that the only described invention is a collating unit with such sensors.").  By rooting its written description analysis in what the specification "does not preclude," the Board erred.

From there, the error continued.  To support its analysis based on what the specification "does not preclude," the Board then pointed to embodiments in the specification that were not even based on sequencing.  In particular, the Board pointed to the embodiments based on digital PCR, which is allegedly a "targeted" approach.  The Board then decided that the entire specification needed to be viewed through the overly narrow lens of the digital PCR method.  According to

the Board, "given the main focus of the Quake '018 patent on diagnosing aneuploidy with digital PCR, those of skill in the art would have understood the discussion of massively parallel sequencing to refer to sequencing targeted, predetermined portions of the DNA in a sample, not sequencing of random DNA." Appx20. Thus, while the specification's description of sequencing explicitly refers to sequencing "*randomly* fragmented genomic DNA" and the generation of "*random* sequence information," the Board recast this plain disclosure of random sequencing as a targeted sequencing disclosure so that it matched the supposed "main focus" of the specification.

No case, however, holds that the written description inquiry involves identifying a "main focus" in the specification and then invalidating all claims that fail to converge to the "main focus." To the contrary, a specification does not fail because it has multiple embodiments. *See Tobinick v. Olmarker*, 753 F.3d 1220, 1226 (Fed. Cir. 2014) (rejecting the argument that "the '205 application does not adequately describe local administration because it mixes local administration techniques with non-local techniques"). Nor does a specification fail because it uses one of those embodiments as a primary example, spending less time on alternative embodiments. *See Falko-Gunter Falkner*, 448 F.3d at 1365-66 (Fed. Cir. 2006) (although the specification provided examples using only a herpes virus, written description requirement still satisfied for poxvirus claim because three

textual passages stated that poxvirus could be used, and one of skill in the art, with the textual description and his or her knowledge, could make the invention). The Board's decision that the digital PCR embodiments could overwhelm and wipe out the random sequencing embodiments was just plain wrong and not in accordance with any law.

Here, the Board never pointed to any language in the specification that requires the sequencing embodiments to be limited to a "targeted" approach. In fact, the specification is clear that the invention is not so limited, expressly stating that it "should be appreciated that methods involving PCR or other amplification are not the only way to detect or enumerate the molecules in a given discrete reaction sample." Appx108(19:5-7). That is, the specification is clear that detection need not involve amplification, which CUHK argued was part of targeted sequencing. *See, e.g.*, Appx6592:24-6593:19.

Where, as here, the specification demonstrates the invention is broader than specifically described embodiments or examples, the written description cannot fail simply because the specification focuses on a particular example. *See, e.g.*, *Lampi Corp. v. Am. Power Prods., Inc.*, 228 F.3d 1365, 1378 (Fed. Cir. 2000). There was thus no legal basis for the Board to decide that Quake's random sequencing claims are unpatentable because the description of those claims co-exists in the specification alongside a digital PCR description. *See Scriptpro*, 762

-42-

F.3d at 1359 ("There is no sufficiently clear language in the specification that limits the invention to a collating unit with the (slot-checking) sensors. And considering what the specification does say… it cannot be said as a matter of law that [the claims] have a scope incommensurate with what is described as the invention.").

## B.    The Board Ignored Key Evidence

The Board stated "given the main focus of the Quake '018 patent on diagnosing aneuploidy with digital PCR, those of skill in the art would have understood the discussion of massively parallel sequencing to refer to sequencing targeted, predetermined portions of the DNA in a sample, not sequencing of random DNA." Appx20. The fundamental rationale of the Board was that all sequencing embodiments disclosed in the specification must be viewed through the lens of digital PCR because digital PCR is the primary example in the specification. Viewed through that distortive lens, the Board concluded that the sequencing disclosure should be treated as though it were directed to targeted sequencing. Putting aside the fact that this methodology is erroneous, it relies on the assumption that random sequencing is so radically different from digital PCR such that one would think *only* of targeted sequencing when confronted with a digital PCR approach.

The Board, however, did not support its surmise with evidence. In fact, the evidence—in the form of admissions by CUHK and its exclusive licensee—demonstrated that such an assumption is without basis. In 2007, shortly after learning of Quake's patent filings, Dennis Lo and researchers filed a provisional patent application directed to the detection of aneuploidy by molecular counting. Like Quake's patent filings, a variety of counting techniques were disclosed, including random DNA sequencing and digital PCR. CUHK's description of the random sequencing approach in its patent filing is telling:

> Here we shall describe another example whereby a variant of digital PCR can be used for the detection of fetal chromosomal aneuploidies, using the example of trisomy 21, in maternal plasma. *The variant of digital PCR is the performance of massively parallel genomic sequencing* using emulsion PCR in a sequencing machine such as the Roche GS20 system (http://www.454.com/about-454/partners.asp) the Applied Biosystems 'supported oligo ligation detection' (SOLiD) and the Illumina Solexa sequencing technology. *The general principle of this strategy is that if one is to do <u>random sequencing</u> of DNA fragments that are present in the plasma of a pregnant woman, then one would obtain genomic sequences which would originally have come from either the fetus or the mother*.

Appx582-83; *see also* Appx5959 (Lo's priority statement, including nearly identical language). Thus, according to CUHK's own patent filing, the "random sequencing" approach is understood to be a "variant" of the digital PCR approach. As the CUHK patent filing describes it, the random sequencing approach follows naturally once one is aware of the digital PCR approach. Notably, the CUHK patent filing does not mention a targeted sequencing approach.

-44-

CUHK's exclusive licensee and real party in interest in the interferences, Sequenom, also disavowed any notion that the digital PCR is aligned with only targeted sequencing. In a "Fact Sheet" disseminated shortly after Quake published a high-profile 2008 article regarding his aneuploidy breakthrough, Sequenom described the "shotgun sequencing" (i.e., random sequencing) method as follows:

> **The sequencing approach is a variant of digital PCR**, which has been already well characterized in a number of experiments and publications. **The ability of Solexa/Illumina (and other next generation sequencing technologies) sequencing to detect aneuploidies in maternal plasma is, therefore, not surprising**, but certainly all research in this field is welcome. Sequenom scientists were pleased to see that the results described in the Quake manuscript support findings from their own experiments. It should be noted that there are some trade-offs between sequencing and digital PCR; sequencing has more sensitivity than a number of non-sequencing variants of digital PCR for aneuploidies, like Trisomy 21, but not for point mutations. This advantage was explicitly anticipated and described in a paper that Dennis Lo, of The Chinese University of Hong Kong, published in PNAS in August 2007(Lo YMD et al (2007) PNAS USA 104: 13116-13121.). Dr. Dennis Lo is an exclusive consultant with Sequenom.

Appx1878. Thus, Sequenom, like CUHK, put the digital PCR and random sequencing approaches to aneuploidy detection in the **same bucket**. Sequenom, like CUHK, did not even mention a targeted sequencing approach. CUHK's expert agreed with the sentiment of Sequenom's Fact Sheet:

> **Q.** So what this paper is saying is that knowing that you can detect aneuploidy using digital PCR is not surprising; that you could do the same thing by random sequencing, right?
>
> …
>
> **A.** That's what it says.

-45-

**Q.**    Okay. And you agree with that, don't you?

**A.**    Yes.

Appx1951(41:11-19).

To be clear, Sequenom and CUHK did not say that a "targeted sequencing" approach was a "variant" of digital PCR. They said that the "shotgun sequencing"/"random sequencing" approach to aneuploidy detection was a variant of the digital PCR approach. These statements were made by CUHK and its licensee no later than 2008—before there was litigation and before they were motivated to attack the written description of Dr. Quake's patents. This is compelling evidence that negates the Board's finding that the Quake patents must be directed to targeted sequencing because they supposedly focus on digital PCR.

As this Court has explained, the "hallmark of written description is disclosure. The standard for satisfying the written description requirement is whether the disclosure allow[s] one skilled in the art to visualize or recognize the identity of the subject matter purportedly described." *Alcon Research Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1190 (Fed. Cir. 2014) (citations omitted). CUHK's and Sequenom's admissions reveal that the random sequencing approach would be directly recognized as a natural variant of a digital PCR approach. This evidence negates the Board's wholly unsupported assumption that digital PCR is aligned only with targeted sequencing. Despite the fact that Stanford brought this evidence

-46-

to the Board's attention (*see, e.g.*, Appx6167-68), the Board ignored it in its final written decision. This error warrants reversal.

### C. The Board Ignored Evidence Proving That The Skilled Artisan Would Not Have Understood The Specification To Refer To Targeted Sequencing To The Exclusion Of Random Sequencing

The Board improperly limited the specification to targeted sequencing—a more complex approach than random sequencing that includes *extra* library preparation steps—to the exclusion of random sequencing. The Board came to this counterintuitive conclusion based, in part, on its finding that the state of the art of targeted sequencing was such that the inventors "could have intended" the specification to refer to targeted sequencing. *See* Appx18-19. The Board's finding as to the state of the art of targeted sequencing, however, was unsupported by substantial evidence. The record established conclusively that the state of the art of targeted sequencing was such that the skilled artisan could only have understood the specification to refer to random sequencing.

The Board began its analysis of this point by noting testimony from Stanford's expert that the Illumina sequencing platform—around which the specification disclosed random sequencing—"would not have been considered for targeted sequencing before 2010." Appx18. Rather than address this compelling evidence, however, the Board turned to testimony from CUHK's expert regarding the Roche 454 sequencing platform, a platform that is *never* mentioned anywhere

in the Quake specification. *Id.* The Board noted testimony from Dr. Gabriel regarding an "information sheet" and two research publications that describe targeted sequencing methods for use with the Roche 454 sequencing platform. *See* Appx18-19 (citing Exh. 1062 ¶¶ 18-20). The Board then found as follows:

> Thus, given that Dr. Gabriel supports her testimony with published references and given that the language of the Quake '018 patent at 19:48-20:3 does not preclude targeted massively parallel sequencing, we credit Dr. Gabriel's testimony that those of skill in the art could have considered the references in the '018 patent specification to Illumina products to indicate targeted sequencing.

Appx19.

The evidence supporting this finding was insubstantial, and the Board abused its discretion. Because all the "published references" relied upon by the Board pertained to the Roche 454 sequencing platform, it was erroneous to conclude from this evidence that the skilled artisan would have understood the specification's references to the ***Illumina*** sequencing platform as describing targeted sequencing. Neither Dr. Gabriel nor the Board cited any evidence to connect targeted sequencing on the Roche 454 system to targeted sequencing on the Illumina system that is disclosed in the Quake specification.

Further, neither Dr. Gabriel nor the Board cited the three Roche 454-oriented references (Exhs. 1010, 1011, and 1072) with any specificity. The Board never explained what it found persuasive about these references. None of the references suggest that the disclosed techniques would be applicable to Illumina, and none

explain the capabilities of the disclosed techniques. One reference (Exh. 1010) is a general review article that does not appear to include any information whatsoever regarding targeting techniques.

While the Roche 454 evidence cited by the Board was irrelevant, overwhelming evidence demonstrates that in 2007 those of skill in the art would *not* have connected the Illumina platform to targeted sequencing. The Illumina sequencing platform came *after* the Roche 454 platform. *See* Appx1244-47 ¶¶ 22-23. As Stanford's expert explained, Illumina represented a technological advance because it generated data on a far more massive scale than the Roche 454 sequencing platform:

> 454 is not too massive. It's – on the scale of things, that's what I was trying to get at earlier, on the scale of things, on the scale of things, the data output of a 454 is like right here (indicating). You know, we're talking inches on a scale of feet. Whereas, an Illumina device is feet on the scale feet. And so is the Helicos.

Appx2016(117:4-12). At the relevant time, researchers believed pre-existing targeting procedures may be applicable to the Roche 454 system due to its "low throughput." *See, e.g.*, Appx2009(87:12-24). These techniques were based on "simple PCR amplification reaction," as stated in the 454 information sheet cited by Dr. Gabriel. Appx5289.

The throughput of the Illumina system, however, presented a different state of affairs. The evidence—which the Board ignored—showed that the pre-existing

"simple PCR" procedures were ***not*** well-suited to the scale of the Illumina platform. For instance, a 2010 article relied upon by Dr. Gabriel explained how PCR amplification was "not practical" as a targeting method for the new class of sequencing instruments:

> The concept of targeting specific regions of the genome is well established, with PCR being the most widely used method, albeit on a small scale. PCR coupled with Sanger sequencing is suitably matched for analysing a handful of candidate genes, but coupling PCR with high-throughput NGS platforms for targeting strategies is not practical, as sample preparation would require handling tens of thousands of primers individually or in large multiplex groups to meet the needs of a single instrument run.

Appx1531; *see also* Appx2416 (83:20-85:4) (Dr. Gabriel agrees with the foregoing). The literature repeatedly confirms this prevailing view. For instance, Dr. Gabriel testified as follows regarding the 2009 Tewhey reference (Exh. 2092):

> **Q.** I want you to look at page 2 of the introduction. It's near the top. Starting at the third line, there's – on the right side there's a sentence that says, "Although traditional PCR enriches target sequences with high specificity and sensitivity, it is difficult to scale the method to match the throughput of current sequencing instruments."
> **A.** Yes.
> **Q.** You agree that that was the case in 2009. Right?
> **A.** Yes.

Appx2417(87:6-16); *see also* Appx2416-17(85:7-86:20) (testimony regarding Ex. 2091, which states that "analogous to how PCR served as an effective front end for resequencing of kilobase-sized targets with capillary electrophoresis, there is a

strong need for flexible targeting methods that are matched to the megabase scale

granularity at which the next generation sequencing instruments operate").

While the Board relied on Dr. Gabriel's testimony regarding the 454 system

to find that the specification's references to Illumina sequencing "could have" been

references to targeted sequencing, the Board failed to mention that Dr. Gabriel *did*

testify regarding the use of targeted sequencing on the Illumina platform.

Tellingly, the only references Dr. Gabriel was able to identify regarding targeted

sequencing on the Illumina platform *post-dated* Quake's filing date.    *See*

Appx4890 ¶ 20 (citing the Porreca and Krishnakumar references).    Neither Dr.

Gabriel nor the Board cited *any evidence* of targeted sequencing on the Illumina

platform prior to Quake's filing date.    No evidence at all.    This is unsurprising,

because even the post-filing literature cited by Dr. Gabriel decries the "crippled"

state of targeting technologies for the new generation of systems, such as the

Illumina system:

> A new generation of technologies is poised to reduce DNA
> sequencing costs by several orders of magnitude. But our ability to
> fully leverage the power of these technologies is *crippled* by the
> absence of suitable 'front-end' methods for isolating complex subsets
> of a mammalian genome at a scale that matches the throughput at
> which these platforms will routinely operate.

Appx5310; *see also* Appx2416(82:7-17) (Dr. Gabriel agrees with the foregoing);

Appx2008 (85:6-9) (Stanford's expert testifies that "[t]o my knowledge, there were

no kits available in 2006 and 2007 for targeted sequencing using massive parallel

sequencing devices."); Appx2009(89:18-25) (Stanford's expert testifies that in the 2006 time frame "using targeted primers and massive parallel sequencing devices was very much in the research mode, not even in the development mode").

As documented above, there was not substantial evidence to support the Board's finding that the specification "could have" been referring to targeted sequencing because targeted sequencing was being done on the Roche 454 system. The Roche 454 system is not mentioned in the Quake specification, and those of skill in the art knew that targeted sequencing on the Illumina platform—which actually *is* mentioned in the specification—presented different challenges. Because, as Stanford's expert explained, targeted sequencing was not being done on the Illumina platform when Quake filed for his patent, those of skill in the art could not possibly have believed the inventors were describing targeted sequencing. Indeed, they never would have referred to sequencing of "*randomly* fragmented genomic DNA" or "*random* sequence information" if this is what was intended.

## III.   THE COURT SHOULD AT LEAST REMAND TO THE PATENT OFFICE FOR CONSIDERATION OF THE EVIDENCE COLLECTED DURING THE § 146 PROCEEDINGS

As documented above, the evidence presented during the interference proceedings demonstrated that the Quake specification described random sequencing. The Board's decision should be reversed based on this record alone.

In no circumstances, however, should the Board's decision be affirmed.  At the very least, this Court should remand to the Board so that the interference proceedings may be reopened for consideration of the valuable evidence developed by the parties during the § 146 proceedings.

The evidence developed by the parties sheds remarkable light on the issues and demonstrates that the Board's decision was wrong because it is inconsistent with the opinions of CUHK's own expert.  *See supra* pp. 21-26.  It is most enlightening.  While CUHK's interference theory was to try to exploit a dichotomy between random and targeted sequencing, CUHK's expert confirmed that this was the wrong way to look at Quake's invention.  To wit, Dr. Gabriel agreed that Quake's invention was, in fact, the broader concept of using molecular counting as a way of detecting aneuploidy without separating fetal DNA from maternal DNA. *See* Appx14620-21(131:2-132:5).  She confirmed that this was "highly inventive" and "an impressive and surprising finding."  *See* Appx1952(44:6-19); Appx14582-83(93:14-94:6).  She further testified that those of skill in the art "reading the patent" would understand the Quake specification to describe random sequencing:

> **Q.** And a person of ordinary skill in the art reading the patent would understand that in terms of massively parallel sequencing for the invention, you would use either random or targeted? They would have that understanding, right?
> **A.** Yes.

-53-

Appx14548(59:18-24).  CUHK's exclusive licensee's expert gave nearly identical testimony, which CUHK's expert confirmed she did not disagree with.  *See* Appx14544-45(55:18-56:11).  At the same time, Dr. Gabriel was unable to identify any teaching in the Stanford IP of the library preparation steps that are the defining feature of targeted sequencing.  *See* Appx14645-46(156:23-157:8).

The circumstances here are extraordinary and unique.  Against the backdrop of the specification's clear disclosure of random sequencing, the Board issued an equivocal and awkward decision.  Subsequently, the parties' litigated Stanford's appeal of this decision nearly to completion—without jurisdictional complaint from CUHK.  Under color of law, the parties collected evidence confirming that the Board's decision was erroneous.  Yet, at the last possible moment, Stanford's appeal pursuant to § 146 evaporated given this Court's decision in *Biogen*, and Stanford was not permitted to finalize the appeal that would have corrected the Board's errors.  CUHK has since resorted to motion practice to try and suppress the evidence that was generated during the § 146 proceedings.  *See* Dkt. No. 27-1.  It would, however, be wasteful and work an extreme injustice if this were permitted.  This Court should thus remand for consideration of the evidence collected during the § 146 proceedings.

Because this Court has jurisdiction over this case, only this Court can consider such a request at this point in time.  By statute, this Court has broad

remand powers, and may shape the form of relief on remand. Any "court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances." 28 U.S.C. § 2106. "There is no dispute that an appellate court generally possesses, as an inherent power, discretion with respect to the scope and type of the relief which it may grant and may make any proper disposition required." *Application of Fischer*, 360 F.2d 230, 231 (C.C.P.A. 1966).

Thus, where, as here, there have been developments that warrant remand to the PTAB for further consideration, this Court has the power to remand. *See id.* at 231-33 (remanding an *ex parte* appeal to the Patent Office for further interference proceedings, and holding that it "would seem wholly inconsistent with normal judicial practice to condition the right to remand an appeal upon a formal request being sent by the Patent Office to this court"). In briefing on its motion for clarification before this Court, CUHK distinguished *Fischer* solely on the basis of it having been decided prior to amendments to 35 U.S.C. § 144. *See* Dkt. No. 29 at 3-4. This, however, has no bearing on *Fischer's* holding that this Court may remand this matter to the Board for further consideration without any request from the Board.

It is undisputed that once jurisdiction has returned to the Board, it has the authority to consider a motion to reopen the interference. "The Board may determine a proper course of conduct in a proceeding for any situation not specifically covered by this part and may enter non-final orders to administer the proceeding." 37 C.F.R. § 41.104(a). Pursuant to this regulation, the PTAB "has authority to entertain a request to reopen an interference after judgment is entered." *Schwartz v. Sawhney*, Patent Interference No. 105,317, 2006 WL 1621782, at *2 (B.P.A.I. Feb. 8, 2006). The Board "will exercise its discretion, under the facts of each case, to determine whether reopening an interference after judgment is appropriate."[6] *Id.* at *3.

Here, numerous considerations align in favor of remand for this purpose. The extensive evidence developed during the § 146 proceedings—which proceeded without jurisdictional dispute until just before trial—sheds much light on which party is correct. Stanford, however, was unable to present this evidence at trial due to this Court's decision in *Biogen*, which fundamentally changed the

---

[6] In briefing on its motion for clarification, CUHK contended that *Schwartz* precludes a party from seeking to reopen an interference if it has sought judicial review. *See* Dkt. No. 29 at 4. A review of *Schwartz*, however, reveals that the Board was merely stating that it cannot grant a motion to reopen an interference if it lacks jurisdiction. *See Schwartz*, 2006 WL 1621782 at *2 n.4-5. So long as there is no jurisdictional barrier, *Schwartz* makes clear that the Board may exercise its discretion to reopen an interference. Here, there is no jurisdictional concern because Stanford is requesting ***remand*** to the Board, either with instructions for the interferences to be reopened or so that the Board may consider a motion to reopen the interference.

jurisdictional rules regarding appeals of interference decisions mid-stream. Neither CUHK nor Stanford has identified a case where there has been a comparable scenario. Likewise, the instant situation is unlikely to ever be repeated because, if *Biogen* is upheld, there will no longer be § 146 appeals of interference decisions. This demonstrates just how extraordinary and unique the circumstances are here. Affirming the PTAB's judgment without consideration of the evidence developed during the § 146 proceedings would work an injustice to the system by maintaining an erroneous judgment and by failing to address the extraordinary circumstances currently before the Court.

At the same time, CUHK cannot identify any prejudice if this Court remands for consideration of the evidence collected during the § 146 proceedings. CUHK cannot argue that it there is an interest in repose, because CUHK never had any expectation that the Board's decision would not be appealed pursuant to § 146 and that the record would not be further developed. As documented above, CUHK agreed from the outset that the District Court had jurisdiction, and it then litigated Stanford's § 146 claims nearly to completion. The parties developed evidence during the § 146 proceedings under color of law. It was not until it became clear that CUHK might not prevail in the § 146 proceedings that CUHK finally raised a jurisdictional question.

If this Court will not remand with instructions for the Board to reopen the interferences, this Court should, at a minimum, remand so that the Board can consider a request by Stanford to reopen the interferences.  Indeed, the decisions of this Court and "of other courts have recognized the appropriateness of a remand to an administrative agency when new and material evidence is presented to the reviewing court and the agency requests a remand for further consideration." *Home Prods. Int'l, Inc. v. United States*, 633 F.3d 1369, 1377-78 (Fed. Cir. 2011). Consistent with this rule from the administrative law context, Federal Rule of Civil Procedure 62.1 provides that when an appeal is pending and the district court lacks jurisdiction to hear a motion, a party may nonetheless seek an indicative ruling from the district court as to whether the district court might grant the motion.  If the district court states "either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue," the Court may remand the motion.  Fed. R. Civ. P. 62.1.  This Court's law and the Federal Rules thus make clear that the Board should at least be given its own opportunity to consider the evidence collected during the § 146 proceedings.

While the unique circumstances here justify a remand if this Court will not reverse the Board, there is no good reason to refuse a remand.

## IV.    THE DISTRICT COURT'S TRANSFER FOR LACK OF SUBJECT MATTER JURISDICTION WAS ERRONEOUS

In *Biogen*, this Court held that the AIA abolished the right of parties to bring civil actions in federal district courts under 35 U.S.C. § 146 for review of Board decisions in interferences declared on or after September 16, 2012.  *See Biogen*, 785 F.3d at 653-54.  In view of *Biogen*, the District Court concluded that it lacked subject matter jurisdiction and transferred this matter to this Court pursuant to 28 U.S.C. § 1631.  *See* Appx88-89.

Stanford respectfully submits that *Biogen* was wrongly decided, and that the District Court's decision transfer was erroneous.   District court review of interference decisions has been available for more than 150 years.  *See Troy v. Samson Mfg. Corp.*, 758 F.3d 1322, 1327 (Fed. Cir. 2014) ("Section 146 and its predecessor statutes date back to the Patent Act of 1836.").  Such review continues to be available under the AIA for the new derivation proceedings.  There was no reason to think that Congress intended to abolish this longstanding avenue for judicial review for pre-AIA patents.

As Stanford explained to the District Court, this Court's holding in *Biogen* that the AIA eliminated § 146 review was based on an incorrect reading of § 3 of the AIA.  *See* Appx14077-80.  Section 3 of the AIA set forth the amendments to implement the first-to-apply system, including the amendment of § 146 to change it from authorizing district court review of an interference to a derivation

proceeding, as noted above.  Subsection 3(n)(1) governs how the AIA amendments in § 3 phase-in.  It provides that the amendments "shall apply to any application for patent, and to any patent issuing thereon" that has a claim to an invention that "has an effective filing date as defined in Section 100(i) of title 35, United States Code, that is on or after the effective date [of the first-to-apply provisions]."  Leahy-Smith America Invents Act, Pub. L. No. 112-29 § 3(n)(1)(A) (125 Stat. 293) (2011). This is logical. The amendments to § 146 to change it from an interference statute to a derivation statute apply only to claims that are part of the new first-to-apply regime.  The analysis is that simple.

In holding that the AIA eliminated § 146 review of interference decisions, this Court relied on (1) silence and (2) a negative inference derived from its combined reading of § 6(f)(3)(C) of the AIA and § 1(k)(3) of the Technical Corrections Act ("TCA").  *See, e.g.*, *Biogen*, 785 F.3d at 655-56, 658.  This Court, however, should not have eliminated district court jurisdiction over § 146 actions on this basis.  "There is a strong presumption against implied repeals of federal statutes, and this presumption is perhaps an even stronger one when the repeal is a grant of jurisdiction to the federal courts."  *United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 9 (1st Cir. 2005) (citations omitted).  Only "a clear and explicit withdrawal of jurisdiction withdraws jurisdiction."  *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 468 (2007) (emphasis omitted).

Further, this Court's identification of a negative inference based on its combined reading of § 6(f)(3)(C) of the AIA and § 1(k)(3) of the TCA was illogical.   TCA § 1(k)(3) addressed a specific issue related only to § 141 proceedings, not § 146 proceedings.  Historically, § 141 provided for direct Federal Circuit review of interferences as an alternative to § 146 district court review.  The AIA created a technical problem because Federal Circuit review of interferences under § 141 had been inadvertently called into question.  Section 7(c) of the AIA, which amended § 141, failed to include interferences in the list of proceedings subject to Federal Circuit review.  These amendments took effect on September 16, 2012, and, unlike the amendments made by § 3, the § 7 amendments apply to all patents and patent applications regardless of whether they contain claims with effective filing dates before March 16, 2013.   Because the AIA inadvertently eliminated § 141 Federal Circuit review of interferences as of September 16, 2012, the TCA was necessary to restore it.  There was no corresponding need for § 146 review to be restored because it was preserved by § 3(n).  There is nothing missing in the TCA that would deprive this Court of jurisdiction.

This Court's decision in *Biogen* was incorrect, and the District Court should not have transferred this matter for lack of subject matter jurisdiction.

## <u>CONCLUSION</u>

For the foregoing reasons, the Board's decision should be reversed. Alternatively, this case should either be remanded to the Board for reopening of the interferences or remanded to the District Court for further proceedings pursuant to § 146.


Dated:  January 11, 2016              Respectfully submitted,

By:  /s/ *Edward R. Reines*

        Edward R. Reines
        WEIL, GOTSHAL & MANGES LLP
        201 Redwood Shores Parkway
        Redwood Shores, CA  94065
        (650) 802-3000

        *Attorneys for Plaintiff-Appellant*
        The Board of Trustees of the
        Leland Stanford Junior University

# <u>CERTIFICATE OF INTEREST</u>

*The Board of Trustees of the Leland Stanford Junior University*
*v. The Chinese University of Hong Kong*
No. 15-2011

Counsel for Plaintiff-Appellant The Board of Trustees of the Leland Stanford Junior University ("Stanford") certifies as follows:

**1. The full name of every party or amicus represented by us is:**

The Board of Trustees of the Leland Stanford Junior University

**2. The name of the real parties in interest represented by us are:**

The Board of Trustees of the Leland Stanford Junior University

**3. All parent corporations and any public companies that own 10 percent or more of the stock of the party represented by us are:**

None

**4. The names of all law firms and the partners or associates that appeared for the parties now represented by us in the trial court or are expected to appear in this court are:**

Weil Gotshal & Manges LLP: Edward R. Reines, Derek C. Walter, Aaron Y. Huang, Michele A. Gauger, Anant N. Pradhan

Rothwell Figg Ernst & Manbeck, PC: R. Danny Huntington, Sharon E. Crane

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B).  This brief contains 13,879 words as calculated by the "Word Count" feature of Microsoft Word 2010, the word processing program used to create it.

The undersigned further certifies that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6).  This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14 point font.

Dated: January 11, 2016                  /s/ Edward R. Reines

Edward R. Reines
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065
(650) 802-3000

*Counsel for Plaintiff-Appellant*
The Board of Trustees of the
Leland Stanford Junior University

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 11, 2016, I filed or caused to be filed copies

of the foregoing with the Clerk of the United States Court of Appeals for the

Federal Circuit via the CM/ECF system and served or caused to be served a copy

on all counsel of record by the CM/ECF system.


Dated:  January 11, 2016                  _/s/ Edward R. Reines_

                                          Edward R. Reines
                                          WEIL, GOTSHAL & MANGES LLP
                                          201 Redwood Shores Parkway
                                          Redwood Shores, CA  94065
                                          (650) 802-3000

                                          *Attorneys for Plaintiff-Appellant*
                                          The Board of Trustees of the
                                          Leland Stanford Junior University

# ADDENDUM

# TABLE OF CONTENTS

| Tab # | Description | Bates Range |
|:---:|:---|:---:|
| 1 | Decision on Motion, Pat. Interference No. 105,920, Paper No. 258, dated Apr. 7, 2014 | Appx1-24 |
| | Judgment, Pat. Interference No. 105,920, Paper No. 259, dated Apr. 7, 2014 | Appx25-27 |
| | Decision on Motion, Pat. Interference No. 105,923, Paper No. 232, dated Apr. 7, 2014 | Appx28-53 |
| | Judgment, Pat. Interference No. 105,923, Paper No. 233, dated Apr. 7, 2014 | Appx54-56 |
| | Decision on Motion, Pat. Interference No. 105,924, Paper No. 230, dated Apr. 7, 2014 | Appx57-82 |
| | Judgment, Pat. Interference No. 105,924, Paper No. 231, dated Apr. 7, 2014 | Appx83-85 |
| | Order Regarding Status of *Biogen* Case, Case No. 3:12-cv-00865-SI, dated June 25, 2015 | Appx86-87 |
| | Order Transferring Case to Federal Circuit, Case No. 3:12-cv-00865-SI, dated Aug. 27, 2015 | Appx88-89 |
| 2 | Quake *et al.*, U.S. Patent No. 8,008,018 B2, dated Aug. 30, 2011 | Appx90-115 |

# TAB 1:
# ORDERS ON APPEAL

BoxInterference@uspto.gov
571.272.4683                                        Filed : April 7, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

STEPHEN **QUAKE** and HEI-MUN CHRISTINA FAN
Junior Party
(Patent 8,008,018),

v.

YUK-MING DENNIS **LO**, ROSSA WAI KWUN CHIU, and
KWAN CHEE CHAN
Senior Party
(Application 13/070,275).

———————

Patent Interference No. 105,920 (DK)
(Technology Center 1600)

———————

**Decision on Motion**

**Bd. R. 125(a)**

*Before*, FRED E. McKELVEY, RICHARD E. SCHAFER, and DEBORAH
KATZ, *Administrative Patent Judges*.

KATZ, *Administrative Patent Judge*.

I. *Statement of the Case*

The interference is before a motions panel for consideration of the pending non-priority motions. An oral argument was held on 25 February 2014. (Transcript, Paper 256.)

Yuk-Ming Dennis Lo, Rossa Wai Kwun Chiu, and Kwan Chee Chan ("Lo") present Motion 1, arguing that the claims presented by Stephen Quake and Hei-Mun Christina Fan ("Quake") lack written description and enabling support under 35 U.S.C. § 112, first paragraph.[1]  (Paper 54.)  We grant Lo Motion 1.  Lo also presents Motion 4 to exclude certain Quake evidence.  (Paper 84.)

Quake presents Motion 1, arguing that it should have been accorded an earlier construction reduction to practice (*i.e.*, benefit for the purposes of priority) based on applications 11/701,686 and 60/764,420.  (Paper 69).  Because Lo Motion 1 presents a threshold issue, which upon our grant terminates the interference, we do not reach Quake Motion 1.  (*See* Bd. R. 41.201(defining a threshold issues as one that, if resolved in favor of the movant, would deprive the opponent of standing in the interference and that includes unpatentability for lack of written description under the first paragraph of 35 U.S.C. § 112 of an involved application claim made after publication of the movant's application, where the applicant suggested, or could have suggested, an interference under Bd. R. 202(a), as a threshold issue.)

II. *The Parties*

   a.  Quake

---

[1] Patent interferences continue under the relevant statutes in effect on 15 March 2013.  Pub. L. 112-29, § 3(n), 125 Stat. 284, 293 (2011).

Quake is involved based on patent 8,008,018 ("the '018 patent"), which issued 30 August 2011 from application 12/393,808, filed 26 February 2009. Although Quake was accorded the benefit of application 11,701,686 for the purposes of priority (*see* Paper 1), upon redeclaration (*see* Paper 43) this benefit was revoked because Lo had presented evidence in its Rule 202(d) showing that, if unrebutted, would have proved Lo is entitled to the earliest constructive reduction to practice. (*See* Decision on Request for Reconsideration, Paper 42.)

Quake represents that its involved application is assigned to The Board of Trustees of the Leland Stanford Junior University. (Paper 6.) Fluidigm Corporation and Verinata Health, Inc, a wholly owned subsidiary of Illumina, Inc., are identified as licensees. (*Id.*) Quake also represents that the United States government has certain rights to the patent. (*Id.*)

Quake relies on the testimony of J. Chris Detter, Ph.D. (*See* Declaration of John Christopher Detter, Ph.D. ("Detter Decl."), Exh. 2049.) Dr. Detter testifies that he has a Ph.D. in molecular genetics and microbiology and that he has held several positions leading genomic sequencing and computational biology groups. (*Id.*, at ¶¶ 2-5.) Dr. Detter testifies that he is currently the Genome Sciences Center Director and Group Leader (B-6) and the Acting Bioscience Deputy Divisional Leader, responsible for programmatic, strategic, and tactical mission areas for bioscience at Los Alamos National Laboratory. (*Id.* at ¶ 6.) Dr. Detter's curriculum vitae shows that he has contributed to numerous research papers regarding genome sequencing of various organisms. (Curriculum Vitae, Exh. 2051; *see* Detter Decl., Exh. 2049, ¶ 8.) In light of his testimony, Dr. Detter is qualified to testify as an expert about the subject matter of this interference.

    a. Lo

-3-

Lo is involved based on patent application 13/070,275 ("the '275 application"). Lo was accorded the benefit for the purposes of priority of application 12/614,350, filed 6 November 2009, and application 12/178,181, filed 23 July 2008. (*See* Declaration, Paper 1, and Redeclaration, Paper 43.)

Lo represents that application 13/070,275 is assigned to The Chinese University of Hong Kong and that Sequenom, Inc. is a licensee. (Paper 9.)

Lo relies on the testimony of Stacey Bolk Gabriel, Ph.D. (*See* Declaration of Stacey Bolk Gabriel, Ph.D. ("Gabriel Decl."), Exh. 1021.) Dr. Gabriel testifies that she received a Ph.D. degree in genetics in 1998. (*Id.*, ¶ 1.) She testifies further that she has held several positions related to mapping and sequencing the human genomes. (*Id.*, ¶¶ 3-9.) Dr. Gabriel testifies that she is currently the Director of the Genomics Platform of the Broad Institute, which, according to Dr. Gabriel, is the largest genome center in the United States. (*Id.* at ¶ 10.) Dr. Gabriel testifies that she has served on several editorial and advisory boards related to genomic research and that she has authored over 100 peer-reviewed publications involving the application of sequencing technology to the study of human disease. (*Id.* at ¶¶ 12-13.) In light of her testimony, Dr. Gabriel is qualified to testify as an expert about the subject matter of this interference.

c. Related Proceedings

The involved Lo application 13/070,275 is related to applications and patents in concurrent Interferences 105, 922, 105,923, and 105,924.[2] The Quake

---

[2] Interference 105,922 involves Lo application 13/070,266 and Fan patent 8,195,415. Interference 105,923 involves Lo applications 12/178,181, 13/070,240, 12/614,350, and 13/070,251 and Quake application 12/393,833. Interference 105,924 involves Lo application 13/417,119 and Quake application 12/393,833.

-4-

'018 patent involved in this interference shares the same parent application as the Quake application involved in Interferences 105,923 and 105,924. The Quake (referred to as "Fan") patent involved in Interference 105,922 is not in the same direct lineage as the involved Quake '018 patent, but has the same real party-in-interest. The Lo application in this and the related interferences are in the same lineage and are related as continuations or continuations-in-part. As in the current interference, the counts of these concurrent interferences are drawn to methods of detecting chromosomal abnormalities.

Some of the issues to be decided in *Inter Partes* Review 2013-00390 may be related to this interference. Review was instituted in that proceeding following a petition filed by Sequenom, Inc. questioning the patentability of the claims of Fan patent 8,195,415 over the publication of Lo application 12/178,181 (U.S. Patent Application Publication 2009/0029377), which is a parent of the Lo application involved in this interference. A final decision has not been entered in the IPR.

III. *The Subject Matter*

The parties claim methods of testing for an abnormal number of chromosomes in a person's cells, a condition called "aneuploidy." The claimed methods can be used to test for conditions, such as Down Syndrome in which there are three copies of chromosome 21 instead of the normal two copies. In the past, these chromosomal abnormalities were diagnosed with invasive procedures such as amniocentesis or chorionic villus sampling. The parties' claims are drawn to methods that allow for the diagnosis of aneuploidies with a simple blood test.

In general, the methods include the determination of a ratio between the number of different chromosomes in the blood sample without distinguishing between the chromosomes of the mother and fetus. The ratio of the number of

-5-

chromosomes suspected of being aneuploid to the number of chromosomes not likely to be aneuploid indicates whether there is an extra or missing chromosome. To count chromosomes, fragments of DNA present in the blood sample are identified as representing specific chromosomes. This method requires sequencing of many, many such DNA fragments to make a statistically significant determination of aneuploidy. The parties' dispute in this interference is about the method of identifying these fragments as representing specific chromosomes.

### IV. Lo Motion 1

Lo argues that the specification of the involved Quake '018 patent does not support at least step b of Quake claim 1, "conducting massively parallel DNA sequencing of DNA fragments randomly selected from the mixture of fetal and maternal genomic DNA . . . to determine the sequence of said DNA fragments . . ." (Quake Clean Copy of Claims, Paper 7), and thus does not comply with the written description requirement of 35 U.S.C. § 112. (Lo Motion 1, Paper 54, at 1:1-3 and 5:20-23.)

Under 35 U.S.C. § 112 the

> specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same . . . .

The test for sufficiency of the written description is "whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharm., Inc., v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010). While claimed subject matter need not be described with the exact words used to claim it,

-6-

"[e]ven if a claim is supported by the specification [with the exact words], the language of the specification, to the extent possible, must describe the claimed invention so that one skilled in the art can recognize what is claimed." *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 968 (Fed. Cir. 2002).

A written description that includes words, structures, figures, diagrams, formulas, etc. fully setting forth the claimed invention can provide sufficient description to meet the requirements of the statute, but a description that merely renders the claimed invention obvious does not. *See Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997). This inquiry is a question of fact, wherein "the level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *Ariad*, 598 F.3d at 1351. To prevail, Lo must provide sufficient evidence to persuade us that the Quake '018 patent is so lacking of written description that one of skill in the art at the time would not have recognized the invention Quake claims.

*Findings of Fact*

The findings of fact below, as well as others in this opinion, are supported by a preponderance of the evidence.

1. Quake claim 1 recites:

> A method for determining presence or absence of fetal aneuploidy in a maternal tissue sample comprising fetal and maternal genomic DNA, wherein the method comprises:
> a. obtaining a mixture of fetal and maternal genomic DNA from said maternal tissue sample;
> b. <u>conducting massively parallel DNA sequencing of DNA fragments randomly selected from the mixture of fetal and maternal genomic DNA of step a) to determine the sequence of said DNA fragments;</u>

-7-

> c. identifying chromosomes to which the sequences obtained in step b) belong;
>
> d. using the data of step c) to compare an amount of at least one first chromosome in said mixture of maternal and fetal genomic DNA to an amount of at least one second chromosome in said mixture of maternal and fetal genomic DNA, wherein said at least one first chromosome is presumed to be euploid in the fetus, wherein said at least one second chromosome is suspected to be aneuploid in the fetus, thereby determining the presence or absence of said fetal aneuploidy.

(Quake Clean Copy of Claims, Paper 7 (emphasis added).)

2.      The parties agree that the broadest reasonable interpretation of the sequencing step of claim 1 of the Quake '018 patent is random massively parallel sequencing.  (Lo Motion 1, Paper 54, at 5:23-6:16, and Material Fact ("MF") 2; Quake response to MF 2.)

3.      Lo's witness, Dr. Gabriel, testifies that the specification of the Quake '018 patent is directed to the use of "digital analysis" or "digital PCR" to detect fetal aneuploidy in which a known target DNA sequence in a reaction well must be amplified by target-specific primers.  (Gabriel Decl., Exh. 1021, at ¶¶ 28 and 35, citing Quake '018 patent, Exh. 1022, at 12:31-13:62.)

4.      Quake's witness, Dr. Detter, testifies that the Quake 'specification contemplates detecting DNA sequences by sequencing in the passage: "Also while detection may be conveniently be [sic] carried out by a sequence specific primer, detection may also be carried out by directly sequencing a region of interest to determine if it is the target sequence of interest."  (Detter Decl., Exh. 2049, ¶ 93, quoting Quake application 11/701,686, which became the '018 patent, Exh. 2004, at ¶ 0061.)

5.      Two paragraphs of the Quake '018 patent state:

-8-

[1] The genomic DNA from the tissue taken from the mother, i.e. the mixture of fetal and maternal genetic material, may be distributed into discrete samples which are anchored to a surface and sequenced or monitored by labeled probes to detect a target specific sequence, e.g., a unique region of chromosome 21, e.g., AML1. [2] Further guidance for the preparation of chromosome 21-unique sequences may be found, for example, in Fuscoe et al., "An Efficient Method for Selecting Unique-Sequence Clones from DNA Libraries and Its Application To Fluorescent Staining of Human Chromosome 21 Using in Situ Hybridization," *Genomics*, vol. 5, 1989, pp. 100-109. [3] A methodology useful in the present invention platform is based on massively parallel sequencing of millions of fragments using attachment of randomly fragmented genomic DNA to a planar, optically transparent surface and solid phase amplification to create a high density sequencing flow cell with millions of clusters, each containing ~1,000 copies of template per sq. cm. [4] These templates are sequenced using four-color DNA sequencing-by-synthesis technology.  See, products offered by Illumina, Inc., San Diego Calif. Also, see US 2003/0022207 to Balasubramanian, et al., published Jan. 30, 2003, entitled "Arrayed polynucleotides and their use in genome analysis."

[5] Sequencing may be combined with amplification-based methods in a microfluidic chip having reaction chambers for both PCR and microscopic template-based sequencing. [6] Only about 30 bp of random sequence information are needed to identify a sequence as belonging to a specific human chromosome. [7] Longer sequences can uniquely identify more particular targets. [8] An algorithm for designing unique sequences is described in Yamada, et al. "PrimerStation: a highly specific multiplex genomic PCR primer design server for the human genome," *Nucleic Acids Res.,* Jul. 1, 2006; 34(Web Server issue): W665-W669, illustrative of software methods that can be used to identify a sequence in comparison to the known genome sequence. [9] See, also Zhu et al., "Single molecule profiling of alternative pre-mRNA splicing," *Science.* 2003 Aug. 8; 301(5634):836-838, describing a single-molecule-based technology for studying mRNA.

-9-

(Quake '018 patent, Exh. 1022, at 19:48-20:20 (bolded sentence numbers added).)

6.      Lo's witness, Dr. Gabriel, testifies that one of ordinary skill in the art would have interpreted sentence **[1]** in the parargraph at 19:48-20:3 of the Quake '018 patent to mean that a target-specific sequence can be detected either by sequencing or by monitoring with known labeled probes.  (Gabriel Decl., Exh. 1021, ¶ 63.)

7.      Dr. Gabriel testifies that the reference to Fuscoe (Exh. 1014) in sentence **[2]** in the paragraph at 19:48-20:3 of the Quake '018 patent teaches using chromosome 21-unique probes for fluorescent in situ hybridization to identify sequences, not using sequencing to identify them.  (Gabriel Decl., Exh. 1021, ¶ 64.)

8.      Quake's witness, Dr. Detter testifies that a person of ordinary skill in the art would have understood sentence **[1]** in the paragraph at 19:48-20:4 of the Quake '018 patent to be directed to two different embodiments, wherein either (1) a sample is anchored to a surface and then sequenced (which, according to Dr. Detter, is the Illumina platform) for identification, or (2) a sample is monitored with labeled probes after PCR amplification for identification.  (Detter Decl., Exh. 2049, ¶¶ 121 and 123.)

9.      Dr. Detter testifies that sentence **[3]** in the paragraph at 19:48-20:3 of the Quake '018 patent refers to massively parallel sequencing.  (Detter Decl., Exh. 2049, ¶ 87.)

10.      Lo's witness, Dr. Gabriel, testifies that while sentences **[3]** and **[4]** in the paragraph at 19:48-20:3 of the Quake '018 patent discuss massively parallel sequencing and refer to "products offered by Illumina, Inc.," Illumina sequencing

-10-

could have been either targeted or random, depending on whether the DNA fragments had been identified or targeted before sequencing or not. (Gabriel Decl., Exh. 1021, ¶ 66.)

11.     Dr. Gabriel testifies that given the focus of the '018 patent specification on targeted sequencing, a reference to products of Illumina would not have suggested to one of skill in the art that the inventors intended random sequencing. (Gabriel Decl., Exh. 1021, at ¶ 66.)

12.     Quake's witness, Dr. Detter, testifies that a massively parallel sequencing system, such as an Illumina system, uses sequencing instead of target-specific primers. (Detter Decl., Exh. 2049, ¶ 129.)

13.     Dr. Detter testifies that one of skill in the art would not have used sequence-specific primers with the Illumina platform because such primers would have defeated the purpose of the Illumina platform by providing sequence for only a fraction of the fragments presented to be sequenced and, thus, would have wasted the space and resources devoted to an Illumina system. (Detter Decl., Exh. 2049, ¶ 147.)

14.     Dr. Detter testifies that he is not aware of anyone having ever taken or suggested an approach using specific primers in an Illumina system and that he has has not heard of an Illumina system being configured to use one's own primers. (Detter Decl., Exh. 2049, ¶ 147.)

15.     Lo's witness, Dr. Gabriel, testifies that the Balasubramanian reference in sentence **[4]** in the paragraph at 19:48-20:3 of the Quake '018 patent provides for amplifying a target sequence with sequence specific primers to preselect for a predetermined target sequence prior to sequencing. (Gabriel Decl., Exh. 1021, ¶ 67, citing Balasubramanian, at ¶ [0055].)

-11-

16.    Dr. Gabriel testifies that Balasubramanian also provides for random massively parallel sequencing.  (Deposition of Stacey Bolk Gabriel, Ph.D., 30 October 2013 ("Gabriel Dep."), Exh. 2078, 60:18-22.)

17.    Quake's witness, Dr. Detter, testifies that Balasubramanian describes using universal primers with randomly fragmented DNA attached to an array of structures to conduct massively parallel sequencing.  (Detter Decl., Exh. 2049, ¶ 97, citing Balasubramanian et al., US Patent Application Publication 2003/0022207, Exh. 2061, at ¶¶ [0052]-[0056].)

18.    Lo's witness, Dr. Gabriel, testifies that because the Quake '018 patent specification is directed, overall, to detection of predetermined target sequences, one of ordinary skill in the art would not have had any reason to understand that the reference to "products offered by Illumina, Inc." or Balasubramanian in the Quake '018 patent specification was a disclosure of random sequencing.  (Gabriel Decl., Exh. 1021, ¶ 67.)

19.    The parties agree that the broadest reasonable interpretation of the indentifying step of Quake claim 1 is aligning the random sequence reads generated in the sequencing step of a reference genome to determine from which chromosomes the sequence read originated.  (Lo Motion 1, Paper 54, at MF 6; Quake Opp. 1, Paper 73, at response to MF 6.)

20.    Dr. Gabriel testifies that one of ordinary skill in the art would have understood the statement in sentence **[6]** in the paragraph at 20:4-20 of the Quake '018 patent "[o]nly about 30 bp of random sequence information are needed to identify a sequence as belonging to a specific human chromosome," to refer to the minimum size of a unique target sequence in the genome used for amplification. (Gabriel Decl., Exh. 1021, ¶ 70.)

21.    Quake's witness, Dr. Detter testifies that the statement "[l]onger sequences can uniquely identify more particular targets," in sentence **[7]**, in the paragraph at 20:4-20 of the Quake '018 patent would have been understood by one of ordinary skill in the art at the time to mean that while only about 30 bp of random sequence is necessary to align a sequenced fragment to a known sequence as in sentence **[6]**, a longer section of sequence more particularly aligns to a target. (Detter Decl., Exh. 2049, ¶¶ 99 and 142.)

22.    Dr. Detter, testifies that sentences **[5], [6]**, and **[7]** in the paragraph at 20:4-20 of the Quake '018 patent describe identification of random nucleic acid sequences to the human genome to identify the sequences aligning with specific human chromosomes.  (Detter Decl., Exh. 2049, ¶¶ 104.)

23.    Dr. Detter testifies that the paragraph at 20:4-20 of the Quake '018 patent is not applicable to the use of target-specific primers because one would only need to identify or align random sequence information as belonging to a specific human chromosome.  (Detter Decl., Exh. 2049, ¶¶ 95.)

24.    Lo's witness, Dr. Gabriel, testifies that Yamada, cited in sentence **[8]**, in the paragraph at 20:4-20 of the Quake '018 patent is not related to massively parallel sequencing of randomly selected DNA fragments, but instead teaches about a web service for generating primers to amplify specific target sequences in the human genome.  (Gabriel Decl., Exh. 1021, ¶ 70.)

25.    Dr. Gabriel testifies that the targeted primers taught in Yamada would not be useful for random sequencing of randomly selected DNA fragments that had not been identified in advance.  (Gabriel Decl., Exh. 1021, ¶ 70.)

26.    Quake's witness, Dr. Detter, testifies that Yamada was cited because it is "illustrative of software methods that can identify a sequence in comparison to

-13-

the known genome sequence," as stated in the paragraph at 20:4-20 of the Quake '018 patent which, according to Dr. Detter, is an alignment step. (Detter Decl., Exh. 2049, ¶ 103.)

27.    Lo's witness, Dr. Gabriel, testifies that the '018 patent does not disclose a step of aligning sequence reads from random sequencing to a reference chromosome. (Gabriel Decl., Exh. 1021, ¶ 84.)

28.    Quake's witness, Dr. Detter, testifies that those of skill in the art at the time would have known how to perform the required alignment (Detter Decl., Exh. 2049, ¶¶ 148-150) and how to perform the statistical analysis to determine if there is an aneuploidy (*id.* at ¶ 151).

29.    Dr. Gabriel testifies that the Quake '018 patent does not support the sequencing or alignment steps of Quake's involved claims and discusses massively parallel sequencing only briefly and only in the context of determining the presence or absence of a specific target sequence. (Gabriel Decl., Exh. 1021, ¶ 90.)

30.    Dr. Detter testifies that it would have been clear to one of skill in the art that the Quake '018 patent specification contains a disclosure of a sequencing embodiment in which sequencing the mixture of maternal and fetal genomic DNA in a maternal plasma sample generates random nucleic acid sequences that can be identified as belonging to a specific chromosome and that this disclosure describes the claims of the Quake '018 patent. (Detter Decl., Exh. 2049, ¶ 131.)

*Analysis*

Lo argues that the Quake '018 patent specification is directed exclusively to detecting the presence or absence of predetermined target sequences and does not describe sequencing to obtain *random* nucleic acid sequences. (Lo Motion 1,

-14-

Paper 54, at 6:19-7:25.)

Lo relies on the testimony of Dr. Gabriel to argue that the Quake '018 patent specification describes only a "digital analysis" technique in which *known, predetermined target sequences*, not *random unknown* sequences, are detected and quantified. (*Id.*, citing Gabriel Decl., Exh. 1021, ¶¶ 28, 29, and 35, Finding of Fact ("FF") 3.)  According to Lo, during prosecution of a related application Quake tried to show support for random massively parallel sequencing in two paragraphs that correspond to the paragraphs at 19:48-20:20 of the '018 patent.  Lo argues that the disclosures of these two paragraphs are insufficient because even though "massively parallel sequencing" is mentioned, in the context of the whole specification it is not provided as a means of random sequencing.  (Lo Motion 1, Paper 54, at 8:5-14:25.)

Quake opposes Lo's motion, arguing that the Quake '018 patent is not limited to digital PCR and is not limited to analysis of only targeted, predetermined sequences.  (Quake Opp. 1, Paper 73, at 2:17-18, and 5:18-24.)  Instead, Quake argues that the '018 patent discloses massively parallel sequencing.  (Quake Opp. 1, Paper 73, at 2:6-7 and 17-21.)  Quake argues further that "every aspect needed to detect aneuploidy using random MPS [massively parallel sequencing] is disclosed in the specification, including the sequencing, alignment, and data analysis steps." (Quake Opp. 1, Paper 73, at 2:15-16.)

Lo argues that the paragraph at 19:48-20:3 of the Quake '018 patent describes detecting target sequences, for example sequences in chromosome 21, by either sequencing them or by using labeled probes.  (Lo Motion 1, Paper 54, at 8:27-31; Gabriel Decl., Exh. 1021, at ¶¶ 63-64; FFs 6 and 7.)  Lo acknowledges that the paragraph at 19:48-20:3 provides for massively parallel sequencing as "[a]

-15-

methodology useful in the present invention platform . . ." and mentions "products offered by Illumina, Inc.," as well as a patent application by Balasubramanian, but Lo argues that these brief, general statements do not indicate that the inventors intended to use that sequencing technique to identify *random* DNA sequence fragments. (FFs 10-11 and 15-16.) Lo argues that Illumina products and the methods taught in Balasubramanian could have been used with either random or targeted sequencing and that given the overall context of the Quake '018 patent, those of skill in the art would not have consider these references to refer to random sequencing. (Lo Motion 1, Paper 54, at 10:9-13:1, citing Gabriel Decl., Exh. 1021, ¶¶ 66-67.)

Quake opposes Lo's interpretation of these references and also cites to a reference to Braslavsky[3] in the '018 patent to argue that these references provide sufficient support for random massively parallel sequencing. (Quake Opp. 1, Paper 73, at 4:13-7:14.) Quake argues[4] further that the '018 patent discloses randomly fragmented genomic DNA. (Quake Opp. 1, Paper 73, at 7:9-14, citing Quake '018 patent, Exh. 2011, at 18:59-62) and discloses sequencing DNA without prior knowledge the sequence. (Quake Opp. 1, Paper 73, at 5:15-22 and 6:12-16; FFs 4, 9, 12-14, and 17.)

_____

[3] Braslavaky, et al., "Sequence information can be obtained from single DNA molecules," 100 Proc. Nat'l Acad. Sci., 3960-64 (2003) (Exh. 1013).

[4] Quake also argues that at 19:48-51 of the '018 patent discloses anchoring DNA from a sample to a surface without an intermediate selection step, which Quake interprets to mean that there is no pre-selection of particular targets and that, therefore, the DNA must be randomly sequenced. (Quake Opp. 1, Paper 73, at 6:23-7:4.) We are not persuaded that disclosure of distributing DNA into a multiwell plate can be interpreted to mean that the sample is randomly sequenced when sequencing is not even mentioned in paragraph [0055].

-16-

Quake argues that Dr. Gabriel gave contradictory testimony on cross-examination and admitted that the '018 patent discloses random massively parallel sequencing. (Quake Opp. 1, Paper 73, at 4:13-5:4.) We do not agree with Quake's characterization of Dr. Gabriel's testimony. Though Dr. Gabriel testified that the Quake specification discloses massively parallel sequencing, we do not find that she testified the application discloses massively parallel sequencing of *random* DNA fragments. Instead, when Dr. Gabriel was asked: "Are you saying that targeted massively parallel sequencing is described in the Quake application, but not random massively parallel sequencing?" she replied: "Correct." (Gabriel Dep., Exh. 2078, at 100:2-6.)

Furthermore, we do not find that Dr. Gabriel was inconsistent in her testimony regarding what those of skill in the art would have understood from the reference to Illumina sequencing in the Quake specification. Although Dr. Gabriel acknowledged that the references to massively parallel sequencing in the specification teach random sequencing, she also consistently testified that they teach targeted sequencing as well. For example, Dr. Gabriel testified:

> Q: Well, do you agree that the Illumina platform is random massively parallel sequencing?
> A: It can be. It can also be targeted massively parallel sequencing.
> \*\*\*
> A: Right. But I feel like that is not limited to random sequencing, is what I'm saying.
> Q: Oh. So you're saying it could be both random and targeted: is that what you're saying?
> A: Yes.
> \*\*\*
> Q: Okay. And the Illumina sequencing platform is useful for both random and targeted sequencing, right?
> A: Yes.

-17-

(Gabriel Dep., Exh. 2078, at 59:18-62:10.)  Thus, Dr. Gabriel's testimony supports Lo's argument that those of skill in the art would not necessarily have considered the reference to Illumina sequencing to be a reference to random massively parallel sequencing because it could have also supported targeted sequencing.[5]

In contrast to Dr. Gabriel's testimony, Dr. Detter testified on cross-examination that the Illumina platform would not have been considered for targeted sequencing before 2010.  (Quake Opp. 1, Paper 73, at 6:7-11, citing Detter Dep. Exh. 2079, at 53:19-54:21, 77:9-22, and 91:13-92:16.)  Dr. Detter relies on the testimony of Sequenome's (Lo's) witness in a reportedly related litigation, Dr. Metzker, to show that the actual sequencing step in an Illumina platform would not have been done with specific primers.  (Detter Decl., Exh. 2049, at ¶ 112.)

We are not persuaded that the reference to Illumina products in the paragraph at 19:48-20:3 of the '018 patent is a reference to the primers used in the actual sequencing step.  Because, as Dr. Gabriel testifies, those of skill in the art could have used targeted primers before the sequencing step in an Illumina platform analysis, we are persuaded that the inventors could have intended that paragraph to refer to this type of analysis.

Furthermore, in her direct testimony, Dr. Gabriel cites to several publications before 2010, even as early as 2006, describing a targeted sequencing

---

[5] Quake also argues that Dr. Gabriel and Sequenom admitted that the Quake inventors were the first to conceive of molecular counting to diagnose aneuploidy (Quake Opp. 1, Paper 73, at 2:9-13, citing several portions of Gabriel Dep., Exh. 2078), we are not persuaded that even if the Quake inventors conceived of using random massively parallel sequencing to do so, this is relevant to the question of whether the Quake '018 patent provides sufficient support for the method of Quake's involved claims.  Indeed, in the testimony cited by Quake, Dr. Gabriel

-18-

method in which a predetermined target sequence is selected by amplification and then sequenced on a massively parallel sequencing platform. (*See* Lo Reply 1, Paper 79, at 5:18-22, citing Declaration of Stacy Bolk Gabriel, Exh. 1062, ¶¶ 18-20.) Specifically, Dr. Gabriel supports her testimony by citing the 454 information sheet[6], which describes selecting a target sequence for amplification and sequencing on a massively parallel platform. (Declaration of Stacy Bolk Gabriel, Exh. 1062,

¶ 20.) Dr. Gabriel also cites Metzker[7], which lists a targeted approach for profiling expressed sequence tags and surveying microbial microenvironments and ancient DNA using the massively parallel 454 sequencing platform, and cites Thomas[8], which teaches a targeted approach to detect mutations. (Declaration of Stacy Bolk Gabriel, Exh. 1062, ¶ 19-20.)

Thus, given that Dr. Gabriel supports her testimony with published references and given that the language of the Quake '018 patent at 19:48-20:3 does not preclude targeted massively parallel sequencing, we credit Dr. Gabriel's testimony that those of skill in the art could have considered the references in the '018 patent specification to Illumina products to indicate targeted sequencing.

Further, we find that because the references to massively parallel sequencing in the Quake '018 patent could have been interpreted as either random or targeted

---

was not questioned about the Quake specification, but about other documents.

[6] 454 Life Sciences Amplicon Sequencing Template Preparation information sheet from November 2006 (Exh. 1071).

[7] Metzker, "Advances in Next-Generation DNA Sequencing Technologies" in Comparative Genomics: Basic and Applied Research. Ed. James R. Brown. (2008) (Exh. 1010).

[8] Thomas et al., "Sensitive mutation detection in heterogeneous cancer specimens by massively parallel picoliter reaction sequencing," 12 Nat Med 852 (2006)

-19-

sequencing and given the main focus of the Quake '018 patent on diagnosing aneuploidy with digital PCR, those of skill in the art would have understood the discussion of massively parallel sequencing to refer to sequencing targeted, predetermined portions of the DNA in a sample, not sequencing of random DNA.

Lo argues further that like the paragraph at 19:48-20:3, the following paragraph at 20:4-20 of the Quake '018 patent focuses on identification of predetermined target sequences, not random sequences as claimed. (Lo Motion 1, Paper 54, at 15:11-25.) Lo argues that the statement that "[o]nly about 30 [basepairs ("bp")] of random sequence [being] need[ed] to identify a sequence as belonging to a human chromosome," and the Yamada reference indicate that the inventors of the '018 patent were not referring to random sequencing or to alignment of random sequence reads to reference human chromosomes. (Lo Motion 1, Paper 54, at 16:5-13; FFs 20, 24, and 25.) Instead, Lo argues that the inventors were indicating that only about 30 base pairs of sequence are necessary to design specific primers, such as for use in digital PCR and that Yamada refers to methods of generating primers, such as for use in digital PCR analysis. (Lo Motion 1, Paper 54, at 16:5-10.) According to Lo, the Quake '018 patent does not disclose aligning a sequence read obtained from random massively parallel sequencing to a human reference genome because aligning sequences is inconsistent with the focus of the application to detect the presence or absence of specific predetermined target sequences in "digital analysis." (Lo Motion 1, Paper 54, at 16:32-17:1, citing Gabriel Decl., Exh. 1021, at ¶ 84; FF 27.)

Quake argues that the '018 patent specification discloses comparing a sequence to a known sequence and that Dr. Gabriel did not consider the

---

(Exh. 1011).

explanation of Yamada, wherein the program taught is "illustrative" of programs that could have been used to identify sequences in comparison with the genome. (Quake Opp. 1, Paper 73, at 8:17-22 and 10:2-4; FFs 22 and 26.)

We agree with Lo that the isolated words and references in the '018 patent specification that might be interpreted to support Quake's claimed methods could also support the main focus of the application – digital PCR analysis. Given this distinct main focus, those of skill in the art would not have had a credible reason to interpret the isolated words and references as supporting a method using random massively parallel sequencing. Although Quake argues that Lo has misinterpreted the language of the '018 patent supporting random massively parallel sequencing and alignment, we are persuaded that those isolated words are not necessarily a complete written description.

"The appearance of mere indistinct words in a specification or a claim, even an original claim, does not necessarily satisfy [the written description requirement]." *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 968 (Fed. Cir. 2002). "[F]or example, in the nineteenth century, use of the word 'automobile' would not have sufficed to describe a newly invented automobile; an inventor would need to describe what an automobile is, *viz.,* a chassis, an engine, seats, wheels on axles, etc. Thus, generalized language may not suffice if it does not convey the detailed identity of an invention." *Univ. of Rochester v. G.D. Searle & Co., Inc.*, 358 F.3d 916, 922-23 (Fed. Cir. 2004). The mere inclusion of phrases such as "massively parallel," "randomly fragmented DNA," "uniquely identify more particular targets," and "sequencing a region of interest to determine if it is the target sequence of interest," does not necessarily indicate that the inventors had possession of or intended a method involving

-21-

b. conducting massively parallel DNA sequencing of DNA fragments randomly selected from the mixture of fetal and maternal genomic DNA of step a) to determine the sequence of said DNA fragments;

c. identifying chromosomes to which the sequences obtained in step b) belong

as recited in Quake claim 1.  Even if the Quake '018 patent includes the correct language, it fails to convey Quake's claimed invention because it is not explained with sufficient detail.

The Quake application does not provide a distinct and full explanation of massively parallel sequencing to obtain random sequences and of aligning these random sequences to known genomic sequences to identify them.  There are no examples of this method and we find that much of the description that might have been interpreted as support could also have been interpreted to support a targeted method.  "[T]he written description requirement does not demand either examples or an actual reduction to practice . . . ," *Ariad*, 598 F.3d at 1352, but the Quake specification never describes a complete analysis of aneuploidy using random massively parallel sequencing.  Though the Quake inventors may have possessed parts of such a method, including massively parallel sequencing, randomly fragmenting DNA, and aligning sequences to genomic sequences, the facts do not indicate that those of ordinary skill in the art would have understood the inventors had put these pieces together into a complete method of sequencing random DNA fragments and identifying the sequenced fragments to determine aneuploidy.

Accordingly, we are not persuaded that the written description of the '018 patent would have indicated to one of ordinary skill in the art that the Quake inventors were in possession of the random massively parallel sequencing method they claim.

-22-

*V.  Lo Motion 4*

Lo argues that certain evidence submitted by Quake in opposition to Lo Motion 1 should be excluded.  We do not reach Lo's arguments.  We considered the evidence objected to but none the less found the evidence sufficient to grant Lo Motion 1.

*VI. Conclusion*

Because we find that the specification of the Quake '018 patent does not provide a sufficient written description for the method of the involved Quake claims as required by 35 U.S.C. § 112, we grant Lo Motion 1.  Accordingly, Quake's involved, copied claims are unpatentable.  We need not determine whether the benefit accorded to Quake upon declaration should be changed, as argued in Lo Motion 5 and Quake Motion 1.  Judgment against Quake will be entered separately.

cc (via electronic delivery):


Attorney for Lo:

Michele C. Bosch
Steven P. O'Connor
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
Email: michele.bosch@finnegan.com
Email: steven.oconnor@finnegan.com

Michael J. Wise
Perkins Coie, LLP
Email: mwise@perkinscoie.com


Attorney for Quake:

R. Danny Huntington
Sharon E. Crane
Rothwell, Figg, Ernst & Manbeck, PC
Email: dhuntington@rfem.com
Email: scrane@rfem.com

-24-

BoxInterference@uspto.gov
571.272.4683

Filed : April 7, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

––––––––––––––

BEFORE THE PATENT TRIAL AND APPEAL BOARD

––––––––––––––

YUK-MING DENNIS **LO**, ROSSA WAI KWUN CHIU, and
KWAN CHEE CHAN
Junior Party
(Application 12/178,181; 13/070,240; 12/614,350; and 13/070,251),

v.

STEPHEN **QUAKE** and HEI-MUN CHRISTINA FAN
Senior Party
(Application 12/393,833).

––––––––––––––

Patent Interference No. 105,923 (DK)
(Technology Center 1600)

––––––––––––––

Judgment – Bd.R. 127

*Before*, FRED E. McKELVEY, RICHARD E. SCHAFER, and DEBORAH
KATZ, *Administrative Patent Judges*.

KATZ, *Administrative Patent Judge*.

In view of the Decision on Motions (Paper 232), it is

ORDERED that judgment be entered against Quake for Count 1 (*see* Paper 1);

FURTHER ORDERED that claims 25, 29, 32, 40, 42, 78, 79, 86, 87, 90, 91, 93, 95, 97, and 98-101 of Quake's involved application 12/393,833 be FINALLY REFUSED 35 U.S.C. 135(a);

FURTHER ORDERED that a copy of this judgment be entered in the administrative records of the involved 12/393,833 application and Lo applications 12/178,181, 13/070,240, 12/614,350, and 13/070,251.

FURTHER ORDERED that a party seeking judicial review timely serve notice on the Director of the United States Patent and Trademark Office.  37 C.F.R. §§ 90.1 and 104.2.


NOTICE: "Any agreement or understanding between parties to an interference, including any collateral agreements referred to therein, made in connection with or in contemplation of the termination of the interference, shall be in writing and a true copy thereof filed in the Patent and Trademark Office before the termination of the interference as between the said parties to the agreement or understanding." 35 U.S.C. 135(c); see also Bd.R. 205 (settlement agreements).

-2-

cc (via electronic delivery):


Attorney for Lo:

Michele C. Bosch
Steven P. O'Connor
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
Email: michele.bosch@finnegan.com
Email: steven.oconnor@finnegan.com

Michael J. Wise
Perkins Coie, LLP
Email: mwise@perkinscoie.com


Attorney for Quake:

R. Danny Huntington
Sharon E. Crane
Rothwell, Figg, Ernst & Manbeck, PC
Email: dhuntington@rfem.com
Email: scrane@rfem.com

-3-

BoxInterference@uspto.gov
571.272.4683                                      Filed : April 7, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
————————

YUK-MING DENNIS **LO**, ROSSA WAI KWUN CHIU, and
KWAN CHEE CHAN
Junior Party
(Application 12/178,181; 13/070,240; 12/614,350; and 13/070,251),

v.

STEPHEN **QUAKE** and HEI-MUN CHRISTINA FAN
Senior Party
(Application 12/393,833).

————————

Patent Interference No. 105,923 (DK)
(Technology Center 1600)

————————

**Decision on Motions**

**Bd. R. 125(a)**

*Before*, FRED E. McKELVEY, RICHARD E. SCHAFER, and
DEBORAH KATZ, *Administrative Patent Judges*.

KATZ, *Administrative Patent Judge*.

Interference 105,923

## I.  Statement of the Case

The interference is before a motions panel for consideration of the pending non-priority motions.  An oral argument was held on 25 February 2014. (Transcript, Paper 230.)

Yuk-Ming Dennis Lo, Rossa Wai Kwun Chiu, and Kwan Chee Chan ("Lo") present Motion 1, arguing that the claims presented by Stephen Quake and Hei-Mun Christina Fan ("Quake") lack written description and enabling support under 35 U.S.C. § 112, first paragraph.[1]  (Paper 26.)  We grant Lo Motion 1.

Lo also presents Motion 5, arguing that Quake should not have been accorded an earlier constructive reduction to practice (*i.e.*, benefit for the purposes of priority) based on application 11/701,686 (Paper 27) and Lo Motion 7, arguing that certain evidence presented by Quake should be excluded (Paper 60).  Quake presents Motion 1, arguing that it should have been accorded an earlier constructive reduction to practice based on application 60/764,420 (Paper 43). Because Lo Motion 1 presents a threshold issue, which upon our grant terminates the interference, we do not reach Lo Motion 5, Lo Motion 7, or Quake Motion 1. (*See* Bd. R. 41.201(defining a threshold issues as one that, if resolved in favor of the movant, would deprive the opponent of standing in the interference and that includes unpatentability for lack of written description under the first paragraph of 35 U.S.C. § 112 of an involved application claim made after publication of the movant's application, where the applicant suggested, or could have suggested, an interference under    Bd. R. 202(a), as a threshold issue.)

---

[1] Patent interferences continue under the relevant statutes in effect on 15 March 2013.  Pub. L. 112-29, § 3(n), 125 Stat. 284, 293 (2011).

Interference 105,923

*II. The Parties*

   a.  Lo

Lo is involved based on several related patent applications.  Specifically, involved applications 13/070,240 and 13/070,251 are both continuations of involved parent application 12/614,350, which is a continuation-in-part of its involved parent application 12/178,181.  Application 12/178,181 was filed 23 July 2008.  Lo was not accorded the benefit of any earlier application for the purposes of priority.

Lo represents that at least application 12/178,181 is assigned to The Chinese University of Hong Kong and that Sequenom, Inc. is a licensee.  (Paper 4.)

Lo relies on the testimony of Stacey Bolk Gabriel, Ph.D.  (*See* Declaration of Stacey Bolk Gabriel, Ph.D. ("Gabriel Decl."), Exh. 1049.)  Dr. Gabriel testifies that she received a Ph.D. degree in genetics in 1998.  (*Id*., ¶ 1.)  She testifies further that she has held several positions related to mapping and sequencing the human genomes.  (*Id.*, ¶¶ 3-9.)  Dr. Gabriel testifies that she is currently the Director of the Genomics Platform of the Broad Institute, which, according to Dr. Gabriel, is the largest genome center in the United States.  (*Id.* at  ¶ 10.)  Dr. Gabriel testifies that she has served on several editorial and advisory boards related to genomic research and that she has authored over 100 peer-reviewed publications involving the application of sequencing technology to the study of human disease.  (*Id.* at ¶¶ 12-13.)  In light of her testimony, Dr. Gabriel is qualified to testify as an expert about the subject matter of this interference.

Interference 105,923

   b.  Quake

Quake is involved based on patent application 12/393,833, which was filed 26 February 2009.  Upon declaration, Quake was accorded the benefit of application 11/701,686, which was filed 2 February 2007 for the purposes of priority.

Quake represents that its involved application is assigned to The Board of Trustees of the Leland Stanford Junior University. (Paper 9.)  Fluidigm Corporation and Verinata Health, Inc, a wholly owned subsidiary of Illumina, Inc., are identified as licensees.  (*Id.*)  Quake also represents that the United States Government has certain rights in the application.  (*Id.*)

Quake relies on the testimony of J. Chris Detter, Ph.D.  (*See* Declaration of John Christopher Detter, Ph.D. ("Detter Decl."), Exh. 2049.)  Dr. Detter testifies that he has a Ph.D. in molecular genetics and microbiology and that he has held several positions leading genomic sequencing and computational biology groups. (*Id.*, at ¶¶ 2-5.)  Dr. Detter testifies that he is currently the Genome Sciences Center Director and Group Leader (B-6) and the Acting Bioscience Deputy Divisional Leader, responsible for programmatic, strategic, and tactical mission areas for bioscience at Los Alamos National Laboratory.  (*Id.* at ¶ 6.)  Dr. Detter's curriculum vitae shows that he has contributed to numerous research papers regarding genome sequencing of various organisms.  (Curriculum Vitae, Exh. 2051; *see* Detter Decl., Exh. 2049, ¶ 8.)  In light of his testimony, Dr. Detter is qualified to testify as an expert about the subject matter of this interference.

   c.  Related Proceedings

The involved Lo applications 12/178,181; 13/070,240; 12/614,350; and

-4-

Interference 105,923

13/070,251 are directly related to the Lo applications in concurrent Interferences 105, 920, 105,922, and 105,924.[2]  The Quake '833 application involved in this interference is also involved in Interference 105,924 and has a parent application in common with the Quake patent involved in Interference 105,920.  The Quake (referred to as "Fan") patent involved in Interference 105,922 is not in the same direct lineage as the involved Quake '833 application, but they have the same real party-in-interest.  As in the current interferences, the counts of these concurrent interferences are drawn to methods of detecting chromosomal abnormalities.

Some of the issues to be decided in *Inter Partes* Review ("IPR") 2013-00390 may be related to this interference.  Review was instituted in that proceeding following a petition filed by Sequenom, Inc. questioning the patentability of the claims of Fan patent 8,195,415 over the publication of Lo application 12/178,181 (US Patent Application Publication 2009/0029377), which is involved in this interference.  A final decision has not been entered in the IPR.

*III. The Subject Matter*

The parties claim methods of testing for an abnormal number of chromosomes in a person's cells, a condition called "aneuploidy."  The claimed methods can be used to test for conditions, such as Down Syndrome in which there are three copies of chromosome 21 instead of the normal two copies.  In the past, these chromosomal abnormalities were diagnosed with invasive procedures such as

_____

[2] Interference 105,920 involves Lo application13/070,275 and Quake patent 8,008,018.  Interference 105,922 involves Lo application 13/070,266 and

-5-

Interference 105,923

amniocentesis or chorionic villus sampling. The parties' claims are drawn to methods that allow for the diagnosis of aneuploidies with a simple blood test.

In general, the methods include the determination of a ratio between the number of different chromosomes in the blood sample without distinguishing between the chromosomes of the mother and fetus. The ratio of the number of chromosomes suspected of being aneuploid to the number of chromosomes not likely to be aneuploid indicates whether there is an extra or missing chromosome. To count chromosomes, fragments of DNA present in the blood sample are identified as representing specific chromosomes. This method requires sequencing of many, many such DNA fragments to make a statistically significant determination of aneuploidy. The parties' dispute in this interference is about the method of identifying these fragments as representing specific chromosomes.

*IV. Lo Motion 1*

Lo argues that the specification of the involved Quake '833 application does not support the term "massively parallel sequencing . . . to obtain random nucleic acid sequences . . ." in Quake claim 25[3] or the similar term "receiving random nucleic acid sequences obtained from massively parallel sequences . . ." in Quake claim 42 and thus does not comply with the written description requirement of 35 U.S.C. § 112. (Lo Motion 1, Paper 26, at 1:1-4 and 5:23-25.)

Under 35 U.S.C. § 112 the

---

Fan patent 8,195,415. Interference 105,924 involves Lo application 13/417,119 and Quake application 12/393,833.

[3] Quake independent claims 91 and 95 contain a similar term: "massively parallel sequencing . . . to generate random nucleic acid sequences . . . ." (Quake Clean Copy of Claims, Paper 11.)

Interference 105,923

> specification shall contain a written description of the invention, and
> of the manner and process of making and using it, in such full, clear,
> concise, and exact terms as to enable any person skilled in the art to
> which it pertains, or with which it is most nearly connected, to make
> and use the same . . . .

The test for sufficiency of the written description is "whether the disclosure of the
application relied upon reasonably conveys to those skilled in the art that the
inventor had possession of the claimed subject matter as of the filing date." *Ariad
Pharm., Inc., v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010). While
claimed subject matter need not be described with the exact words used to claim it,
"[e]ven if a claim is supported by the specification [with the exact words], the
language of the specification, to the extent possible, must describe the claimed
invention so that one skilled in the art can recognize what is claimed." *Enzo
Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 968 (Fed. Cir. 2002).

A written description that includes words, structures, figures, diagrams,
formulas, etc. fully setting forth the claimed invention can provide sufficient
description to meet the requirements of the statute, but a description that merely
renders the claimed invention obvious does not. *See Lockwood v. Am. Airlines,
Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997). This inquiry is a question of fact,
wherein "the level of detail required to satisfy the written description requirement
varies depending on the nature and scope of the claims and on the complexity and
predictability of the relevant technology." *Ariad*, 598 F.3d at 1351. To prevail, Lo
must provide sufficient evidence to persuade us that the Quake '833 application is
so lacking of written description that one of skill in the art at the time would not
have recognized the invention Quake claims.

-7-

Interference 105,923

*Findings of Fact*

The findings of fact below, as well as others in this opinion, are supported by a preponderance of the evidence.

　1.　Quake claim 25 recites:

　　　　A method for performing prenatal diagnosis of a fetal chromosomal aneuploidy from a plasma or serum sample of a female subject pregnant with at least one fetus, wherein the plasma or serum sample includes cell-free genomic DNA molecules from the female subject and from the at least one fetus, the method comprising: massively parallel sequencing cell-free genomic DNA molecules contained in the plasma or serum sample to obtain random nucleic acid sequences from the genomic DNA molecules of the female subject and of the at least one fetus;

　　　　identifying at least a portion of the nucleic acid sequences as belonging to a first specific human chromosome and at least one second specific human chromosome;

　　　　determining a first amount of the nucleic acid sequences identified as being uniquely present on the first specific human chromosome; and

　　　　determining a second amount of the nucleic acid sequences identified as being uniquely present on the at least one second specific human chromosome;

　　　　determining a ratio based on the first amount and the second amount, thereby determining a ratio of the amount of the nucleic acid sequences identified as being uniquely present on the first specific human chromosome to the amount of the nucleic acids being uniquely present on the at least one second specific chromosome;

　　　　determining whether the ratio is statistically significant; and

　　　　correlating a statistically significant result with the presence of a fetal chromosomal aneuploidy on the first chromosome.

(Quake Clean Copy of Claims, Paper 11 (emphasis added).)

　2.　Lo's involved applications provides:

-8-

Interference 105,923

> The term "random sequencing" as used herein refers to sequencing whereby the nucleic acid fragments sequenced have not been specifically identified or targeted before the sequencing procedure. Sequence specific primers to target specific gene loci are not required. The pools of nucleic acids sequenced vary from sample to sample and even from analysis to analysis for the same sample. The identities of the sequenced nucleic acids are only revealed from the sequencing output generated.

(*E.g.,* US Patent Publication 2009/0029377 (Lo application 12/178,181), Exh. 1026, ¶ [0047].)

     3.     The parties agree that under the holding of *Agilent Tech., Inc. v. Affymetrix, Inc.*, 567 F.3d 1366, 1375 (Fed. Cir. 2009), the Quake claim phrase "massively parallel sequencing . . . to obtain random nucleic acid sequences" means that the DNA fragments to be sequenced are *randomly* selected and that their identity is *unknown prior to sequencing*. (Lo Motion 1, Paper 26, at 5:23-6:16 and Material Fact ("MF") 2; Quake Opp. 1, Paper 47, at response to MF 2; *see* Finding of Fact ("FF") 2.)

     4.     Lo's witness, Dr. Gabriel, testifies that the specification of the Quake '833 application is directed to the use of "digital analysis" or "digital PCR" to detect fetal aneuploidy in which a known target DNA sequence in a reaction well must be amplified by target-specific primers. (Gabriel Decl., Exh. 1049, at ¶¶ 32 and 38, citing Quake '833 application, Exh. 2018, at ¶¶ [0062]-[0068].)

     5.     Quake's witness, Dr. Detter, testifies that the Quake '833 application contemplates detecting DNA sequences by sequencing in the passage: "Also while detection may be conveniently be [sic] carried out by a sequence specific primer, detection may also be carried out by directly sequencing a region of interest to

Interference 105,923

determine if it is the target sequence of interest."  (Detter Decl., Exh. 2049, ¶ 139,

quoting Quake '833 application, Exh. 2018, at ¶ 0061.)

      6.     Paragraphs [0098] and [0099] of the Quake '833 application state:

> [1] The genomic DNA from the tissue taken from the mother, i.e. the
> mixture of fetal and maternal genetic material, may be distributed into
> discrete samples which are anchored to a surface and sequenced or
> monitored by labeled probes to detect a target specific sequence, e.g.,
> a unique region of chromosome 21, e.g., AML1. [2] Further guidance
> for the preparation of chromosome 21-unique sequences may be
> found, for example, in Fuscoe et al., "An Efficient Method for
> Selecting Unique-Sequence Clones from DNA Libraries and Its
> Application To Fluorescent Staining of Human Chromosome 21
> Using in Situ Hybridization," *Genomics*, vol. 5, 1989, pp. 100-109.
> [3] A methodology useful in the present invention platform is based
> on massively parallel sequencing of millions of fragments using
> attachment of randomly fragmented genomic DNA to a planar,
> optically transparent surface and solid phase amplification to create a
> high density sequencing flow cell with millions of clusters, each
> containing ~1,000 copies of template per sq. cm. [4] These templates
> are sequenced using four-color DNA sequencing-by-synthesis
> technology.  See, products offered by Illumina, Inc., San Diego Calif.
> Also, see US 2003/0022207 to Balasubramanian, et al., published
> Jan. 30, 2003, entitled "Arrayed polynucleotides and their use in
> genome analysis."
>
> [5] Sequencing may be combined with amplification-based methods
> in a microfluidic chip having reaction chambers for both PCR and
> microscopic template-based sequencing. [6] Only about 30 bp of
> random sequence information are needed to identify a sequence as
> belonging to a specific human chromosome. [7] Longer sequences can
> uniquely identify more particular targets. [8] An algorithm for
> designing unique sequences is described in Yamada, et al.
> "PrimerStation: a highly specific multiplex genomic PCR primer
> design server for the human genome," *Nucleic Acids Res.*,

Interference 105,923

> Jul. 1, 2006; 34(Web Server issue): W665-W669, illustrative of software methods that can be used to identify a sequence in comparison to the known genome sequence. **[9]** See, also Zhu et al., "Single molecule profiling of alternative pre-mRNA splicing," *Science*. 2003 Aug. 8; 301(5634):836-838, describing a single-molecule-based technology for studying mRNA.

(Quake '833 application, Exh. 2018, at ¶¶ [0098] and [0099] (bolded sentence numbers added).)

7.    Lo's witness, Dr. Gabriel, testifies that one of ordinary skill in the art would have interpreted sentence **[1]** in paragraph [0098] of the Quake '833 application, to mean that a target-specific sequence can be detected either by sequencing or by monitoring with known labeled probes.  (Gabriel Decl., Exh. 1049, ¶ 73.)

8.    Dr. Gabriel testifies that the reference to Fuscoe (Exh. 1014) in sentence **[2]** in paragraph [0098] of the Quake '833 application, teaches using chromosome 21-unique probes for fluorescent in situ hybridization to identify sequences, not using sequencing to identify them.  (Gabriel Decl., Exh. 1049, ¶ 74.)

9.    Dr. Detter testifies that a person of ordinary skill in the art would have understood sentence **[1]** in paragraph [0098] of the Quake '833 application, to be directed to two different embodiments, wherein either (1) a sample is anchored to a surface and then sequenced (which, according to Dr. Detter, is the Illumina platform) for identification, or (2) a sample is monitored with labeled probes after PCR amplification for identification.  (Detter Decl., Exh. 2049, ¶¶ 121 and 123.)

-11-

Interference 105,923

10.    Dr. Detter testifies that sentence **[3]** in paragraph [0098] of the Quake '833 application, refers to massively parallel sequencing.  (Detter Decl., Exh. 2049, ¶ 121.)

11.    Lo's witness, Dr. Gabriel, testifies that while sentences **[3]** and **[4]** in paragraph [0098] of the Quake '833 application, discuss massively parallel sequencing and refer to "products offered by Illumina, Inc.," Illumina sequencing could have been either targeted or random, depending on whether the DNA fragments had been identified or targeted before sequencing or not.  (Gabriel Decl., Exh. 1049, ¶ 76.)

12.    Dr. Gabriel testifies that given the focus of the '833 application on targeted sequencing, a reference to products of Illumina would not have suggested to one of skill in the art that the inventors intended random sequencing.  (Gabriel Decl., Exh. 1049, at ¶ 76.)

13.    Quake's witness, Dr. Detter, testifies that a massively parallel sequencing system, such as an Illumina system, uses sequencing instead of target-specific primers.  (Detter Decl., Exh. 2049, ¶ 129.)

14.    Dr. Detter testifies that one of skill in the art would not have used sequence-specific primers with the Illumina platform because such primers would have defeated the purpose of the Illumina platform by providing sequence for only a fraction of the fragments presented to be sequenced and, thus, would have wasted the space and resources devoted to an Illumina system.  (Detter Decl., Exh. 2049, ¶ 147.)

15.    Dr. Detter testifies that he is not aware of anyone having ever taken or suggested an approach using specific primers in an Illumina system and that he has

-12-

Interference 105,923

has not heard of an Illumina system being configured to use one's own primers. (Detter Decl., Exh. 2049, ¶ 147.)

16.    Lo's witness, Dr. Gabriel, testifies that the Balasubramanian reference in sentence **[4],** paragraph [0098] of the Quake '833 application, provides for amplifying a target sequence with sequence specific primers to preselect for a predetermined target sequence prior to sequencing. (Gabriel Decl., Exh. 1049, ¶ 77, citing Balasubramanian, at ¶ [0055].)

17.    Dr. Gabriel testifies that Balasubramanian also provides for random massively parallel sequencing. (Deposition of Stacey Bolk Gabriel, Ph.D., 30 October 2013 ("Gabriel Dep."), Exh. 2078, 60:18-22.)

18.    Quake's witness, Dr. Detter, testifies that Balasubramanian describes using universal primers with randomly fragmented DNA attached to an array of structures to conduct massively parallel sequencing. (Detter Decl., Exh. 2049, ¶ 143, citing Balasubramanian et al., U.S. Patent Application Publication 2003/0022207, Exh. 2061, at ¶¶ [0052]-[0056].)

19.    Lo's witness, Dr. Gabriel, testifies that because the Quake '833 application is directed, overall, to detection of predetermined target sequences, one of ordinary skill in the art would not have had any reason to understand that the reference to "products offered by Illumina, Inc." or Balasubramanian in the Quake '833 application was a disclosure of random sequencing. (Gabriel Decl., Exh. 1049, ¶ 77.)

20.    The parties agree that the claim phrases "identifying at least a portion of the nucleic acid sequences as belonging to a . . . chromosome" and "determining a[n] amount of the nucleic acid sequences identified as being uniquely present on

-13-

Interference 105,923

the . . . specific human chromosome" mean identifying the sequences by aligning them with a reference chromosome and determining the amount of sequence that aligns to the chromosomes.  (Lo Motion 1, Paper 26, at 14:12-15:1, and MFs 60 and 62; Quake Opp. 1, Paper 47, at response to MFs 60 and 62.)

21.    Dr. Gabriel testifies that one of ordinary skill in the art would have understood the statement in sentence **[6]** in paragraph [0099] of the Quake '833 application, "[o]nly about 30 bp of random sequence information are needed to identify a sequence as belonging to a specific human chromosome," to refer to the minimum size of a unique target sequence in the genome used for amplification. (Gabriel Decl., Exh. 1049, ¶ 80.)

22.    Quake's witness, Dr. Detter testifies that the statement "[l]onger sequences can uniquely identify more particular targets," in sentence **[7]**, paragraph [0099] of the Quake '833 application, would have been understood by one of ordinary skill in the art at the time to mean that while only about 30 bp of random sequence is necessary to align a sequenced fragment to a known sequence as in sentence **[6]**, a longer section of sequence more particularly aligns to a target. (Detter Decl., Exh. 2049, ¶ 122.)

23.    Dr. Detter, testifies that sentences **[5], [6]**, and **[7]** in paragraph [0099] of the Quake '833 application, describe identification of random nucleic acid sequences to the human genome to identify the sequences aligning with specific human chromosomes.  (Detter Decl., Exh. 2049, ¶¶ 125 and 126.)

24.    Dr. Detter testifies that paragraph [0099] of the Quake '833 application is not applicable to the use of target-specific primers because one would only need to identify or align random sequence information as belonging to

-14-

Interference 105,923

a specific human chromosome.  (Detter Decl., Exh. 2049, ¶¶ 127 and 142.)

25.    Lo's witness, Dr. Gabriel, testifies that Yamada, cited in sentence **[8]**, paragraph [0099] of the Quake '833 application, is not related to massively parallel sequencing of randomly selected DNA fragments, but instead teaches about a web service for generating primers to amplify specific target sequences in the human genome.  (Gabriel Decl., Exh. 1049, ¶ 80.)

26.    Dr. Gabriel testifies that the targeted primers taught in Yamada would not be useful for random sequencing of randomly selected DNA fragments that had not been identified in advance.  (Gabriel Decl., Exh. 1049, ¶ 80.)

27.    Quake's witness, Dr. Detter, testifies that Yamada was cited because it is "illustrative of software methods that can identify a sequence in comparison to the known genome sequence," as stated in paragraph [0099] of the Quake '833 application, which, according to Dr. Detter, is an alignment step.  (Detter Decl., Exh. 2049, ¶ 103.)

28.    Lo's witness, Dr. Gabriel, testifies that the '833 application does not disclose a step of aligning sequence reads from random sequencing to a reference chromosome.  (Gabriel Decl., Exh. 1049, ¶ 95.)

29.    Quake's witness, Dr. Detter, testifies that those of skill in the art at the time would have known how to perform the required alignment (Detter Decl., Exh. 2049, ¶¶ 148-150) and how to perform the statistical analysis to determine if there is an aneuploidy (*id.* at ¶ 151).

30.    Dr. Gabriel testifies that the '833 application does not support the sequencing or alignment steps of Quake's involved claims and discusses massively parallel sequencing only briefly and only in the context of determining

-15-

Interference 105,923

the presence or absence of a specific target sequence. (Gabriel Decl., Exh. 1049, ¶ 111.)

31.    Dr. Detter testifies that it would have been clear to one of skill in the art that the Quake '833 application contains a disclosure of a sequencing embodiment in which sequencing the mixture of maternal and fetal genomic DNA in a maternal plasma sample generates random nucleic acid sequences that can be identified as belonging to a specific chromosome and that this disclosure describes the claims of the Quake '833 application. (Detter Decl., Exh. 2049, ¶ 131.)

*Analysis*

Lo argues that the Quake '833 application is directed exclusively to detecting the presence or absence of predetermined target sequences and does not describe sequencing to obtain *random* nucleic acid sequences. (Lo Motion 1, Paper 26, at 6:17-7:17.)

Lo relies on the testimony of Dr. Gabriel to argue that the Quake '833 application describes only a "digital analysis" technique in which *known, predetermined target sequences*, not *random unknown* sequences, are detected and quantified. (*Id.*, citing Gabriel Decl., Exh. 1049, ¶¶ 32, 33, and 38, FF 4.) According to Lo, during prosecution Quake tried to show support for random massively parallel sequencing in paragraphs [0098] and [0099] of the '833 application, but Lo argues that the disclosures of these two paragraphs are insufficient because even though "massively parallel sequencing" is mentioned, in the context of the whole specification it is not provided as a means of random sequencing. (Lo Motion 1, Paper 26, at 7:18-14:3.)

-16-

Interference 105,923

Quake opposes Lo's motion, arguing that the Quake '833 application is not limited to digital PCR and is not limited to analysis of only targeted, predetermined sequences. (Quake Opp. 1, Paper 47, at 2:20-23, and 5:18-24.) Instead, Quake argues that the '833 application discloses massively parallel sequencing as a variant of digital PCR. (Quake Opp. 1, Paper 47, at 2:8-9 and 21-23.) Quake argues further that "every aspect of the machinery needed to diagnose aneuploidy using random MPS [massively parallel sequencing] is disclosed in the specification, including the sequencing, alignment, and data analysis steps." (Quake Opp. 1, Paper 47, at 2:17-19.)

Lo argues that paragraph [0098] of the Quake '833 application describes detecting target sequences, for example sequences in chromosome 21, by either sequencing them or by using labeled probes. (Lo Motion 1, Paper 26, at 8:12-21; Gabriel Decl., Exh. 1049, at ¶¶ 73-74; FFs 7 and 8.) Lo acknowledges that paragraph [0098] provides for massively parallel sequencing as "[a] methodology useful in the present invention platform . . ." and mentions "products offered by Illumina, Inc.," as well as a patent application by Balasubramanian, but Lo argues that these brief, general statements do not indicate that the inventors intended to use that sequencing technique to identify *random* DNA sequence fragments. (FFs 11-12 and 16-17.) Lo argues that Illumina products and the methods taught in Balasubramanian have been used with either random or targeted sequencing and that given the overall context of the Quake '833 application, those of skill in the art would not have consider these references to refer to random sequencing. (Lo Motion 1, Paper 26, at 9:25-11:16, citing Gabriel Decl., Exh. 1049, ¶¶ 75-77.)

-17-

Interference 105,923

Quake opposes Lo's interpretation of these references and also cites to a reference to Braslavsky[4] in the '833 application to argue that these references provide sufficient support for random massively parallel sequencing. (Quake Opp. 1, Paper 47, at 4:13-7:18.) Quake argues[5] further that the '833 application discloses randomly fragmented genomic DNA. (Quake Opp. 1, Paper 47, at 7:8-18, citing Quake '833 application, Exh. 2018, ¶ [0098] ) and discloses sequencing DNA without prior knowledge the sequence. (Quake Opp. 1, Paper 47, at 5:18-24 and 6:15-18; FFs 5, 10, 13-15, and 18.)

Quake argues that Dr. Gabriel gave contradictory testimony on cross-examination and that she admitted that the '833 application discloses random massively parallel sequencing. (Quake Opp. 1, Paper 47, at 2:11-15.) We do not agree with Quake's characterization of Dr. Gabriel's testimony. Though Dr. Gabriel testified that the Quake '833 application discloses massively parallel sequencing, we do not find that she testified the application discloses massively parallel sequencing of *random* DNA fragments. Instead, when Dr. Gabriel was asked: "Are you saying that targeted massively parallel sequencing is described in

---

[4] Braslavaky, et al., "Sequence information can be obtained from single DNA molecules," 100 Proc. Nat'l Acad. Sci., 3960-64 (2003) (Exh. 1013).

[5] Quake also argues that paragraph [0055] of the '833 application discloses anchoring DNA from a sample to a surface without an intermediate selection step, which Quake interprets to mean that there is no pre-selection of particular targets and that, therefore, the DNA must be randomly sequenced. (Quake Opp. 1, Paper 47, at 6:26-7:7.) We are not persuaded that disclosure of distributing DNA into a multiwell plate can be interpreted to mean that the sample is randomly sequenced when sequencing is not even mentioned in paragraph [0055].

-18-

Interference 105,923

the Quake application, but not random massively parallel sequencing?" she replied: "Correct." (Gabriel Dep., Exh. 2078, at 100:2-6.)

Furthermore, we do not find that Dr. Gabriel was inconsistent in her testimony regarding what those of skill in the art would have understood from the reference to Illumina sequencing in the '833 application. Although Dr. Gabriel acknowledged that the references to massively parallel sequencing in the Quake '833 application teach random sequencing, she also consistently testified that they teach targeted sequencing as well. For example, Dr. Gabriel testified:

> Q: Well, do you agree that the Illumina platform is random massively parallel sequencing?
> A: It can be. It can also be targeted massively parallel sequencing.
> ***
> A: Right. But I feel like that is not limited to random sequencing, is what I'm saying.
> Q: Oh. So you're saying it could be both random and targeted: is that what you're saying?
> A: Yes.
> ***
> Q: Okay. And the Illumina sequencing platform is useful for both random and targeted sequencing, right?
> A: Yes.

(Gabriel Dep., Exh. 2078, at 59:18-62:10.) Thus, Dr. Gabriel's testimony supports Lo's argument that those of skill in the art would not necessarily have considered the reference to Illumina sequencing to be a reference to random massively parallel sequencing because it could have also supported targeted sequencing. [6]

---

[6] Quake also argues that Dr. Gabriel and Sequenom admitted that the Quake inventors were the first to conceive of molecular counting to diagnose aneuploidy

-19-

Interference 105,923

In contrast to Dr. Gabriel's testimony, Dr. Detter testified on cross-examination that the Illumina platform would not have been considered for targeted sequencing before 2010. (Quake Opp. 1, Paper 47, at 6:10-14, citing Detter Dep. Exh. 2079, at 53:19-54:21, 77:9-22, and 91:13-92:16.) Dr. Detter relies on the testimony of Sequenome's (Lo's) witness in a reportedly related litigation, Dr. Metzker, to show that the actual sequencing step in an Illumina platform would not have been done with specific primers. (Detter Decl., Exh. 2049, at ¶ 112.)

We are not persuaded that the reference to Illumina products in paragraph [0098] of the '833 application is a reference to the primers used in the actual sequencing step. Because, as Dr. Gabriel testifies, those of skill in the art could have used targeted primers before the sequencing step in an Illumina platform analysis, we are persuaded that the inventors could have intended paragraph [0098] of the '833 application to refer to this type of analysis.

Furthermore, in her direct testimony, Dr. Gabriel cites to several publications before 2010, even as early as 2006, describing a targeted sequencing method in which a predetermined target sequence is selected by amplification and then sequenced on a massively parallel sequencing platform. (*See* Lo Reply 1, Paper 54, at 5:15-18, citing Declaration of Stacy Bolk Gabriel, Exh. 1062, ¶¶ 18-

_____

(Quake Opp. 1, Paper 47, at 2:11-15, citing several portions of Gabriel Dep., Exh. 2078), we are not persuaded that even if the Quake inventors conceived of using random massively parallel sequencing to do so, this is relevant to the question of whether the Quake '833 application provides sufficient support for the method of Quake's involved claims. Indeed, in the testimony cited by Quake, Dr. Gabriel was not questioned about the Quake specification, but about other

Interference 105,923

20.)  Specifically, Dr. Gabriel supports her testimony by citing the 454 information sheet[7], which describes selecting a target sequence for amplification and sequencing on a massively parallel platform.  (Declaration of Stacy Bolk Gabriel, Exh. 1062,

¶ 20.)  Dr. Gabriel also cites Metzker[8], which lists a targeted approach for profiling expressed sequence tags and surveying microbial microenvironments and ancient DNA using the massively parallel 454 sequencing platform, and cites Thomas[9], which teaches a targeted approach to detect mutations.  (Declaration of Stacy Bolk Gabriel, Exh. 1062, ¶ 19-20.)

Thus, given that Dr. Gabriel supports her testimony with published references and given that the language of paragraph [0098] of the '833 application does not preclude targeted massively parallel sequencing, we credit Dr. Gabriel's testimony that those of skill in the art could have considered the references in the '833 application to Illumina products to indicate targeted sequencing.

Further, we find that because the references to massively parallel sequencing in the Quake '833 application could have been interpreted as either random or targeted sequencing and given the main focus of the Quake '833 application on

---

documents.

[7] 454 Life Sciences Amplicon Sequencing Template Preparation information sheet from November 2006 (Exh. 1071).

[8] Metzker, "Advances in Next-Generation DNA Sequencing Technologies" in Comparative Genomics: Basic and Applied Research. Ed. James R. Brown. (2008) (Exh. 1010).

[9] Thomas et al., "Sensitive mutation detection in heterogeneous cancer specimens by massively parallel picoliter reaction sequencing," 12 Nat Med 852 (2006) (Exh. 1011).

Interference 105,923

diagnosing aneuploidy with digital PCR, those of skill in the art would have understood the discussion of massively parallel sequencing to refer to sequencing targeted, predetermined portions of the DNA in a sample, not sequencing of random DNA.

Lo argues further that like paragraph [0098], paragraph [0099] of the Quake '833 application focuses on analysis of predetermined target sequences, not random sequences as claimed. (Lo Motion 1, Paper 26, at 11:17-12:19.) Lo argues that the statement that "[o]nly about 30 [basepairs ("bp")] of random sequence [being] need[ed] to identify a sequence as belonging to a human chromosome," and the Yamada reference indicate that the inventors of the '833 application were not referring to random sequencing or to alignment of random sequence reads to reference human chromosomes. (Lo Motion 1, Paper 26, at 11:30-12:1; FFs 21, 25, and 26.) Instead, Lo argues that the inventors were indicating that only about 30 base pairs of sequence are necessary to design specific primers, such as for use in digital PCR and that Yamada refers to methods of generating primers, such as for use in digital PCR analysis. (Lo Motion 1, Paper 26, at 12:9-11.) According to Lo, the Quake '833 application does not disclose aligning a sequence read obtained from random massively parallel sequencing to a human reference genome because aligning sequences is inconsistent with the focus of the application to detect the presence or absence of specific predetermined target sequences in "digital analysis." (Lo Motion 1, Paper 26, at 15:17-19, citing Gabriel Decl., Exh. 1049, at ¶¶ 94 and 95; FF 28.)

Quake argues that the '833 application discloses comparing a sequence to a known sequence and that Dr. Gabriel did not consider the explanation of Yamada

-22-

**Appx000049**

Interference 105,923

in the '833 application, wherein the program taught is "illustrative" of programs that could have been used to identify sequences in comparison with the genome. (Quake Opp. 1, Paper 47, at 8:20-25 and 9:20-27; FFs 23 and 27.)

We agree with Lo that the isolated words and references in the '833 application that might be interpreted to support Quake's claimed methods could also support the main focus of the application – digital PCR analysis. Given this distinct main focus, those of skill in the art would not have had a credible reason to interpret the isolated words and references as supporting a method using random massively parallel sequencing. Although, Quake argues that Lo has misinterpreted the language of the '833 application that supports random massively parallel sequencing and alignment, we are persuaded that these isolated words are not necessarily a complete written description.

"The appearance of mere indistinct words in a specification or a claim, even an original claim, does not necessarily satisfy [the written description requirement]." *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 968 (Fed. Cir. 2002). "[F]or example, in the nineteenth century, use of the word 'automobile' would not have sufficed to describe a newly invented automobile; an inventor would need to describe what an automobile is, *viz.,* a chassis, an engine, seats, wheels on axles, etc. Thus, generalized language may not suffice if it does not convey the detailed identity of an invention." *Univ. of Rochester v. G.D. Searle & Co., Inc.*, 358 F.3d 916, 922-23 (Fed. Cir. 2004). The mere inclusion of phrases such as "massively parallel," "randomly fragmented DNA," "uniquely identify more particular targets," and "sequencing a region of interest to determine if it is

-23-

Interference 105,923

the target sequence of interest," does not necessarily indicate that the inventors had possession of or intended to a method involving

> massively parallel sequencing cell-free genomic DNA molecules contained in the plasma or serum sample to obtain random nucleic acid sequences from the genomic DNA molecules of the female subject and of the at least one fetus [and]
> identifying at least a portion of the nucleic acid sequences as belonging to a first specific human chromosome and at least one second specific human chromosome,

as recited in Quake claim 25. Even if the Quake '833 application includes the correct language, it fails to convey Quake's claimed invention because it is not explained with sufficient detail.

The Quake application does not provide a distinct and full explanation of massively parallel sequencing to obtain random sequences and of aligning these random sequences to known genomic sequences to identify them. There are no examples of this method and we find that much of the description that might have been interpreted as support could also have been interpreted to support a targeted method. "[T]he written description requirement does not demand either examples or an actual reduction to practice . . . ," *Ariad*, 598 F.3d at 1352, but the Quake specification never describes a complete analysis of aneuploidy using random massively parallel sequencing. Though the Quake inventors may have possessed parts of such a method, including massively parallel sequencing, randomly fragmenting DNA, and aligning sequences to genomic sequences, the facts do not indicate that those of ordinary skill in the art would have understood the inventors had put these pieces together into a complete method of sequencing random DNA fragments and identifying the sequenced fragments to determine aneuploidy.

-24-

Interference 105,923

Accordingly, we are not persuaded that the written description of the '833 application would have indicated to those of ordinary skill in the art that the Quake inventors had possession of the random massively parallel sequencing method they claim.

### V.  Lo Motion 7

Lo argues that certain evidence submitted by Quake in opposition to Lo Motion 1 should be excluded.  We do not reach Lo's arguments.  We considered the evidence objected to but none the less found the evidence sufficient to grant Lo Motion 1.

### VI. Conclusion

Because we find that the Quake '833 application does not provide a sufficient written description for the method of the involved Quake claims as required by 35 U.S.C. § 112, we grant Lo Motion 1.  Accordingly, Quake's involved, copied claims are unpatentable.  We need not determine whether the benefit accorded to Quake upon declaration should be changed, as argued in Lo Motion 5 and Quake Motion 1.  Judgment against Quake will be entered separately.

Appx000052

Interference 105,923

cc (via electronic delivery):

Attorney for Lo:

Michele C. Bosch
Steven P. O'Connor
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
Email: michele.bosch@finnegan.com
Email: steven.oconnor@finnegan.com

Michael J. Wise
Perkins Coie, LLP
Email: mwise@perkinscoie.com

Attorney for Quake:

R. Danny Huntington
Sharon E. Crane
Rothwell, Figg, Ernst & Manbeck, PC
Email: dhuntington@rfem.com
Email: scrane@rfem.com

-26-

BoxInterference@uspto.gov
571.272.4683                                        Filed : April 7, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

YUK-MING DENNIS **LO**, ROSSA WAI KWUN CHIU, and
KWAN CHEE CHAN
Junior Party
(Application 12/178,181; 13/070,240; 12/614,350; and 13/070,251),

v.

STEPHEN **QUAKE** and HEI-MUN CHRISTINA FAN
Senior Party
(Application 12/393,833).

————————

Patent Interference No. 105,923 (DK)
(Technology Center 1600)

————————

Judgment – Bd.R. 127

*Before*, FRED E. McKELVEY, RICHARD E. SCHAFER, and DEBORAH
KATZ, *Administrative Patent Judges*.

KATZ, *Administrative Patent Judge*.

In view of the Decision on Motions (Paper 232), it is

ORDERED that judgment be entered against Quake for Count 1 (*see* Paper 1);

FURTHER ORDERED that claims 25, 29, 32, 40, 42, 78, 79, 86, 87, 90, 91, 93, 95, 97, and 98-101 of Quake's involved application 12/393,833 be FINALLY REFUSED 35 U.S.C. 135(a);

FURTHER ORDERED that a copy of this judgment be entered in the administrative records of the involved 12/393,833 application and Lo applications 12/178,181, 13/070,240, 12/614,350, and 13/070,251.

FURTHER ORDERED that a party seeking judicial review timely serve notice on the Director of the United States Patent and Trademark Office. 37 C.F.R. §§ 90.1 and 104.2.


NOTICE: "Any agreement or understanding between parties to an interference, including any collateral agreements referred to therein, made in connection with or in contemplation of the termination of the interference, shall be in writing and a true copy thereof filed in the Patent and Trademark Office before the termination of the interference as between the said parties to the agreement or understanding." 35 U.S.C. 135(c); see also Bd.R. 205 (settlement agreements).

cc (via electronic delivery):


Attorney for Lo:

Michele C. Bosch
Steven P. O'Connor
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
Email: michele.bosch@finnegan.com
Email: steven.oconnor@finnegan.com

Michael J. Wise
Perkins Coie, LLP
Email: mwise@perkinscoie.com


Attorney for Quake:

R. Danny Huntington
Sharon E. Crane
Rothwell, Figg, Ernst & Manbeck, PC
Email: dhuntington@rfem.com
Email: scrane@rfem.com

-3-

**Appx000056**

BoxInterference@uspto.gov
571.272.4683                                                    Filed : April 7, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

YUK-MING DENNIS **LO**, ROSSA WAI KWUN CHIU, and
KWAN CHEE CHAN
Junior Party
(Application 13/417,119),

v.

STEPHEN **QUAKE** and HEI-MUN CHRISTINA FAN
Senior Party
(Application 12/393,833).

————————

Patent Interference No. 105,924 (DK)
(Technology Center 1600)

————————

**Decision on Motions**

**Bd. R. 125(a)**

*Before*, FRED E. McKELVEY, RICHARD E. SCHAFER, and
DEBORAH KATZ, *Administrative Patent Judges*.

KATZ, *Administrative Patent Judge*.

Interference 105,924

###### I. *Statement of the Case*

The interference is before a motions panel for consideration of the pending non-priority motions.  An oral argument was held on 25 February 2014. (Transcript, Paper 229.)

Yuk-Ming Dennis Lo, Rossa Wai Kwun Chiu, and Kwan Chee Chan ("Lo") present Motion 1, arguing that the claims presented by Stephen Quake and Hei-Mun Christina Fan ("Quake") lack written description and enabling support under 35 U.S.C. § 112, first paragraph.[1]  (Paper 26.)  We grant Lo Motion 1.

Lo also presents Motion 5, arguing that Quake should not have been accorded an earlier constructive reduction to practice (*i.e.*, benefit for the purposes of priority) based on application 11/701,686 (Paper 27) and Lo Motion 7, arguing that certain evidence presented by Quake should be excluded (Paper 59).  Quake presents Motion 1, arguing that it should have been accorded an earlier constructive reduction to practice based on application 60/764,420 (Paper 43). Because Lo Motion 1 presents a threshold issue, which upon our grant terminates the interference, we do not reach Lo Motion 5, Lo Motion 7, or Quake Motion 1. (*See* Bd. R. 41.201(defining a threshold issues as one that, if resolved in favor of the movant, would deprive the opponent of standing in the interference and that includes unpatentability for lack of written description under first paragraph of 35 U.S.C. §112 of an involved application claim made after publication of the movant's application, where the applicant suggested, or could have suggested, an interference under   Bd. R. 202(a), as a threshold issue.)

---

[1] Patent interferences continue under the relevant statutes in effect on 15 March 2013.  Pub. L. 112-29, § 3(n), 125 Stat. 284, 293 (2011).

Interference 105,924

## II. The Parties

### a. Lo

Lo is involved based on application 13/417,119 ("the '119 application"), filed 9 March 2012.  Lo was accorded the benefit of application 12/614,350, filed 6 November 2009, and application 12/178,181, filed 23 July 2008, for the purposes of priority.

Lo represents that the '119 application is assigned to The Chinese University of Hong Kong and that Sequenom, Inc. is a licensee.  (Paper 4.)  Quake also represents that the United States government has certain rights in the application.  (*Id.*)

Lo relies on the testimony of Stacey Bolk Gabriel, Ph.D.  (*See* Declaration of Stacey Bolk Gabriel, Ph.D. ("Gabriel Decl."), Exh. 1048.)  Dr. Gabriel testifies that she received a Ph.D. degree in genetics in 1998.  (*Id.*, Exh. 1048, ¶ 1.)  She testifies further that she has held several positions related to mapping and sequencing the human genomes.  (*Id.*, ¶¶ 3-9.)  Dr. Gabriel testifies that she is currently the Director of the Genomics Platform of the Broad Institute, which, according to Dr. Gabriel, is the largest genome center in the United States.  (*Id.* at ¶ 10.)  Dr. Gabriel testifies that she has served on several editorial and advisory boards related to genomic research and that she has authored over 100 peer-reviewed publications involving the application of sequencing technology  to the study of human disease.  (*Id.* at ¶¶ 12-13.)  In light of her testimony, Dr. Gabriel is qualified to testify as an expert about the subject matter of this interference.

-3-

Interference 105,924

    b. Quake

Quake is involved based on patent application 12/393,833, which was filed 26 February 2009. Upon declaration, Quake was accorded the benefit of application 11/701,686, which was filed 2 February 2007.

Quake represents that its involved application is assigned to The Board of Trustees of the Leland Stanford Junior University. (Paper 9.) Fluidigm Corporation and Verinata Health, Inc, a wholly owned subsidiary of Illumina, Inc., are identified as licensees. (*Id*.)

Quake relies on the testimony of J. Chris Detter, Ph.D. (*See* Declaration of John Christopher Detter, Ph.D. ("Detter Decl."), Exh. 2049.) Dr. Detter testifies that he has a Ph.D. in molecular genetics and microbiology and that he has held several positions leading genomic sequencing and computational biology groups. (*Id.*, at ¶¶ 2-5.) Dr. Detter testifies that he is currently the Genome Sciences Center Director and Group Leader (B-6) and the Acting Bioscience Deputy Divisional Leader, responsible for programmatic, strategic, and tactical mission areas for bioscience at Los Alamos National Laboratory. (*Id.* at ¶ 6.) Dr. Detter's curriculum vitae shows that he has contributed to numerous research papers regarding genome sequencing of various organisms. (Curriculum Vitae, Exh. 2051; *see* Detter Decl., Exh. 2049, ¶ 8.) In light of his testimony, Dr. Detter is qualified to testify as an expert about the subject matter of this interference.

-4-

Interference 105,924

   c.  Related Proceedings

The involved Lo application 13/417,119 is related to applications and patents in concurrent Interferences 105, 920, 105,922, and 105,923.[2]  The Quake '833 application involved in this interference is also involved in Interference 105,924 and is has a parent application in common with the Quake patent involved in Interference 105,920.  The Quake (referred to as "Fan") patent involved in Interference 105,922 is not in the same direct lineage as the involved Quake '833 application, but they have the same real party-in-interest.  As in the current interference, the counts of these concurrent interferences are drawn to methods of detecting chromosomal abnormalities.

Some of the issues involved in *Inter Partes* Review 2013-00390 may be related to this interference.  Review was instituted in that proceeding following a petition filed by Sequenom, Inc. questioning the patentability of the claims of Fan patent 8,195,415 over the publication of Lo application 12/178,181 (US Patent Application Publication  2009/0029377), which is a parent of the involved 13/417,119 application.  A final decision has not been entered in the IPR.

 *III.The Subject Matter*

The parties claim methods of testing for an abnormal number of chromosomes in a person's cells, a condition called "aneuploidy."  The claimed methods can be used to test for conditions, such as Down Syndrome in which there are three copies of chromosome 21 instead of the normal two copies.  In the past,

--------

[2] Interference 105,920 involves Lo application 13/070,275 and Quake patent 8,008,018.  Interference 105,922 involves Lo application 13/070,266 and

Interference 105,924

these chromosomal abnormalities were diagnosed with invasive procedures such as amniocentesis or chorionic villus sampling. The parties' claims are drawn to methods that allow for the diagnosis of aneuploidies with a simple blood test.

In general, the methods include the determination of a ratio between the number of different chromosomes in the blood sample without distinguishing between the chromosomes of the mother and fetus. The ratio of the number of chromosomes suspected of being aneuploid to the number of chromosomes not likely to be aneuploid indicates whether there is an extra or missing chromosome. To count chromosomes, fragments of DNA present in the blood sample are identified as representing specific chromosomes. This method requires sequencing of many, many such DNA fragments to make a statistically significant determination of aneuploidy. The parties' dispute in this interference is about the method of identifying these fragments as representing specific chromosomes.

## IV. *Lo Motion 1*

Lo argues that the specification of the involved Quake '833 application does not support the term "massively parallel sequencing . . . to obtain random nucleic acid sequences . . ." in Quake claim 25[3] or the similar term "receiving random nucleic acid sequences obtained from massively parallel sequences . . ." in Quake claim 42 and thus does not comply with the written description requirement of 35 U.S.C. § 112. (Lo Motion 1, Paper 26, at 1:1-4 and 5:22-24.)

---

Fan patent 8,195,415. Interference 105,923 involves Lo applications 12/178,181, 13/070,240, 12/614,350, and 13/070,251 and Quake application 12/393,833.
[3] Quake independent claims 91 and 95 contain a similar term: "massively parallel sequencing . . . to generate random nucleic acid sequences . . . ." (Quake Clean Copy of Claims, Paper 11.)

-6-

Interference 105,924

Under 35 U.S.C. § 112 (a), the

> specification shall contain a written description of the invention, and
> of the manner and process of making and using it, in such full, clear,
> concise, and exact terms as to enable any person skilled in the art to
> which it pertains, or with which it is most nearly connected, to make
> and use the same . . . .

The test for sufficiency of the written description is "whether the disclosure of the
application relied upon reasonably conveys to those skilled in the art that the
inventor had possession of the claimed subject matter as of the filing date." *Ariad
Pharm., Inc., v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010). While
claimed subject matter need not be described with the exact words used to claim it,
"[e]ven if a claim is supported by the specification [with the exact words], the
language of the specification, to the extent possible, must describe the claimed
invention so that one skilled in the art can recognize what is claimed." *Enzo
Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 968 (Fed. Cir. 2002).

A written description that includes words, structures, figures, diagrams,
formulas, etc. fully setting forth the claimed invention can provide sufficient
description to meet the requirements of the statute, but a description that merely
renders the claimed invention obvious does not. *See Lockwood v. Am. Airlines,
Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997). This inquiry is a question of fact,
wherein "the level of detail required to satisfy the written description requirement
varies depending on the nature and scope of the claims and on the complexity and
predictability of the relevant technology." *Ariad*, 598 F.3d at 1351. To prevail, Lo
must provide sufficient evidence to persuade us that the Quake '833 application is

-7-

Appx000063

Interference 105,924

so lacking of written description that one of skill in the art at the time would not have recognized the invention Quake claims.

*Findings of Fact*

The findings of fact below, as well as others in this opinion, are supported by a preponderance of the evidence.

1.    Quake claim 25 recites:

> A method for performing prenatal diagnosis of a fetal chromosomal aneuploidy from a plasma or serum sample of a female subject pregnant with at least one fetus, wherein the plasma or serum sample includes cell-free genomic DNA molecules from the female subject and from the at least one fetus, the method comprising:
> <u>massively parallel sequencing cell-free genomic DNA molecules contained in the plasma or serum sample to obtain random nucleic acid sequences</u> from the genomic DNA molecules of the female subject and of the at least one fetus;
> identifying at least a portion of the nucleic acid sequences as belonging to a first specific human chromosome and at least one second specific human chromosome;
> determining a first amount of the nucleic acid sequences identified as being uniquely present on the first specific human chromosome; and
> determining a second amount of the nucleic acid sequences identified as being uniquely present on the at least one second specific human chromosome;
> determining a ratio based on the first amount and the second amount, thereby determining a ratio of the amount of the nucleic acid sequences identified as being uniquely present on the first specific human chromosome to the amount of the nucleic acids being uniquely present on the at least one second specific chromosome;
> determining whether the ratio is statistically significant; and
> correlating a statistically significant result with the presence of a fetal chromosomal aneuploidy on the first chromosome.

-8-

Interference 105,924

(Quake Clean Copy of Claims, Paper 11 (emphasis added).)

2.    Lo's involved applications provides:

> The term "random sequencing" as used herein refers to sequencing whereby the nucleic acid fragments sequenced have not been specifically identified or targeted before the sequencing procedure. Sequence specific primers to target specific gene loci are not required. The pools of nucleic acids sequenced vary from sample to sample and even from analysis to analysis for the same sample. The identities of the sequenced nucleic acids are only revealed from the sequencing output generated.

(*E.g.,* US Patent Publication 2009/0029377 (Lo application 12/178,181), Exh. 1026, ¶ [0047].)

3.    The parties agree that under the holding of *Agilent Tech., Inc. v. Affymetrix, Inc.*, 567 F.3d 1366, 1375 (Fed. Cir. 2009), the Quake claim phrase "massively parallel sequencing . . . to obtain random nucleic acid sequences" means that the DNA fragments to be sequenced are *randomly* selected and that their identity is *unknown prior to sequencing*.  (Lo Motion 1, Paper 26, at 5:22-6:15, and Material Fact ("MF") 2; Quake Opp. 1, Paper 47, at response to MF 2; *see* Finding of Fact ("FF") 2.)

4.    Lo's witness, Dr. Gabriel, testifies that the specification of the Quake '833 application is directed to the use of "digital analysis" or "digital PCR" to detect fetal aneuploidy in which a known target DNA sequence in a reaction well must be amplified by target-specific primers.  (Gabriel Decl., Exh. 1048, at ¶¶ 32 and 38, citing Quake '833 application, Exh. 2018, at ¶¶ [0062]-[0068].)

5.    Quake's witness, Dr. Detter, testifies that the Quake '833 application contemplates detecting DNA sequences by sequencing in the passage: "Also while

Interference 105,924

detection may be conveniently be [sic] carried out by a sequence specific primer, detection may also be carried out by directly sequencing a region of interest to determine if it is the target sequence of interest." (Detter Decl., Exh. 2049, ¶ 139, quoting Quake '833 application, Exh. 2018, at ¶ 0061.)

6.    Paragraphs [0098] and [0099] of the Quake '833 application state:

[1] The genomic DNA from the tissue taken from the mother, i.e. the mixture of fetal and maternal genetic material, may be distributed into discrete samples which are anchored to a surface and sequenced or monitored by labeled probes to detect a target specific sequence, e.g., a unique region of chromosome 21, e.g., AML1. [2] Further guidance for the preparation of chromosome 21-unique sequences may be found, for example, in Fuscoe et al., "An Efficient Method for Selecting Unique-Sequence Clones from DNA Libraries and Its Application To Fluorescent Staining of Human Chromosome 21 Using in Situ Hybridization," *Genomics*, vol. 5, 1989, pp. 100-109. [3] A methodology useful in the present invention platform is based on massively parallel sequencing of millions of fragments using attachment of randomly fragmented genomic DNA to a planar, optically transparent surface and solid phase amplification to create a high density sequencing flow cell with millions of clusters, each containing ~1,000 copies of template per sq. cm. [4] These templates are sequenced using four-color DNA sequencing-by-synthesis technology.  See, products offered by Illumina, Inc., San Diego Calif. Also, see US 2003/0022207 to Balasubramanian, et al., published Jan. 30, 2003, entitled "Arrayed polynucleotides and their use in genome analysis."

[5] Sequencing may be combined with amplification-based methods in a microfluidic chip having reaction chambers for both PCR and microscopic template-based sequencing. [6] Only about 30 bp of random sequence information are needed to identify a sequence as belonging to a specific human chromosome. [7] Longer sequences can uniquely identify more particular targets. [8] An algorithm for

-10-

Interference 105,924

> designing unique sequences is described in Yamada, et al.
> "PrimerStation: a highly specific multiplex genomic PCR primer
> design server for the human genome," *Nucleic Acids Res.*,
> Jul. 1, 2006; 34(Web Server issue): W665-W669, illustrative of
> software methods that can be used to identify a sequence in
> comparison to the known genome sequence. **[9]** See, also Zhu et al.,
> "Single molecule profiling of alternative pre-mRNA splicing,"
> Science. 2003 Aug. 8; 301(5634):836-838, describing a single-
> molecule-based technology for studying mRNA.

(Quake '833 application, Exh. 2018, at ¶¶ [0098] and [0099] (bolded sentence
numbers added).)

7.     Lo's witness, Dr. Gabriel, testifies that one of ordinary skill in the art
would have interpreted sentence **[1]** in paragraph [0098] of the Quake '833
application, to mean that a target-specific sequence can be detected either by
sequencing or by monitoring with known labeled probes.  (Gabriel Decl.,
Exh. 1048, ¶ 73.)

8.     Dr. Gabriel testifies that the reference to Fuscoe (Exh. 1014) in
sentence **[2]** in paragraph [0098] of the Quake '833 application, teaches using
chromosome 21-unique probes for fluorescent in situ hybridization to identify
sequences, not using sequencing to identify them.  (Gabriel Decl., Exh. 1048,
¶ 74.)

9.     Dr. Detter testifies that a person of ordinary skill in the art would have
understood sentence **[1]** in paragraph [0098] of the Quake '833 application, to be
directed to two different embodiments, wherein either (1) a sample is anchored to a
surface and then sequenced (which, according to Dr. Detter, is the Illumina
platform) for identification, or (2) a sample is monitored with labeled probes after

-11-

Interference 105,924

PCR amplification for identification.  (Detter Decl., Exh. 2049, ¶¶ 121 and 123.)

10.    Dr. Detter testifies that sentence **[3]** in paragraph [0098] of the Quake '833 application, refers to massively parallel sequencing.  (Detter Decl., Exh. 2049, ¶ 121.)

11.    Lo's witness, Dr. Gabriel, testifies that while sentences **[3]** and **[4]** in paragraph [0098] of the Quake '833 application, discuss massively parallel sequencing and refer to "products offered by Illumina, Inc.,"  Illumina sequencing could have been either targeted or random, depending on whether the DNA fragments had been identified or targeted before sequencing or not.  (Gabriel Decl., Exh. 1048, ¶ 76.)

12.    Dr. Gabriel testifies that given the focus of the '833 application on targeted sequencing, a reference to products of Illumina would not have suggested to one of skill in the art that the inventors intended random sequencing.  (Gabriel Decl., Exh. 1048, at ¶ 76.)

13.    Quake's witness, Dr. Detter, testifies that a massively parallel sequencing system, such as an Illumina system, uses sequencing instead of target-specific primers.  (Detter Decl., Exh. 2049, ¶ 129.)

14.    Dr. Detter testifies that one of skill in the art would not have used sequence-specific primers with the Illumina platform because such primers would have defeated the purpose of the Illumina platform by providing sequence for only a fraction of the fragments presented to be sequenced and, thus, would have wasted the space and resources devoted to an Illumina system.  (Detter Decl., Exh. 2049, ¶ 147.)

-12-

Interference 105,924

15.    Dr. Detter testifies that he is not aware of anyone having ever taken or suggested an approach using specific primers in an Illumina system and that he has has not heard of an Illumina system being configured to use one's own primers. (Detter Decl., Exh. 2049, ¶ 147.)

16.    Lo's witness, Dr. Gabriel, testifies that the Balasubramanian reference in sentence **[4],** paragraph [0098] of the Quake '833 application, provides for amplifying a target sequence with sequence specific primers to preselect for a predetermined target sequence prior to sequencing.  (Gabriel Decl., Exh. 1048, ¶ 77, citing Balasubramanian, at ¶ [0055].)

17.    Dr. Gabriel testifies that Balasubramanian also provides for random massively parallel sequencing.  (Deposition of Stacey Bolk Gabriel, Ph.D., 30 October 2013 ("Gabriel Dep."), Exh. 2078, 60:18-22.)

18.    Quake's witness, Dr. Detter, testifies that Balasubramanian describes using universal primers with randomly fragmented DNA attached to an array of structures to conduct massively parallel sequencing.  (Detter Decl., Exh. 2049, ¶ 143, citing Balasubramanian et al., US Patent Application Publication 2003/0022207, Exh. 2061, at ¶¶ [0052]-[0056].)

19.    Lo's witness, Dr. Gabriel, testifies that because the Quake '833 application is directed, overall, to detection of predetermined target sequences, one of ordinary skill in the art would not have had any reason to understand that the reference to "products offered by Illumina, Inc." or Balasubramanian in the Quake '833 application was a disclosure of random sequencing.  (Gabriel Decl., Exh. 1048, ¶ 77.)

-13-

Interference 105,924

20.    The parties agree that the claim phrases "identifying at least a portion of the nucleic acid sequences as belonging to a . . . chromosome" and "determining a[n] amount of the nucleic acid sequences identified as being uniquely present on the . . . specific human chromosome" mean identifying the sequences by aligning them with a reference chromosome and determining the amount of sequence that aligns to the chromosomes.  (Lo Motion 1, Paper 26, at 14:12-15:1, and MFs 60 and 62; Quake Opp. 1, Paper 47, at response to MFs 60 and 62.)

21.    Dr. Gabriel testifies that one of ordinary skill in the art would have understood the statement in sentence **[6]** in paragraph [0099] of the Quake '833 application, "[o]nly about 30 bp of random sequence information are needed to identify a sequence as belonging to a specific human chromosome," to refer to the minimum size of a unique target sequence in the genome used for amplification. (Gabriel Decl., Exh. 1048, ¶ 80.)

22.    Quake's witness, Dr. Detter testifies that the statement "[l]onger sequences can uniquely identify more particular targets," in sentence **[7]**, paragraph [0099] of the Quake '833 application, would have been understood by one of ordinary skill in the art at the time to mean that while only about 30 bp of random sequence is necessary to align a sequenced fragment to a known sequence as in sentence **[6]**, a longer section of sequence more particularly aligns to a target.  (Detter Decl., Exh. 2049, ¶ 122.)

23.    Dr. Detter, testifies that sentences **[5], [6]**, and **[7]** in paragraph [0099] of the Quake '833 application, describe identification of random nucleic acid sequences to the human genome to identify the sequences aligning with specific human chromosomes.  (Detter Decl., Exh. 2049, ¶¶ 125 and 126.)

-14-

Interference 105,924

24.     Dr. Detter testifies that paragraph [0099] of the Quake '833 application is not applicable to the use of target-specific primers because one would only need to identify or align random sequence information as belonging to a specific human chromosome.  (Detter Decl., Exh. 2049, ¶¶ 127 and 142.)

25.     Lo's witness, Dr. Gabriel, testifies that Yamada, cited in sentence **[8]**, paragraph [0099] of the Quake '833 application, is not related to massively parallel sequencing of randomly selected DNA fragments, but instead teaches about a web service for generating primers to amplify specific target sequences in the human genome.  (Gabriel Decl., Exh. 1048, ¶ 80.)

26.     Dr. Gabriel testifies that the targeted primers taught in Yamada would not be useful for random sequencing of randomly selected DNA fragments that had not been identified in advance.  (Gabriel Decl., Exh. 1048, ¶ 80.)

27.     Quake's witness, Dr. Detter, testifies that Yamada was cited because it is "illustrative of software methods that can identify a sequence in comparison to the known genome sequence," as stated in paragraph [0099] of the Quake '833 application, which, according to Dr. Detter, is an alignment step.  (Detter Decl., Exh. 2049, ¶ 103.)

28.     Lo's witness, Dr. Gabriel, testifies that the '833 application does not disclose a step of aligning sequence reads from random sequencing to a reference chromosome.  (Gabriel Decl., Exh. 1048, ¶ 95.)

29.     Quake's witness, Dr. Detter, testifies that those of skill in the art at the time would have known how to perform the required alignment (Detter Decl., Exh. 2049, ¶¶ 148-150) and how to perform the statistical analysis to determine if there is an aneuploidy (*id.* at ¶ 151).

-15-

Interference 105,924

30.    Dr. Gabriel testifies that the '833 application does not support the sequencing or alignment steps of Quake's involved claims and discusses massively parallel sequencing only briefly and only in the context of determining the presence or absence of a specific target sequence.  (Gabriel Decl., Exh. 1048, ¶ 111.)

31.    Dr. Detter testifies that it would have been clear to one of skill in the art that the Quake '833 application contains a disclosure of a sequencing embodiment in which sequencing the mixture of maternal and fetal genomic DNA in a maternal plasma sample generates random nucleic acid sequences that can be identified as belonging to a specific chromosome and that this disclosure describes the claims of the Quake '833 application.  (Detter Decl., Exh. 2049, ¶ 131.)

*Analysis*

Lo argues that the Quake '833 application is directed exclusively to detecting the presence or absence of predetermined target sequences and does not describe sequencing to obtain *random* nucleic acid sequences.  (Lo Motion 1, Paper 26, at 6:16-7:16.)

Lo relies on the testimony of Dr. Gabriel to argue that the Quake '833 application describes only a "digital analysis" technique in which *known, predetermined target sequences*, not *random unknown* sequences, are detected and quantified. (*Id.*, citing Gabriel Decl., Exh. 1048, ¶¶ 32, 33, and 38, FF 4.) According to Lo, during prosecution Quake tried to show support for random massively parallel sequencing in paragraphs [0098] and [0099] of the '833 application, but Lo argues that the disclosures of these two paragraphs are insufficient because even though "massively parallel sequencing" is mentioned, in

-16-

Interference 105,924

the context of the whole specification it is not provided as a means of random sequencing.  (Lo Motion 1, Paper 26, at 7:17-15:1.)

Quake opposes Lo's motion, arguing that the Quake '833 application is not limited to digital PCR and is not limited to analysis of only targeted, predetermined sequences.  (Quake Opp. 1, Paper 47, at 2:20-23, and 5:17-24.)  Instead, Quake argues that the '833 application discloses massively parallel sequencing as a variant of digital PCR.  (Quake Opp. 1, Paper 47, at 2:8-9 and 21-23.)  Quake argues further that "every aspect of the machinery needed to diagnose aneuploidy using random MPS [massively parallel sequencing] is disclosed in the specification, including the sequencing, alignment, and data analysis steps." (Quake Opp. 1, Paper 47, at 2:17-19.)

Lo argues that paragraph [0098] of the Quake '833 application describes detecting target sequences, for example sequences in chromosome 21, by either sequencing them or by using labeled probes.  (Lo Motion 1, Paper 26, at 8:11-20; Gabriel Decl., Exh. 1048, at ¶¶ 73-74; FFs 7 and 8.)  Lo acknowledges that paragraph [0098] provides for massively parallel sequencing as "[a] methodology useful in the present invention platform . . ." and mentions "products offered by Illumina, Inc.," as well as a patent application by Balasubramanian, but Lo argues that these brief, general statements do not indicate that the inventors intended to use that sequencing technique to identify *random* DNA sequence fragments. (FFs 11-12 and 16-17.)  Lo argues that Illumina products and the methods taught in Balasubramanian have been used with either random or targeted sequencing and that given the overall context of the Quake '833 application, those of skill in the art

-17-

Interference 105,924

would not have consider these references to refer to random sequencing.  (Lo Motion 1, Paper 26, at 9:24-11:14, citing Gabriel Decl., Exh. 1048, ¶¶ 75-77.)

Quake opposes Lo's interpretation of these references and also cites to a reference to Braslavsky[4] in the '833 application to argue that these references provide sufficient support for random massively parallel sequencing.  (Quake Opp. 1, Paper 47, at 4:12-7:17.)  Quake argues[5] further that the '833 application discloses randomly fragmented genomic DNA.  (Quake Opp. 1, Paper 47, at 7:8-18, citing Quake '833 application, Exh. 2018, ¶ [0098] ) and discloses sequencing DNA without prior knowledge the sequence.  (Quake Opp. 1, Paper 47, at 5:17-24 and 6:14-17; FFs 5, 10, 13-15, and 18.)

Quake argues that Dr. Gabriel gave contradictory testimony on cross-examination and admitted that the '833 application discloses random massively parallel sequencing.  (Quake Opp. 1, Paper 47, at 2:11-15.)  We do not agree with Quake's characterization of Dr. Gabriel's testimony.  Though Dr. Gabriel testified that the Quake '833 application discloses massively parallel sequencing, we do not find that she testified the application discloses massively parallel sequencing of *random* DNA fragments.  Instead, when Dr. Gabriel was asked: "Are you saying

---

[4] Braslavaky, et al., "Sequence information can be obtained from single DNA molecules," 100 Proc. Nat'l Acad. Sci., 3960-64 (2003) (Exh. 1013).

[5] Quake also argues that paragraph [0055] of the '833 application discloses anchoring DNA from a sample to a surface without an intermediate selection step, which Quake interprets to mean that there is no pre-selection of particular targets and that, therefore, the DNA must be randomly sequenced.  (Quake Opp. 2, Paper 47, at 6:25-7:6.)  We are not persuaded that disclosure of distributing DNA into a multiwell plate can be interpreted to mean that the sample is randomly sequenced when sequencing is not even mentioned in paragraph [0055].

-18-

Interference 105,924

that targeted massively parallel sequencing is described in the Quake application, but not random massively parallel sequencing?" she replied: "Correct." (Gabriel Dep., Exh. 2078, at 100:2-6.)

Furthermore, we do not find that Dr. Gabriel was inconsistent in her testimony regarding what those of skill in the art would have understood from the reference to Illumina sequencing in the '833 application. Although Dr. Gabriel acknowledged that the references to massively parallel sequencing in the Quake '833 application teach random sequencing, she also consistently testified that they teach targeted sequencing as well. For example, Dr. Gabriel testified:

> Q: Well, do you agree that the Illumina platform is random massively parallel sequencing?
> A: It can be. It can also be targeted massively parallel sequencing.
> ***
> A: Right. But I feel like that is not limited to random sequencing, is what I'm saying.
> Q: Oh. So you're saying it could be both random and targeted: is that what you're saying?
> A: Yes.
> ***
> Q: Okay. And the Illumina sequencing platform is useful for both random and targeted sequencing, right?
> A: Yes.

(Gabriel Dep., Exh. 2078, at 59:18-62:10.) Thus, Dr. Gabriel's testimony supports Lo's argument that those of skill in the art would not necessarily have considered

-19-

Interference 105,924

the reference to Illumina sequencing to be a reference to random massively parallel sequencing because it could have also supported targeted sequencing. [6]

In contrast to Dr. Gabriel's testimony, Dr. Detter testified on cross-examination that the Illumina platform would not have been considered for targeted sequencing before 2010. (Quake Opp. 1, Paper 47, at 6:9-13, citing Detter Dep. Exh. 2079, at 53:19-54:21, 77:9-22, and 91:13-92:16.) Dr. Detter relies on the testimony of Sequenome's (Lo's) witness in a reportedly related litigation, Dr. Metzker, to show that the actual sequencing step in an Illumina platform would not have been done with specific primers. (Detter Decl., Exh. 2049, at ¶ 112.)

We are not persuaded that the reference to Illumina products in paragraph [0098] of the '833 application is a reference to the primers used in the actual sequencing step. Because, as Dr. Gabriel testifies, those of skill in the art could have used targeted primers before the sequencing step in an Illumina platform analysis, we are persuaded that the inventors could have intended paragraph [0098] of the '833 application to refer to this type of analysis.

Furthermore, in her direct testimony, Dr. Gabriel cites to several publications before 2010, even as early as 2006, describing a targeted sequencing

---

[6] Quake also argues that Dr. Gabriel and Sequenom admitted that the Quake inventors were the first to conceive of molecular counting to diagnose aneuploidy (Quake Opp. 1, Paper 47, at 2:11-15, citing several portions of Gabriel Dep., Exh. 2078), we are not persuaded that even if the Quake inventors conceived of using random massively parallel sequencing to do so, this is relevant to the question of whether the Quake '833 application provides sufficient support for the method of Quake's involved claims. Indeed, in the testimony cited by Quake, Dr. Gabriel was not questioned about the Quake specification, but about other documents.

-20-

Interference 105,924

method in which a predetermined target sequence is selected by amplification and then sequenced on a massively parallel sequencing platform.  (*See* Lo Reply 1, Paper 54, at 5:15-18, citing Declaration of Stacy Bolk Gabriel, Exh. 1062, ¶¶ 18-20.)  Specifically, Dr. Gabriel supports her testimony by citing the 454 information sheet[7], which describes selecting a target sequence for amplification and sequencing on a massively parallel platform.  (Declaration of Stacy Bolk Gabriel, Exh. 1062, ¶ 20.)  Dr. Gabriel also cites Metzker[8], which lists a targeted approach for profiling expressed sequence tags and surveying microbial microenvironments and ancient DNA using the massively parallel 454 sequencing platform, and cites Thomas[9], which teaches a targeted approach to detect mutations.  (Declaration of Stacy Bolk Gabriel, Exh. 1062, ¶ 19-20.)

Thus, given that Dr. Gabriel supports her testimony with published references and given that the language of paragraph [0098] of the '833 application does not preclude targeted massively parallel sequencing, we credit Dr. Gabriel's testimony that those of skill in the art could have considered the references in the '833 application to Illumina products to indicate targeted sequencing.

Further, we find that because the references to massively parallel sequencing in the Quake '833 application could have been interpreted as either random or

---

[7] 454 Life Sciences Amplicon Sequencing Template Preparation information sheet from November 2006 (Exh. 1071).

[8] Metzker, "Advances in Next-Generation DNA Sequencing Technologies" in Comparative Genomics: Basic and Applied Research. Ed. James R. Brown. (2008) (Exh. 1010).

[9] Thomas et al., "Sensitive mutation detection in heterogeneous cancer specimens by massively parallel picoliter reaction sequencing," 12 Nat Med 852 (2006) (Exh. 1011).

Interference 105,924

targeted sequencing and given the main focus of the Quake '833 application on diagnosing aneuploidy with digital PCR, those of skill in the art would have understood the discussion of massively parallel sequencing to refer to sequencing targeted, predetermined portions of the DNA in a sample, not sequencing of random DNA.

Lo argues further that like paragraph [0098], paragraph [0099] of the Quake '833 application focuses on analysis of predetermined target sequences, not random sequences as claimed. (Lo Motion 1, Paper 26, at 11:15-12:17.) Lo argues that the statement that "[o]nly about 30 [basepairs ("bp")] of random sequence [being] need[ed] to identify a sequence as belonging to a human chromosome," and the Yamada reference indicate that the inventors of the '833 application were not referring to random sequencing or to alignment of random sequence reads to reference human chromosomes. (Lo Motion 1, Paper 26, at 12:2-5; FFs 21, 25, and 26.) Instead, Lo argues that the inventors were indicating that only about 30 base pairs of sequence are necessary to design specific primers, such as for use in digital PCR and that Yamada refers to methods of generating primers, such as for use in digital PCR analysis. (Lo Motion 1, Paper 26, at 12:7-9.) According to Lo, the Quake '833 application does not disclose aligning a sequence read obtained from random massively parallel sequencing to a human reference genome because aligning sequences is inconsistent with the focus of the application to detect the presence or absence of specific predetermined target sequences in the "digital analysis." (Lo Motion 1, Paper 26, at 15:16-18, citing Gabriel Decl., Exh. 1048, at ¶¶ 94 and 95; FF 28.)

-22-

Interference 105,924

Quake argues that the '833 application discloses comparing a sequence to a known sequence and that Dr. Gabriel did not consider the explanation of Yamada in the '833 application, wherein the program taught is "illustrative" of programs that could have been used to identify sequences in comparison with the genome. (Quake Opp. 1, Paper 47, at 8:19-23 and 9:19-26; FFs 23 and 27.)

We agree with Lo that the isolated words and references in the '833 application that might be interpreted to support Quake's claimed methods could also support the main focus of the application – digital PCR analysis. Given this distinct main focus, those of skill in the art would not have had a credible reason to interpret the isolated words and references as supporting a method using random massively parallel sequencing. Although, Quake argues that Lo has misinterpreted the language of the '833 application that supports random massively parallel sequencing and alignment, we are persuaded that these isolated words are not necessarily a complete written description.

"The appearance of mere indistinct words in a specification or a claim, even an original claim, does not necessarily satisfy [the written description requirement]." *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 968 (Fed. Cir. 2002). "[F]or example, in the nineteenth century, use of the word 'automobile' would not have sufficed to describe a newly invented automobile; an inventor would need to describe what an automobile is, *viz.,* a chassis, an engine, seats, wheels on axles, etc. Thus, generalized language may not suffice if it does not convey the detailed identity of an invention." *Univ. of Rochester v. G.D. Searle & Co., Inc.*, 358 F.3d 916, 922-23 (Fed. Cir. 2004). The mere inclusion of phrases such as "massively parallel," "randomly fragmented DNA," "uniquely identify

-23-

Interference 105,924

more particular targets," and "sequencing a region of interest to determine if it is

the target sequence of interest," does not necessarily indicate that the inventors had

possession of or intended to a method involving

> massively parallel sequencing cell-free genomic DNA
> molecules contained in the plasma or serum sample to obtain random
> nucleic acid sequences from the genomic DNA molecules of the
> female subject and of the at least one fetus [and]
> identifying at least a portion of the nucleic acid sequences as
> belonging to a first specific human chromosome and at least one
> second specific human chromosome,

as recited in Quake claim 25. Even if the Quake '833 application includes the

correct language, it fails to convey Quake's claimed invention because it is not

explained with sufficient detail.

The Quake application does not provide a distinct and full explanation of

massively parallel sequencing to obtain random sequences and of aligning these

random sequences to known genomic sequences to identify them. There are no

examples of this method and we find that much of the description that might have

been interpreted as support could also have been interpreted to support a targeted

method. "[T]he written description requirement does not demand either examples

or an actual reduction to practice . . . ," *Ariad*, 598 F.3d at 1352, but the Quake

specification never describes a complete analysis of aneuploidy using random

massively parallel sequencing. Though the Quake inventors may have possessed

parts of such a method, including massively parallel sequencing, randomly

fragmenting DNA, and aligning sequences to genomic sequences, the facts do not

indicate that those of ordinary skill in the art would have understood the inventors

-24-

Interference 105,924

had put these pieces together into a complete method of sequencing random DNA fragments and identifying the sequenced fragments to determine aneuploidy.

Accordingly, we are not persuaded that the written description of the '833 application would have indicated to those of ordinary skill in the art that the Quake inventors had possession of the random massively parallel sequencing method they claim.

### V. *Lo Motion 7*

Lo argues that certain evidence submitted by Quake in opposition to Lo Motion 1 should be excluded.  We do not reach Lo's arguments.  We considered the evidence objected to but none the less found the evidence sufficient to grant Lo Motion 1.

### VI. Conclusion

Because we find that the Quake '833 application does not provide a sufficient written description for the method of the involved Quake claims as required by 35 U.S.C. § 112, we grant Lo Motion 1.  Accordingly, Quake's involved, copied claims are unpatentable.  We need not determine whether the benefit accorded to Quake upon declaration should be changed, as argued in Lo Motion 5 and Quake Motion 1.  Judgment against Quake will be entered separately.

Interference 105,924

cc (via electronic delivery):

Attorney for Lo:

Michele C. Bosch
Steven P. O'Connor
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
Email: michele.bosch@finnegan.com
Email: steven.oconnor@finnegan.com

Michael J. Wise
Perkins Coie, LLP
Email: mwise@perkinscoie.com

Attorney for Quake:

R. Danny Huntington
Sharon E. Crane
Rothwell, Figg, Ernst & Manbeck, PC
Email: dhuntington@rfem.com
Email: scrane@rfem.com

BoxInterference@uspto.gov
571.272.4683                                          Filed : April 7, 2014

### UNITED STATES PATENT AND TRADEMARK OFFICE

────────────────

### BEFORE THE PATENT TRIAL AND APPEAL BOARD

────────────────

YUK-MING DENNIS **LO**, ROSSA WAI KWUN CHIU, and
KWAN CHEE CHAN
Junior Party
(Application 13/417,119),

v.

STEPHEN **QUAKE** and HEI-MUN CHRISTINA FAN
Senior Party
(Application 12/393,833).

────────────────

Patent Interference No. 105,924 (DK)
(Technology Center 1600)

────────────────

Judgment – Bd.R. 127

*Before*, FRED E. McKELVEY, RICHARD E. SCHAFER, and DEBORAH KATZ, *Administrative Patent Judges*.

KATZ, *Administrative Patent Judge*.

In view of the Decision on Motions (Paper 230), it is

ORDERED that judgment be entered against Quake for Count 1 (*see* Paper 1);

FURTHER ORDERED that claims 25, 29, 32, 40, 42, 78, 79, 86, 87, 90, 91, 93, 95, 97, and 98-101 of Quake's involved application 12/393,833 be FINALLY REFUSED 35 U.S.C. 135(a);

FURTHER ORDERED that a copy of this judgment be entered in the administrative records of the involved 12/393,833 application and Lo application 13/417,119.

FURTHER ORDERED that a party seeking judicial review timely serve notice on the Director of the United States Patent and Trademark Office.  37 C.F.R. §§ 90.1 and 104.2.


NOTICE: "Any agreement or understanding between parties to an interference, including any collateral agreements referred to therein, made in connection with or in contemplation of the termination of the interference, shall be in writing and a true copy thereof filed in the Patent and Trademark Office before the termination of the interference as between the said parties to the agreement or understanding." 35 U.S.C. 135(c); see also Bd.R. 205 (settlement agreements).

cc (via electronic delivery):

Attorney for Lo:

Michele C. Bosch
Steven P. O'Connor
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
Email: michele.bosch@finnegan.com
Email: steven.oconnor@finnegan.com

Michael J. Wise
Perkins Coie, LLP
Email: mwise@perkinscoie.com

Attorney for Quake:

R. Danny Huntington
Sharon E. Crane
Rothwell, Figg, Ernst & Manbeck, PC
Email: dhuntington@rfem.com
Email: scrane@rfem.com

-3-

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VERINATA HEALTH, INC., et al., | Case No. 12-cv-00865-SI |
| Plaintiffs, | |
| v. | **ORDER RE: STATUS OF BIOGEN CASE** |
| SEQUENOM, INC., et al., | |
| Defendants. | |

On February 2, 2015, the Court denied cross-motions for summary judgment filed by Sequenom and CHUK, and *sua sponte* stayed the action pending the Federal Circuit's resolution of the appeal from *Biogen Idec MA, Inc. v. Japanese Found. for Cancer Research*, No. CIV. 13-13061-FDS, 2014 WL 2167677 (D. Mass. May 22, 2014), which found that the proper forum for § 146 appeals from PTAB interference proceedings declared *after* September 16, 2012 is the Federal Circuit, not a district court. Docket No. 345. This Court found that if the Federal Circuit affirmed the *Biogen* ruling, it would likely deprive this Court of subject matter jurisdiction over this case. On May 7, 2015, the Federal Circuit affirmed, thereby depriving this Court of subject matter jurisdiction. *Biogen MA, Inc. v. Japanese Found. for Cancer Research*, 785 F.3d 648 (Fed. Cir. 2015).

On May 8, 2015, CHUK filed a letter requesting that the Court dismiss this action with prejudice. Docket No. 365. In a reply, Stanford urged the Court to postpone any action until the time for initiating *en banc* review had expired, and that in any event, dismissal was an improper remedy. Docket No. 357.

The Court hereby **ORDERS** the parties to file a joint statement no later than July 1, 2015 informing the Court as to the status of the *Biogen* case, and in particular, whether the time for

United States District Court
Northern District of California

1    initiating *en banc* review has expired. In the event that the Federal Circuit will not rehear the case,

2    the Court intends to transfer this action to the Federal Circuit.

3

4

5    **IT IS SO ORDERED.**

6    Dated: June 25, 2015

7

8    _____

9    SUSAN ILLSTON
     United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

2

1

2

3

4

5

6                                  UNITED STATES DISTRICT COURT

7                                  NORTHERN DISTRICT OF CALIFORNIA

8

9    VERINATA HEALTH, INC., et al.,                      Case No.  12-cv-00865-SI

10                          Plaintiffs,

11            v.                                          **ORDER TRANSFERRING CASE TO**
                                                         **FEDERAL CIRCUIT**
12   SEQUENOM, INC., et al.,

13                          Defendants.

14

15

16          On February 2, 2015, the Court denied cross-motions for summary judgment filed by

17   Stanford and CHUK, and *sua sponte* stayed the action pending the Federal Circuit's resolution of

18   the appeal from *Biogen Idec MA, Inc. v. Japanese Found. for Cancer Research*, No. CIV. 13-

19   13061-FDS, 2014 WL 2167677 (D. Mass. May 22, 2014), which found that the proper forum for

20   § 146 appeals from PTAB interference proceedings declared *after* September 16, 2012 is the

21   Federal Circuit, not a district court. Docket No. 345. This Court found that if the Federal Circuit

22   affirmed the *Biogen* ruling, it would likely deprive this Court of subject matter jurisdiction over

23   this case. On May 5, 2015, the Court denied Stanford's motion for reconsideration of its decision

24   to stay the litigation. Docket No. 351. Two days later, the Federal Circuit affirmed, thereby

25   depriving this Court of subject matter jurisdiction. *Biogen MA, Inc. v. Japanese Found. for Cancer*

26   *Research*, 785 F.3d 648 (Fed. Cir. 2015). On August 25, 2015, the parties informed the Court that

27   the Federal Circuit had denied appellant's petition for rehearing *en banc*. Docket No. 362.

28          When a court lacks jurisdiction over a case before it, it may, pursuant to 28 U.S.C. § 1631,

*United States District Court*
*Northern District of California*

"transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed." Accordingly, the Court transfers Stanford's appeal of Interferences 105,920, 105,923, and 105,924 to the Federal Circuit.


**IT IS SO ORDERED**.

Dated: August 27, 2015

_____
SUSAN ILLSTON
United States District Judge

United States District Court
Northern District of California

2

**Appx000089**

# TAB 2:
# PATENT-IN-SUIT



US008008018B2

(12) **United States Patent**　　(10) **Patent No.:**　　**US 8,008,018 B2**

Quake et al.　　　　　　　　　　　(45) **Date of Patent:**　　**\*Aug. 30, 2011**

(54) **DETERMINATION OF FETAL ANEUPLOIDIES BY MASSIVELY PARALLEL DNA SEQUENCING**

(75) Inventors: **Stephen Quake**, Stanford, CA (US); **Hei-Mun Christina Fan**, Mountain View, CA (US)

(73) Assignee: **The Board of Trustees of the Leland Stanford Junior University**, Palo Alto, CA (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/393,803**

(22) Filed: **Feb. 26, 2009**

(65) **Prior Publication Data**

US 2009/0170113 A1　　Jul. 2, 2009

**Related U.S. Application Data**

(63) Continuation of application No. 11/701,686, filed on Feb. 2, 2007, now Pat. No. 7,888,017.

(60) Provisional application No. 60/764,420, filed on Feb. 2, 2006.

(51) **Int. Cl.**
*C12Q 1/68*　　(2006.01)
*C12P 19/34*　　(2006.01)

(52) **U.S. Cl.** ...... **435/6.1**; 435/6.11; 435/6.12; 435/91.2; 436/94

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,641,628 A | 6/1997 | Bianchi | |
| 5,879,883 A | 3/1999 | Benson et al. | |
| 6,100,029 A | 8/2000 | Lapidus et al. | |
| 6,143,496 A | 11/2000 | Brown et al. | |
| 6,214,558 B1 | 4/2001 | Shuber et al. | |
| 6,258,540 B1 | 7/2001 | Lo et al. | |
| 6,391,559 B1 | 5/2002 | Brown et al. | |
| 6,440,706 B1 | 8/2002 | Vogelstein et al. | |
| 6,632,655 B1 | 10/2003 | Mehta et al. | |
| 6,664,056 B2 | 12/2003 | Lo et al. | |
| 6,753,147 B2 | 6/2004 | Vogelstein et al. | |
| 6,927,028 B2 | 8/2005 | Dennis et al. | |
| 7,332,277 B2 | 2/2008 | Dhallan | |
| 7,442,506 B2 | 10/2008 | Dhallan | |
| 7,476,363 B2 | 1/2009 | Unger et al. | |
| 7,645,576 B2 | 1/2010 | Lo et al. | |
| 7,655,399 B2 | 2/2010 | Cantor et al. | |
| 7,727,720 B2 | 6/2010 | Dhallan et al. | |
| 7,838,647 B2 | 11/2010 | Hahn et al. | |
| 7,888,017 B2 * | 2/2011 | Quake et al. ...................... 435/6 |
| 2001/0051341 A1 | 12/2001 | Lo et al. | |
| 2002/0164816 A1 | 11/2002 | Quake | |
| 2003/0022207 A1 | 1/2003 | Balasubramanian | |
| 2003/0044388 A1 | 3/2003 | Dennis et al. | |
| 2003/0186255 A1 | 10/2003 | Williams et al. | |
| 2003/0204331 A1 | 10/2003 | Whitney et al. | |
| 2004/0096892 A1 | 5/2004 | Wang et al. | |
| 2004/0137470 A1 | 7/2004 | Dhallan | |
| 2004/0203037 A1 | 10/2004 | Lo et al. | |
| 2005/0003351 A1 | 1/2005 | Fejgin et al. | |
| 2005/0019792 A1 | 1/2005 | McBride et al. | |
| 2005/0037388 A1 | 2/2005 | Antonarakis et al. | |
| 2005/0129581 A1 | 6/2005 | McBride et al. | |
| 2005/0145496 A1 | 7/2005 | Goodsaid et al. | |
| 2005/0164241 A1 | 7/2005 | Hahn et al. | |
| 2005/0221341 A1 | 10/2005 | Shimkets et al. | |
| 2005/0221373 A1 | 10/2005 | Enzelberger et al. | |
| 2005/0252773 A1 | 11/2005 | McBride et al. | |
| 2006/0046258 A1 | 3/2006 | Lapidus et al. | |
| 2006/0051775 A1 | 3/2006 | Bianchi et al. | |
| 2006/0121452 A1 | 6/2006 | Dhallan | |
| 2006/0252068 A1 | 11/2006 | Lo et al. | |
| 2006/0252071 A1 | 11/2006 | Lo et al. | |
| 2007/0059680 A1 | 3/2007 | Kapur et al. | |
| 2007/0134658 A1 | 6/2007 | Bohmer et al. | |
| 2007/0202525 A1 | 8/2007 | Quake et al. | |
| 2007/0207466 A1 | 9/2007 | Cantor et al. | |
| 2007/0212689 A1 | 9/2007 | Bianchi et al. | |
| 2007/0238105 A1 | 10/2007 | Barrett et al. | |
| 2007/0275402 A1 | 11/2007 | Lo et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

EP　　0994963 B1　　5/2003

(Continued)

OTHER PUBLICATIONS

EPO Examination Report, Application No. 07 763 674.4, Dec. 21, 2010, 3 pp.

Satiroglu Tufan, N. Lale, et al., Analysis of Cell-Free Fetal DNA from Maternal Plasma and Serum Using a Conventional Multiplex PCR: Factors Influencing Success, Turk J Med Sci, 35 (2005) 85-92.

Maureen Martin, et al., "A Method for Using Serum or Plasma as a Source of DNA for HLA Typing," Human Immunology, 1992, vol. 33, 108-113.

Stuart L Emanuel, et al., "Amplification of Specific Gene Products from Human Serum," GATA, 1993, Vol. 10, No. 6, 144-146.

Y-M. D. Lo, et al., "Prenatal Sex Determination by DNA Amplification from Maternal Peripheral Blood," The Lancet, Dec. 9, 1989, 1363-1365.

Y-M. D. Lo, et al., "Detection of fetal RhD sequence from peripheral blood of sensitized RhD-negative pregnant women," British Journal of Haematology, 1994, vol. 87, 658-660.

(Continued)

*Primary Examiner* — Carla Myers

(74) *Attorney, Agent, or Firm* — David J. Aston; Peters Verny, LLP

(57) **ABSTRACT**

The present methods are exemplified by a process in which maternal blood containing fetal DNA is diluted to a nominal value of approximately 0.5 genome equivalent of DNA per reaction sample. Digital PCR is then be used to detect aneuploidy, such as the trisomy that causes Down Syndrome. Since aneuploidies do not present a mutational change in sequence, and are merely a change in the number of chromosomes, it has not been possible to detect them in a fetus without resorting to invasive techniques such as amniocentesis or chorionic villi sampling. Digital amplification allows the detection of aneuploidy using massively parallel amplification and detection methods, examining, e.g., 10,000 genome equivalents.

**4 Claims, 5 Drawing Sheets**

**US 8,008,018 B2**

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2008/0020390 | A1 | 1/2008 | Mitchell et al. |
| 2008/0026390 | A1 | 1/2008 | Stoughton et al. |
| 2008/0038733 | A1 | 2/2008 | Bischoff et al. |
| 2008/0050739 | A1 | 2/2008 | Stoughton et al. |
| 2008/0070792 | A1 | 3/2008 | Stoughton et al. |
| 2008/0071076 | A1 | 3/2008 | Hahn et al. |
| 2008/0090239 | A1 | 4/2008 | Shoemaker et al. |
| 2008/0096216 | A1 | 4/2008 | Quake |
| 2008/0096766 | A1 | 4/2008 | Lee |
| 2008/0113358 | A1 | 5/2008 | Kapur et al. |
| 2008/0124721 | A1 | 5/2008 | Fuchs |
| 2008/0138809 | A1 | 6/2008 | Kapur et al. |
| 2008/0153090 | A1 | 6/2008 | Lo et al. |
| 2008/0182261 | A1 | 7/2008 | Bianchi |
| 2008/0193927 | A1 | 8/2008 | Mann et al. |
| 2008/0213775 | A1 | 9/2008 | Brody et al. |
| 2008/0220422 | A1 | 9/2008 | Shoemaker et al. |
| 2008/0299562 | A1 | 12/2008 | Oeth et al. |
| 2009/0029377 | A1 | 1/2009 | Lo et al. |
| 2009/0087847 | A1 | 4/2009 | Lo et al. |
| 2009/0170114 | A1 | 7/2009 | Quake et al. |
| 2009/0280492 | A1 | 11/2009 | Stoughton et al. |
| 2009/0291443 | A1 | 11/2009 | Stoughton et al. |
| 2010/0094562 | A1 | 4/2010 | Shohat et al. |
| 2010/0112575 | A1 | 5/2010 | Fan et al. |
| 2010/0216151 | A1 | 8/2010 | Lapidus et al. |
| 2010/0216153 | A1 | 8/2010 | Lapidus et al. |
| 2010/0291572 | A1 | 11/2010 | Stoughton et al. |
| 2011/0003293 | A1 | 1/2011 | Stoughton et al. |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 2161347 A2 | 3/2010 |
| WO | WO 03/020974 A2 | 3/2003 |
| WO | 03048295 | 6/2003 |
| WO | WO 2004/065629 A1 | 8/2004 |
| WO | WO 2005/023091 A2 | 3/2005 |
| WO | WO 2005/118852 A2 | 12/2005 |
| WO | 2006010610 A2 | 1/2006 |
| WO | WO 2006/108101 A2 | 10/2006 |
| WO | 2007044091 A2 | 4/2007 |
| WO | WO 2007/075836 A2 | 7/2007 |
| WO | WO 2007/092473 A2 | 8/2007 |
| WO | WO 2007/132166 A2 | 11/2007 |
| WO | WO 2007/132167 A2 | 11/2007 |
| WO | 2009013492 A1 | 1/2009 |
| WO | 2009013496 A1 | 1/2009 |
| WO | 2009019455 A2 | 2/2009 |

### OTHER PUBLICATIONS

Y. M. Dennis Lo, et al., "Presence of fetal DNA in maternal plasma and serum," The Lancet, Aug. 16, 1997, vol. 350, 485-487.

Jouni Uitto, et al., "Probing the fetal genome: progress in non-invasive prenatal diagnosis," Trends in Molecular Medicine, Aug. 2003, vol. 9, No. 8, 339-343.

Sinuhe Hahn, et al., "Prenatal Diagnosis Using Fetal Cells and Cell-Free Fetal DNA in Maternal Blood: What is Currently Feasible?" Clinical Obstetrics and Gynecology, Sep. 2002, vol. 45, No. 3, 649-656.

Barbara Pertl, et al., "Fetal DNA in Maternal Plasma: Emerging Clinical Applications," Obstetrics and Gynecology, Sep. 2001, vol. 98, No. 3, 483-490.

Leo L.M. Poon, et al., "Circulating fetal DNA in maternal plasma," Clinical Chimica Acta, 2001, vol. 313, 151-155.

Y-M. D. Lo, et al., "Fetal DNA in Maternal Plasma," Ann. N.Y. Acad. Sci, Apr. 2000, vol. 906, 141-147.

Y-M. D. Lo, et al., "Detection of single-copy fetal DNA sequence from maternal blood," The Lancet, Jun. 16, 1990, vol. 335, 1463-1464.

Y.M. Dennis Lo, et al., "Quantitative Analysis of Fetal NA in Maternal Plasma and Serum: Implications for Noninvasive Prenatal Diagnosis," Am J. Hum. Genet., 1998, vol. 62, 768-775.

Bert Vogelstein, et al., "Digital PCR," Proc. Natl. Acad. Sci. USA, Aug. 1999, vol. 96., 9236-9241.

Rossa W.K. Chiu, et al., "Effects of Blood-Processing Protocols on Fetal and Total DNA Quantification in Maternal Plasma," Clinical Chemistry, 2001, vol. 47, No. 9, 1607-1613.

Ilona Hromadnikova, et al., "Quantitative analysis of DNA levels in maternal plasma in normal and Down syndrome pregnancies," Bio Med Central, May 2002, 1-5.

Enders K.O. Ng, et al., "The Concentration of Circulating Corticotropin-releasing Hormone mRNA in Maternal Plasma Is Increased in Preeclampsia," Clinical Chemistry, 2003, vol. 49, No. 5, 727-731.

Ido Braslavsky, et al., "Sequence information can be obtained from single DNA molecules," PNAS, Apr. 2003, vol. 100, No. 7, 3960-3964.

Jun Zhu, et al., "Single Molecule Profiling of Alternative Pre-mRNA Splicing," Science, Aug. 2003, vol. 301, 836-838.

Devin Dressman, et al., "Transforming single DNA molecules into fluorescent magnetic particles for detection and enumeration of genetic variations," PNAS, Jul. 2003, vol. 100, No. 15, 8817-8822.

Eugene Y. Chan, et al., "DNA Mapping Using Microfluidic Stretching and Single-Molecule Detection of Fluorescent Site-Specific Tags," Genome Research, 2004, vol. 14, 1137-1146.

Ai Sheng Xiong, et al., "A simple, rapid, high-fidelity and cost-effective PCR-based two-step DNA synthesis method for long gene sequences," Nucleic Acids Research, Apr. 19, 2004, vol. 32, No. 12, e98.

Jong Wook Hong, et al., "Molecular biology on a microfluidic chip," Journal of Physics: Condensed Matter, 2006, vol. 18, S691-S701.

Elizabeth A. Ottesen, et al., "Microfluidic Digital PCR Enables Multigene Analysis of Individual Environmental Bacteria," Science, Dec. 2006, vol. 314, 1464-1467.

Joshua S. Marcus, et al., "Parallel Picoliter RT-PCR Assays Using Microfluidics," Analytical Chemistry, Feb. 1, 2006, vol. 78, No. 3, 956-958.

Y. M. Dennis Lo, et al., "Plasma placental RNA allelic ratio permits noninvasive prenatal chromosomal aneuploidy detection," Nature Medicine, Jan. 2007, 1-6.

Joshua S. Marcus, et al., "Microfluidic Single-Cell mRNA Isolation and Analysis," American Chemical Society, Mar. 2006, p. A-F.

Ryo Kimura, et al., "The DYRK1A gene, encoded in chromosome 21 Down syndrome critical region, bridges between b-amyloid production and tau phosphorylation in Alzheimer disease," Human Molecular Genetics, Nov. 29, 2006, vol. 16, No. 1, 15-23.

Y. M. Dennis Lo, et al., "Prenatal diagnosis: progress through plasma nucleic acids," Nature, Jan. 2007, vol. 8, 71-76.

Tetsuya S. Tanaka, et al., "Genome-wide expression profiling of mid-gestation placenta and embryo using a 15,000 mouse developmental cDNA microarray," PNAS, Aug. 2000, vol. 97, No. 16, 9127-9132.

"Separation of RNA & DNA by Gel Filtration Chromatography," Edvotek, 1987, 1-9.

International Search Report and Written Opinion for PCT/US2007/003209, received Sep. 22, 2008.

Sean Maloney, et al., "Microchimerism of maternal origin persists into adult life," Journal of Clinical Investigation, Jul. 1999, vol. 104, No. 1, 41-47.

M. Nelson, et al., "Genotyping fetal DNA by non-invasive means: extraction from maternal plasma," Vox Sanguinis, 2001, vol. 80, 112-116.

Maureen Martin, et al., "A Method for Using Serum or Plasma as a Source of DNA for HLA Typing," Human Immunology, 1992, vol. 33, 108-113.

Stuart L. Emanuel, et al., "Amplification of Specific Gene Products from Human Serum," GATA, 1993, vol. 10, No. 6, 144-146.

Y-M. D. Lo, et al., "Prenatal Sex Determination by DNA Amplification from Maternal Peripheral Blood," The Lancet, Dec. 9, 1989, 1363-1365.

Y-M. D. Lo, et al., "Detection of fetal RhD sequence from peripheral blood of sensitized RhD-negative pregnant women," British Journal of Haematology, 1994, vol. 87, 658-660.

Y. M. Dennis Lo, et al., "Presence of fetal DNA in maternal plasma and serum," The Lancet, Aug. 16, 1997, vol. 350, 485-487.

Jouni Uitto, et al., "Probing the fetal genome: progress in non-invasive prenatal diagnosis," Trends in Molecular Medicine, Aug. 2003, vol. 9, No. 8, 339-343.

**US 8,008,018 B2**

Page 3

Sinuhe Hahn, et al., "Prenatal Diagnosis Using Fetal Cells and Cell-Free Fetal DNA in Maternal Blood: What is Currently Feasible?" Clinical Obstetrics and Gynecology, Sep. 2002, vol. 45, No. 3, 649-656.

Barbara Pertl, et al., "Fetal DNA in Maternal Plasma: Emerging Clinical Applications," Obstetrics and Gynecology, Sep. 2001, vol. 98, No. 3, 483-490.

Leo L.M. Poon, et al., "Circulating fetal DNA in maternal plasma," Clinical Chimica Acta, 2001, vol. 313, 151-155.

Y-M. D. Lo, et al., "Fetal DNA in Maternal Plasma," Ann. N.Y. Acad. Sci, Apr. 2000, vol. 906, 141-147.

Y-M. D. Lo, et al., "Detection of single-copy fetal DNA sequence from maternal blood," The Lancet, Jun. 16, 1990, vol. 335, 1463-1464.

Fiona M. F. Lun, et al., "Microfluidics Digital PCR Reveals a Higher than Expected Fraction of Fetal DNA in Maternal Plasma," Clinical Chemistry, 2008, vol. 54, No. 10, 1664-1672.

Young Ho Yang, et al., "Rapid Prenatal Diagnosis of Trisomy 21 by Real-time Quantitative Polymerase Chain Reaction with Amplification of Small Tandem Repeats and S100B in Chromosome 21," Yonsei Medical Journal, 2005, vol. 46, No. 2, 193-197.

Vincenzo Cirigliano, et al., "Clinical application of multiplex quantitative fluorescent polymerase chain reaction (QF-PCR) for the rapid prenatal detection of common chromosome aneuploidies," Molecular Human Reproduction, 2001, vol. 7, No. 10, 1001-1006.

Rebecca Sparkes, et al., "New Molecular Techniques for the Prenatal Detection of Chromosomal Aneuploidy," JOGC, Jul. 2008, No. 210, 617-621.

Y.M. Dennis Lo, et al., "Digital PCR for the molecular detection of fetal chromosomal aneuploidy," PNAS, Aug. 7, 2007, vol. 104, No. 32, 13116-13121.

Haissam Rahil, et al., Rapid detection of common autosomal aneuploidies by quantitative fluorescent PCR on uncultured amniocytes, European Journal of Human Genetics, 2002, vol. 10, 462-466.

Bernhard Zimmermann, "Molecular Diagnosis in Prenatal Medicine," Ph.D. Thesis, 2004.

Yuk-Ming Dennis Lo, "Noninvasive prenatal detection of fetal chromosomal aneuploidies by maternal plasma nucleic acid analysis: a review of the current state of the art," BJOG, 2009, vol. 116, 152-157.

Jay Shendure, et al., "Next-generation DNA sequencing," Nature, 2008, vol. 26, No. 10, 1135-1145.

H. Christina Fan, et al., "Noninvasive diagnosis of fetal aneuploidy by shotgun sequencing DNA from maternal blood," PNAS, Oct. 21, 2008, vol. 105, 16266-16271.

Richard A. White III, et al., "Digital PCR provides sensitive and absolute calibration for high throughput sequencing," BMC Genomics, Mar. 19, 2009, 10:116.

Frank Diehl, et al., "Digital quantification of mutant DNA in cancer patients," Curr Opin Oncol, 2007, 19:36-42.

P.J. Sykes, et al., "Quantitation of Targets for PCR by Use of Limiting Dilution," BioTechniques, 1992, vol. 13, No. 3, 444-449.

B. Zimmermann, et al., "Novel Real-Time Quantitative PCR Test for Trisomy 21," Jan. 1, 2002, Clinical Chemistry, American Association for Clinical Chemistry, vol. 48, No. 2, 362-363.

Ying Li, et al., "Size Separation of Circulatory DNA in Maternal Plasma Permits Ready Detection of Fetal DNA Polymorphisms," 2004, Clinical Chemistry, vol. 50, No. 6, 1002-1001.

H. Christina Fan, et al., "Detection of Aneuploidy with Digital Polymerase Chain Reaction," Analytical Chemistry, Oct. 1, 2007, vol. 79, No. 19, 7576-7579.

H. Christina Fan, et al., "Microfluidic digital PCR enables rapid prenatal diagnosis of fetal aneuploidy," American Journal of Obstetrics & Gynecology, May 2009, 543e1-543-e7.

EPO Search Report, 07 763 674.4, Jul. 31, 2009.

International Search Report and Written Opinion for PCT/US2007/003209, received Sep. 22, 2008.

Pohl et al., Principle and applications of digital PCR, Expert Reviews in Molecular Diagnosis. 2004. 4: 41-47.

Chan et al., Size Distributions of Maternal and Fetal DNA in Maternal Plasma, Clinical Chemistry. 2004. 50: 88-92.

Nelson et al., Genotyping fetal DNA by non-invasive means: extraction from maternal plasma, Vox Sanguinis. 2001. 80: 112-116.

Maloney et al., Microchimerism of maternal origin persists into adult life, Jounal Clinical Investigation. 1999. 104: 41-47.

Leutwyler, K., Mapping Chromosomes 21, Scientific American, May 15, 2000.

Tettelin, T., et al., "The nucleotide sequence of Saccharomyces cerevisiae chromosome VII," Nature 1997, 387:81-84.

Zavala, A., et al., "Genomic GC content prediction in prokaryotes from a sample of genes," Gene 2005, 357(2):127-143.

International Search Report, International Application No. PCT/US 09/57136, Mar. 16, 2010.

Dhallan et al., "A non-invasive test for prenatal diagnosis based on fetal DNA present in maternal blood: a preliminary study," Lancet 369:474-481 (Feb. 2 2007).

Chiu, et al. Non-invasive prenatal assessment of trisomy 21 by multiplexed maternal plasma DNA sequencing: large scale validity study. BMJ. Jan. 11, 2011;342:c7401. doi: 10.1136/bmj.c7401.

Chiu, et al. Noninvasive prenatal diagnosis of fetal chromosomal aneuploidy by massively parallel genomic sequencing of DNA in maternal plasma. Proc Natl Acad Sci U S A. Dec. 23, 2008;105(51):20458-63.

European Search Opinion dated Jul. 31, 2009 for EP07763674.4.

European search report dated Nov. 9, 2009 for Application No. 7784442.1.

European search report dated Dec. 21, 2009 for Application No. 07798579.4.

European search report dated Dec. 22, 2009 for Application No. 07798580.2.

European search report dated Dec. 22, 2009 for Application No. 07784444.7.

Hong, et al. A nanoliter-scale nucleic acid processor with parallel architecture. Nat. Biotechnol. 2004; 22(4):435-9.

International preliminary report on patentability dated Oct. 29, 2008 for PCT/US2007/003209.

Kasakov, et al. Extracellular DNA in the blood of pregnant women. Tsitologiia. 1995;37(3):232-6. (English translation only).

Office action dated Dec. 3, 2008 for U.S. Appl. No. 11/763,426 with pending claims.

Office Action dated Jan. 12, 2009 for U.S. Appl. No. 11/763,133 with pending claims.

Office action dated Mar. 4, 2009 for U.S. Appl. No. 11/228,454 with pending claims.

Office action dated Jul. 10, 2009 for U.S. Appl. No. 11/763,421 with pending claims.

Office action dated Sep. 23, 2009 for EP Application No. EP07763674.4 with pending claims.

Office action dated Nov. 3, 2009 for U.S. Appl. No. 11/763,133 with pending claims.

Office action dated Dec. 1, 2009 for U.S. Appl. No. 11/763,426 with pending claims.

Office action dated Dec. 31, 2009 for U.S. Appl. No. 11/763,421 with pending claims.

Office action dated Mar. 11, 2010 for U.S. Appl. No. 11/763,245 with pending claims.

Office action dated Jun. 14, 2010 for U.S. Appl. No. 11/763,426 with pending claims.

Office action dated Feb. 15, 2011 for U.S. Appl. No. 11/763,426 with pending claims.

US 8,008,018 B2

Page 4

Office action dated Mar. 29, 2011 for U.S. Appl. No. 11/763,245 with pending claims.

Office action dated May 6, 2011 for U.S. Appl. No. 11/763,133 with pending claims.

Office action (Ex parte Quayle) dated May 13, 2011 for U.S. Appl. No. 11/763,421 with pending claims.

Office action dated May 18, 2011 for U.S. Appl. No. 12/413,467 with pending claims.

Sehnert, et al. Optimal Detection of Fetal Chromosomal Abnormalities by Massively Parallel DNA Sequencing of Cell-Free Fetal DNA from Maternal Blood. Clin Chem. Apr. 25, 2011. [Epub ahead of print].

Solexa Genome Analysis System. 2006; 1-2.

Voelkerding, et al. Digital fetal aneuploidy diagnosis by next-generation sequencing. Clin Chem. Mar. 2010;56(3):336-8.

* cited by examiner



Fig. 1A



Fig. 1B

Appx000094



Fig. 1C

**Appx000095**



**Chr21 FAM**

Fig. 2



**Chr 12 HEX**

Fig. 3



Fig. 4

1

## DETERMINATION OF FETAL ANEUPLOIDIES BY MASSIVELY PARALLEL DNA SEQUENCING

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims priority from U.S. Provisional Patent Application No. 60/764,420 filed on Feb. 2, 2006, and U.S. Utility patent application Ser. No. 11/701,686, filed Feb. 2, 2007, which are hereby incorporated by reference in their entirety.

### STATEMENT OF GOVERNMENTAL SUPPORT

This invention was made with U.S. Government support under contract 0535870 awarded by the National Science Foundation. The U.S. Government has certain rights in this invention.

### REFERENCE TO SEQUENCE LISTING

Applicants assert that the paper copy of the Sequence Listing is identical to the Sequence Listing in computer readable form found on the accompanying computer file. Applicants incorporate the contents of the sequence listing by reference in its entirety.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to the field of fetal genetic screening and to the field of quantitative nucleic acid analysis.

2. Related Art

It is now recognized that fetal DNA sheds from the placenta and mixes with the mother's blood at fairly high levels—between 3% and 6% of DNA in the mother's blood is from the fetus. This observation has been used in conjunction with PCR assays for a variety of fetal genetic screens—gender, Rh, and thalassemia. However, the technique remains limited for two primary reasons: first, the PCR assays trade off sensitivity for specificity, making it difficult to identify particular mutations, and second, the most common genetic disorder, Down Syndrome, is a chromosomal trisomy and therefore cannot be detected by conventional PCR in a mixed sample.

It has now been found that these problems can be solved by quantitative examination of large numbers of chromosome samples through the use of highly scalable techniques. This approach is termed here "digital analysis," and involves the separation of extracted genomic material into discrete units so that the detection of a target sequence (e.g., chromosome 21) may be simply quantified as binary (0, 1) or simple multiples, 2, 3, etc. The primary example of a technique that can be used to yield such "digital" results is "digital PCR," which allows efficient amplification from single molecules, followed by subsequent quantitative analysis. Digital PCR, as the term is used here, refers to a quantitative, limited dilution of a nucleic acid sample, such as into multiwell plates, then the amplification of a nucleic acid molecule in a well, which due to the dilution, should be either 0 or 1 molecule. Digital PCR using multiwell plates has been used previously to detect rare mutations by either serial analysis of single molecule (i.e., clonal) amplicons (Vogelstein B, Kinzler K W. Proc Natl Acad Sci USA. 1999 Aug. 3; 96 (16): 9236-41) or by enhancing the sensitivity of differential amplification (http://www-.fluidigm.com/didIFC.htm). Described below is an invention whereby digital PCR can be applied to noninvasive fetal

2

diagnostics in order to detect fetal mutations with specificity and sensitivity beyond what is possible with conventional PCR analysis.

Furthermore, as also described in connection with the invention described below, digital PCR can be used to detect aneuploidy, such as the trisomy that causes Down Syndrome. Since aneuploidies do not present a mutational change in sequence, and are merely a change in the number of chromosomes, it has not been possible to detect them in a fetus without resorting to invasive techniques such as amniocentesis or chorionic villi sampling (Science 309, 2 Sep. 2005 pp. 1476-8).

Another form of digital PCR has been described as emulsion PCR, which has been used to prepare small beads with clonally amplified DNA—in essence, each bead contains one amplicon of digital PCR. (Dressman et al, Proc Natl Acad Sci USA. 100, 8817 (Jul. 22, 2003)).

Another form of Digital PCR can be carried out using microfluidics. In this embodiment, described below, DNA is diluted and separated into small, discrete samples for forming reaction samples by a series of channels and valves.

An example of a suitable method for single molecule analysis that may be adapted to the present methods is given in Braslavsky et al., "Sequence information can be obtained from single DNA molecules, *Proc. Nat. Acad. Sci.* 100(7): 3960-3964 (2003), which uses sequential incorporation of labeled nucleotides onto an immobilized single stranded DNA template and monitoring by fluorescent microscopy.

Another aspect of the relevant art involves sample preparation in order to carry out the present processes. That is, the fetal DNA may be enriched relative to maternal DNA. Chan, et al., "Size Distribution of Maternal and Fetal DNA in Maternal Plasma," *Clin. Chem.* 50(1): 88-92 (2004) reports that plasma DNA molecules are mainly short DNA fragments. The DNA fragments in the plasma of pregnant women are significantly longer than DNA fragments from non-pregnant women, and longer than fetal DNA.

Related Publications and Patents

Vogelstein et al., "Digital Amplification," U.S. Pat. No. 6,440,705, issued Aug. 27, 2002, discloses the identification of pre-defined mutations expected to be present in a minor fraction of a cell population.

Lo, "Fetal DNA in Maternal Plasma: Biology and Diagnostic Applications," *Clin. Chem.* 46:1903-1906 (2000) discloses the demonstration of fetal DNA in maternal plasma. The authors found a mean fractional level of 3.4% fetal DNA in maternal DNA in plasma during early pregnancy. The authors report detection of the RhD gene and microsatellite polymorphisms in the plasma of pregnant women.

Li et al., "Detection of Paternally Inherited Fetal Point Mutations for β-Thalassemia Using Size Fractionated Cell-Free DNA in Maternal Plasma," *J. Amer. Med. Assoc.* 293: 843-849 (Feb. 16, 2005) discloses that the analysis of cell-free fetal DNA in maternal plasma has proven to be remarkably reliable for the assessment of fetal loci absent from the maternal genome, such as Y-chromosome specific sequences or the RhD gene in pregnant women who are Rh-negative. The authors report on the extraction and size fractionation of maternal plasma DNA using agarose gel electrophoresis. Then, peptide-nucleic acids (PNA) were used to bind specifically to a maternal allele to suppress PCR amplification of the of the wild type maternal allele, thereby enriching for the presence of paternally inherited mutant sequences. Four distinct point mutations in the β-globin gene were examined. It was found that the PNA step was necessary for the detection of mutant alleles using allele specific PCR.

3

Lo et al., "Quantitative Analysis of Fetal DNA in Maternal Plasma and Serum: Implications for Noninvasive Prenatal Diagnosis," *Am. J. Hum. Genet.* 62:768-775 (1998) disclose a real-time quantitative PCR assay to measure the concentration of fetal DNA in maternal plasma and serum. The authors found a mean of 25.4 genome equivalents/ml of fetal DNA in early pregnancy. This corresponds to about 3.4% of total DNA in early pregnancy.

Chan et al., "Size Distribution of Maternal and Fetal DNA in Maternal Plasma," *Clin. Chem.* 50:89-92 (January 2004) investigated the size distribution of plasma DNA in non-pregnant women and pregnant women, using a panel of quantitative PCR assays with different amplicon sizes targeting the leptin gene. They found that the DNA fragments in the plasma of pregnant women are significantly longer than those in the plasma of non-pregnant women, and the maternal-derived DNA molecules are longer than the fetal-derived ones.

Tufan et al., "Analysis of Cell-Free Fetal DNA from Maternal Plasma and Serum Using a Conventional Multiplex PCR: Factors Influencing Success," *Turk. J. Med. Sci.* 35: 85-92 (2005) compared the success rates of two different DNA extraction techniques, the heat based direct method and the QIAMP DNA blood mini kit method. The crucial role of PCR optimization was also reported. The authors used the DYS14 marker for the Y chromosome and the GAPH gene for a control. The QIAMP mini kit was found to give the best results in sex determination analysis using multiplex PCR and ethidium bromide staining on gels.

Hromadnikova et al., "Quantitative analysis of DNA levels in maternal plasma in normal and Down Syndrome pregnancies," *BMC Pregnancy and Childbirth* 2(4): 1-5 (2002), investigated total DNA levels in maternal plasma and found no difference in fetal DNA levels between the patients carrying Down Syndrome fetuses and the controls. Real time quantitative PCR analysis was performed using primers to the β-globin gene and the SRY locus.

Grundevikk and Rosen, "Molecular Diagnosis of Aneuploidies," published on line at http://www.molbiotech.chalmers.se/research/mk/mbtk/Molecular%20diagnostics%20of %20aneuploidies%20-%20rapport.pdf, suggests that non-invasive methods for detection of aneuploidies (such as Down Syndrome, Edwards Syndrome or extra sex chromosomes) may be carried out on fetal nucleated cells isolated from maternal blood. In their review, the authors also describe quantitative fluorescence polymerase chain reaction (QF-PCR), based on amplification of short tandem repeats specific for the chromosome to be tested. They describe tests where DNA was amplified from amniotic or chorionic villus samples. The authors suggest that the STR markers will give PCR products of different size, and these size differences may be studied by analyzing peak sizes in electrophoresis. It is also proposed that quantitative real time PCR may be used to diagnose Down Syndrome by comparing the amount of a gene located on chromosome 12 to the amount of a gene located on another autosomal chromosome. If the ratio of these two genes is 1:1, the fetus is normal, but if the ratio of these genes is 3:2, it indicates Down Syndrome. The authors propose the use of Down Syndrome marker DSCR3. They also suggest that the housekeeping gene GAPDH on chromosome 12 can be used as a reference.

Poon et al., "Differential DNA Methylation between Fetus and Mother as a Strategy for Detecting Fetal DNA in Maternal Plasma," *Clin. Chem.* 48(1): 35-41 discloses the detection of genes or mutations in a fetus where the same mutation or condition is also present in maternal DNA. That is, the use of fetal DNA in maternal plasma is limited due to the low

4

amount of fetal DNA compared to maternal DNA. The authors overcame this limitation by detecting the IGF2-H19 locus, which is maintained in a methylated DNA status in the paternal allele and is unmethylated in the maternal allele. The authors used a bisulfite modification kit whereby unmethylated cytosine residues were converted to uracil. The sequence difference between methylated and unmethylated DNA sequences could be distinguished with different PCR primers. DNA extracted from buffy coat was used.

Science 309:1476 (2 Sep. 2005) News Focus "An Earlier Look at Baby's Genes" describes attempts to develop tests for Down Syndrome using maternal blood. Early attempts to detect Down Syndrome using fetal cells from maternal blood were called "just modestly encouraging." The report also describes work by Dennis Lo to detect the Rh gene in a fetus where it is absent in the mother. Other mutations passed on from the father have reportedly been detected as well, such as cystic fibrosis, beta-thalassemia, a type of dwarfism and Huntington's disease. However, these results have not always been reproducible.

United States Patent Application 20040137470 to Dhallan, Ravinder S, published Jul. 15, 2004, entitled "Methods for detection of genetic disorders," describes a method for detecting genetic disorders using PCR of known template DNA and restriction analysis. Also described is an enrichment procedure for fetal DNA. It also describes a method used to detect mutations, and chromosomal abnormalities including but not limited to translocation, transversion, monosomy, trisomy, and other aneuploidies, deletion, addition, amplification, fragment, translocation, and rearrangement. Numerous abnormalities can be detected simultaneously. The method is said to provide a non-invasive method to determine the sequence of fetal DNA from a tissue, such as blood, drawn from a pregnant female, and a method for isolating free nucleic acid from a sample containing nucleic acid.

BRIEF SUMMARY OF THE INVENTION

The following brief summary is not intended to include all features and aspects of the present invention, nor does it imply that the invention must include all features and aspects discussed in this summary.

Briefly, the present invention is directed to a method of differential detection of target sequences in a mixture of maternal and fetal genetic material. One obtains maternal tissue containing both maternal and fetal genetic material. Preferably, the maternal tissue is maternal peripheral blood or blood plasma. The term "plasma" may include plasma or serum. The genetic material may be genomic DNA or RNA, preferably mRNA. In the case of mRNA, one may choose target sequences corresponding to genes that are highly expressed in the placenta for fetal genetic material. The genetic material (e.g., DNA) in each reaction sample is detected with a sequence specific reactant directed to at least one of two target sequences in the genetic material to obtain a detectible reaction product if the target sequence is present in the reaction sample. For example, a probe specific to chromosome 21 is bound to the reaction sample, along with a control probe specific to another chromosome. In most cases, the results will be from maternal DNA, but a small number of results will be obtained from fetal DNA. In order to distinguish random variation from fetal results, a large number of reactions are run, and statistical methods are applied to the results. The labeling and detection in the present method is used to distinguish the presence or absence of a single target sequence, referred to as "digital analysis," although it may be performed with sensitive nucleic acid detection methods

US 8,008,018 B2

5

which distinguish between one and more than one target sequence in a discrete sample. Many fluorescent techniques have this sensitivity. The target sequences are chosen so that a maternal sequence and a fetal sequence are distinguishable, such as two copies of a maternal sequence versus two copies of a fetal sequence.

The genetic material thus obtained is distributed into discrete samples, where each sample will contain, on average not more than about one target sequence per sample. The average of one target sequence means that, for practical reasons, the sample will contain, preferably 0.1 to 0.8 genome equivalents per discrete sample, ideally 0.5 genome equivalent per sample. The method may be performed with dilutions whereby more target sequences are detected in samples containing a trisomic or increased copy number of target sequence. That is, if one is analyzing chromosome 21, the mixture may be diluted such that, on average, one may detect two chromosomes present in a maternal DNA, and three chromosomes in a Down Syndrome fetal DNA. Alternatively, the method may be performed with dilutions whereby more reaction samples are positive in this situation. The presence or absence of different target sequences in the discrete samples is detected; and the results are analyzed whereby the number of results from the discrete samples will provide data sufficient to obtain results distinguishing different target sequences. In one aspect, the method involves an analysis of a trisomy. In this method, one of the different target sequences (e.g. chromosome 21) is diploid in maternal genetic material and aneuploid in fetal genetic material and another of the different target sequences (e.g. chromosome 12) is diploid in both maternal and fetal genetic material.

The discrete samples are in reaction samples where the target sequences can be analyzed. The reaction samples may be, for example, wells in a microtiter plate, aqueous phases in an emulsion, areas in an array surface, or reaction chambers in a microfluidic device. The reaction samples may be used for PCR analysis of the discrete samples. The discrete samples are contacted with a plurality of PCR primers, including at least one (or one forward and one reverse) primer directed specifically to a maternal control sequence, expected to be the same in both mother and fetus. PCR primers are also directed specifically to a fetal sequence, i.e. one which may be present in both mother and fetus, but is amplified or altered in the fetus. PCR amplification will allow detection of these two different sequences, and, according to the present method, there will be a differential in the case of an abnormal fetal target sequence. The PCR method may be (but is not necessarily) quantitative. Quantitative real time PCR, which includes hybridizing target sequences with a nucleic acid having a fluorescent label, may be used. A fluorescent probe hybridizing to the target sequence may also be used. A number of "digital PCR" protocols are known for this purpose, as well as bead-based or emulsion PCR. While florescent probes are readily available and may be used to provide sensitive results, e.g., in FRET combinations, other labeling techniques may be used.

The number of discrete samples is chosen according to the results desired. In one aspect, it is preferred that a high degree of statistical significance is obtained, and the number of samples is at least about 10,000. In order to improve statistical confidence, it is preferable to employ large numbers of reactions, preferably between 500 and 100,000, more preferably between 10,000 and 100,000 or more reactions, depending on the percentage of fetal DNA present in the mixture. The results to be obtained should be statistically significant for purposes of the analysis conducted, e.g. initial screening, primary diagnosis, etc. A commonly used measure of statis-

6

tical significance when a highly significant result is desired is p<0.01, i.e., a 99% confidence interval based on a chi-square or t-test.

However, as shown below, results can be obtained with less, e.g. on the order of about 500 samples, placed in separate reaction samples. Fewer discrete samples may be analyzed where the genetic material is present in a higher concentration in the mixture. The mixture may be enriched for fetal genetic material. One method to enrich plasma DNA for fetal DNA is size separation, whereby a preparation comprising only DNA fragments less than about 300 bp are used for measuring target sequences.

A variety of genetic abnormalities may be detected according to the present method, including known alterations in one or more of the genes: CFTR, Factor VIII (F8 gene), beta globin, hemachromatosis, G6PD, neurofibromatosis, GAPDH, beta amyloid, and pyruvate kinase. The sequences and common mutations of these genes are known. Other genetic abnormalities may be detected, such as those involving a sequence which is deleted in a human chromosome, is moved in a translocation or inversion, or is duplicated in a chromosome duplication, wherein said sequence is characterized in a known genetic disorder in the fetal genetic material not present in the maternal genetic material. For example chromosome trisomies may include partial, mosaic, ring, 18, 14, 13, 8, 6, 4 etc. A listing of known abnormalities may be found in the OMIM Morbid map, http://www.ncbi.nlm.nih.gov/Omim/getmorbid.cgi.

In general, the term "aneuploidy" is used to refer to the occurrence of one or more extra or missing chromosomes.

In one aspect, the present method of differential detection of target sequences may involve direct sequencing of target sequences the genetic material. Single molecule sequencing, as is known, is further described below. The method may also comprise sequencing of amplified derivatives of the target sequences clones or amplicons of the genetic material. That is, a target sequence in a discrete sample is amplified by PCR, i.e. as an amplicon, or cloned into a vector that is grown up and thereby amplified by obtaining multiple copies of the vector insert.

In another aspect, the present invention comprises materials selected and combined for carrying out the present methods. Thus is provided a kit for differential detection of target sequences in maternal and fetal DNA in a mixed DNA sample, comprising primers specific for a genetically abnormal sequence and a control sequence, such as two chromosomes, one of which is possibly aneuploid and one of which is presumed diploid; a PCR reaction buffer for forming a PCR reaction sample with the primers in a device having separate reaction samples; and a size separation medium for separating the DNA sample into a fraction having less than about 1000 bp. The size separation medium may be gel or centrifugation material for recovering smaller DNA fragments and thus enriching fetal DNA. The kit may further comprise a pair of primers specific to chromosome 21. The kit may further comprise the device having separate reaction samples for discrete samples. The device may be a microfluidic device or a microtiter plate having at least 1,000 discrete reaction samples.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic illustration of the present analytical method, showing distribution of genetic material into compartments (1A), chromosome peaks of different height (1B), and statistical analysis of chromosomes (1C);

US 8,008,018 B2

7

FIG. **2** is a photograph of a microfluidic chip having 12 panels (numbered 1-12) containing DNA with chromosome 21 labeled;

FIG. **3** is a photograph of a microfluidic chip having 12 panels (numbered 1-12) containing DNA with chromosome 12 labeled; and

FIG. **4** is a graph showing results from experiments done using digital analysis of mixed normal and trisomic (Down Syndrome, trisomy 21) DNA.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Outline
I. Overview
II. Description of Steps
  A. Tissue Preparation
  B. Distribution of DNA molecules
  C. Detection and Quantification
    1. Digital PCR Methods
    2. Bead emulsion PCR
    3. Microfluidic Dilution with PCR
    4. Single molecule detection and/or sequencing
  D. Quantitative evaluation
III. Specific applications
  A. Preparation for trisomy with frequency analysis.
  B Sample Protocol
IV. Examples

#### I. Overview

The methods and materials described below apply techniques for analyzing numerous nucleic acids contained in a tissue sample (preferably serum or, more preferably, plasma) containing a mixture of DNA from both the mother and the fetus, and allowing detection of small but statistically significant differences.

The present invention involves the analysis of maternal blood for a genetic condition, wherein the mixed fetal and maternal DNA in the maternal blood is analyzed to distinguish a fetal mutation or genetic abnormality from the background of the maternal DNA. It has been found that, using a combination of steps, a DNA sample containing DNA from both the mother and the fetus can be analyzed to distinguish a genetic condition present in a minor fraction of the DNA, which represents the fetal DNA. The method employs "digital analysis," in which the DNA in the sample is isolated to a nominal single target molecule in a small reaction volume. Each sample mixture has a possibility of having distributed in it less than 1 target (i.e., 0 target) or more than one target. Next, the target molecules are detected in each reaction well, preferably as target sequences which are amplified, which may include a quantization of starting copy number of the target sequence, that is, 0, 1, 2, 3, etc. A control sequence is used to distinguish an abnormal increase in the target sequence, e.g., a trisomy. Thus there is a differential detection of target sequences, one of which is chosen to represent a normal genotype present in both mother and offspring, and one of which is chosen for detection of an abnormal genotype in the offspring, where the target sequence in the offspring will be different from that of the mother, e.g. in trisomy.

FIG. **1**A illustrates an embodiment where quantitative detection, e.g. quantitative real time PCR, is used. Blood **10** is processed to obtain plasma DNA **12**, which is diluted and distributed into aliquots **14**. These are added to reactions wells **1**A through **5**D. Shown in the wells are targets representing chromosomes 21 and 22. In well **2**A, no target DNA

8

is found; some wells (not shown) may have excess DNA. In well **3**B, fetal DNA having trisomy 21 (Down Syndrome) is found. The remainder of the wells contains maternal DNA. The DNA is amplified and/or labeled and a quantitative readout is obtained, as shown at **16**. Peak **18** representing well **3**B will be 50% higher than the peaks from the other well, or the peaks from a reference sequence on chromosome 22. Well A2, lacking either **21** or **22**, will have no peak. The peaks are shown at **20**. A single run will have numerous random variations, such as wells that have no target sequence, or have duplication through sample variability. Also, samples with no target will clearly result in no peak at all; wells with two or more targets, will give peaks significantly higher than peak **18**, i.e., 2× or 2.5× controls. These results are distinguished by running a multitude of reactions, followed by statistical analysis that can discriminate random variations from true results.

FIG. **1**C illustrates an embodiment where the DNA is distributed in a more dilute fashion (less than 1, or about one half genome equivalents per well). In this case chromosome 21 labels (primers) will generate more positives than chromosome 22 (a diploid chromosome) specific labels (e.g., primers) due simply to the slightly greater abundance of chromosome 21 in a trisomy-containing sample. As shown, some wells will contain positives **20** for both chromosomes, some will contain negatives **22** for both chromosomes, but some will contain blanks **24** for the diploid chromosome and peaks for the trisomic chromosome, due to its greater abundance. The data from a higher peak **18** is not used in this mode. As explained below, this slight difference can be made statistically significant by examining a large number of wells, and by the sensitivity of the present method to a single molecule.

Thus, the present method comprises generally the following steps:

1. Obtaining a tissue containing DNA from a pregnant subject, which DNA is known to have about 3% fetal DNA. This material is preferably drawn blood, and the circulating DNA is found in the blood plasma, rather than in cells. The blood or plasma may optionally be enriched for fetal DNA by known methods, such as size fractionation to select for DNA fragments less than about 300 bp. Alternatively, maternal DNA, which tends to be larger than about 500 bp may be excluded. Another enrichment step may be to treat the blood sample with formaldehyde, as described in Dhallan et al. "Methods to Increase the Percentage of Free Fetal DNA Recovered From the Maternal Circulation," J. Am. Med. Soc. 291(9): 1114-1119 (March 2004).

2. Distributing single DNA molecules from this sample to a number of discrete reaction samples, where the number of reaction samples is selected to give a statistically significant result for the number of copies of a target in the DNA molecules. Further, the reaction sample is confined to a small volume to bring the reaction molecules into close approximation. The amount of DNA molecule per reaction sample is preferably on the order of one copy of the chromosome of interest equivalent per reaction sample.

3. Detecting the presence of the target in the DNA in a large number of reaction samples, preferably with a sequence specific technique such as highly multiplexed short read sequencing or a PCR reaction wherein the PCR product is labeled to give a convenient quantitative read out. The detection step is referred to here as "digital PCR" and may be carried out by a variety of methods, such as (a) by PCR on samples diluted into individual wells of a microtiter plate; (b) PCR on samples diluted into emulsions containing primers immobilized to beads; or (c) PCR on samples trapped in a microfluidic chamber; and

US 8,008,018 B2

9                                                                                        10

4. Quantitative analysis of the detection of the maternal and fetal target sequences. In some cases this may include targets to different regions, such as probes to a target on a chromosome suspected of being present in an abnormal copy number (trisonomy) compared to a normal diploid chromosome, which is used as a control.

## II. Description of Steps

### A. Tissue Preparation

The present method is directed to non-invasive testing. The preferred starting material is maternal peripheral venous blood. In order to obtain sufficient DNA for testing, it is preferred that 10-20 mL of blood be drawn, in order to obtain about at least 10,000 genome equivalents of total DNA. This sample size is based on an estimate of fetal DNA being present as roughly 25 genome equivalents/mL of maternal plasma in early pregnancy, and a fetal DNA concentration of about 3.4% of total plasma DNA. However, less blood may be drawn for a genetic screen where less statistical significance is required, or the DNA sample is enriched for fetal DNA.

It should be noted that, while the present description refers throughout to DNA, fetal RNA found in maternal blood may be analyzed as well. As described in Ng et al., "mRNA of placental origin is readily detectable in maternal plasma," Proc. Nat. Acad. Sci. 100(8): 4748-4753 (2003), hPL (human placental lactogen) and hCG (human chorionic gonadotropin) mRNA transcripts were detectable in maternal plasma, as analyzed using the respective real-time RT-PCR assays. In the present method, mRNA encoding genes expressed in the placenta and present on the chromosome of interest are used. For example, DSCR4 (Down syndrome critical region 4) is found on chromosome 21 and is mainly expressed in the placenta. Its mRNA sequence may be found at GenBank NM_005867. In this case, it is preferred to use RNase H minus (RNase H—) reverse transcriptases (RTs) to prepare cDNA for detection. RNase H—RTs are available from several manufacturers, with SuperScript™ II (Invitrogen) being the most widely used. Reverse transcriptase PCR may be used as described below for chromosomal DNA.

#### i. Enrichment of DNA or RNA from Plasma

The maternal blood may be processed to enrich the fetal DNA concentration in the total DNA, as described in Li et al., supra. Briefly, circulatory DNA is extracted from 5- to 10-mL maternal plasma using commercial column technology (Roche High Pure Template DNA Purification Kit; Roche, Basel, Switzerland) in combination with a vacuum pump. After extraction, the DNA is separated by agarose gel (1%) electrophoresis (Invitrogen, Basel, Switzerland), and the gel fraction containing circulatory DNA with a size of approximately 300 bp is carefully excised. The DNA is extracted from this gel slice by using an extraction kit (QIAEX II Gel Extraction Kit; Qiagen, Basel, Switzerland) and eluted into a final volume of 40-μL sterile 10-mM trishydrochloric acid, pH 8.0 (Roche).

DNA may be concentrated by known methods, including centrifugation and various enzyme inhibitors. The DNA is bound to a selective membrane (e.g., silica) to separate it from contaminants. The DNA is preferably enriched for fragments circulating in the plasma, which are less than 1000 base pairs in length, generally less than 300 bp. This size selection is done on a DNA size separation medium, such as an electrophoretic gel or chromatography material. Such a material is described in Huber et al., "High-resolution liquid chromatography of DNA fragments on non-porous poly(styrene-divinylbenzene) particles," Nucleic Acids Res. 1993 March 11; 21(5): 1061-1066, gel filtration chromatography, TSK gel, as

described in Kato et al., "A New Packing for Separation of DNA Restriction Fragments by High Performance Liquid Chromatography," J. Biochem, 1984, Vol. 95, No. 1 83-86.

In addition, enrichment may be accomplished by suppression of certain alleles through the use of peptide nucleic acids (PNAs), which bind to their complementary target sequences, but do not amplify.

Plasma RNA extraction is described in Enders et al., "The Concentration of Circulating Corticotropin-releasing Hormone mRNA in Maternal Plasma Is Increased in Preeclampsia," Clinical Chemistry 49: 727-731, 2003. As described there, plasma harvested after centrifugation steps is mixed Trizol LS reagent (Invitrogen) and chloroform. The mixture is centrifuged, and the aqueous layer transferred to new tubes. Ethanol is added to the aqueous layer. The mixture is then applied to an RNeasy mini column (Qiagen) and processed according to the manufacturer's recommendations.

#### ii. Blood—Extraction from Fetal Cells

United States Patent Application 20040137470 to Dhallan, Ravinder S, published Jul. 15, 2004, entitled "Methods for detection of genetic disorders," describes an enrichment procedure for fetal DNA," in which blood is collected into 9 ml EDTA Vacuette tubes (catalog number NC9897284) and 0.225 ml of 10% neutral buffered solution containing formaldehyde (4% w/v), is added to each tube, and each tube gently is inverted. The tubes are stored at 4° C. until ready for processing.

Agents that impede cell lysis or stabilize cell membranes can be added to the tubes including but not limited to formaldehyde, and derivatives of formaldehyde, formalin, glutaraldehyde, and derivatives of glutaraldehyde, crosslinkers, primary amine reactive crosslinkers, sulfhydryl reactive crosslinkers, sulfhydryl addition or disulfide reduction, carbohydrate reactive crosslinkers, carboxyl reactive crosslinkers, photoreactive crosslinkers, cleavable crosslinkers, etc. Any concentration of agent that stabilizes cell membranes or impedes cell lysis can be added. In a preferred embodiment, the agent that stabilizes cell membranes or impedes cell lysis is added at a concentration that does not impede or hinder subsequent reactions.

Flow cytometry techniques can also be used to enrich fetal cells (Herzenberg et al., PNAS 76: 1453-1455 (1979); Bianchi et al., PNAS 87: 3279-3283 (1990); Bruch et al., Prenatal Diagnosis 11: 787-798 (1991)). U.S. Pat. No. 5,432,054 also describes a technique for separation of fetal nucleated red blood cells, using a tube having a wide top and a narrow, capillary bottom made of polyethylene. Centrifugation using a variable speed program results in a stacking of red blood cells in the capillary based on the density of the molecules. The density fraction containing low-density red blood cells, including fetal red blood cells, is recovered and then differentially hemolyzed to preferentially destroy maternal red blood cells. A density gradient in a hypertonic medium is used to separate red blood cells, now enriched in the fetal red blood cells from lymphocytes and ruptured maternal cells. The use of a hypertonic solution shrinks the red blood cells, which increases their density, and facilitates purification from the more dense lymphocytes. After the fetal cells have been isolated, fetal DNA can be purified using standard techniques in the art.

Further, an agent that stabilizes cell membranes may be added to the maternal blood to reduce maternal cell lysis including but not limited to aldehydes, urea formaldehyde, phenol formaldehyde, DMAE (dimethylaminoethanol), cholesterol, cholesterol derivatives, high concentrations of magnesium, vitamin E, and vitamin E derivatives, calcium, calcium gluconate, taurine, niacin, hydroxylamine derivatives,

US 8,008,018 B2

11                                                                                                    12

bimoclomol, sucrose, astaxanthin, glucose, amitriptyline, isomer A hopane tetral phenylacetate, isomer B hopane tetral phenylacetate, citicoline, inositol, vitamin B, vitamin B complex, cholesterol hemisuccinate, sorbitol, calcium, coenzyme Q, ubiquinone, vitamin K, vitamin K complex, menaquinone, zonegran, zinc, *ginkgo biloba* extract, diphenylhydantoin, perftoran, polyvinylpyrrolidone, phosphatidylserine, tegretol, PABA, disodium cromglycate, nedocromil sodium, phenyloin, zinc citrate, mexitil, dilantin, sodium hyaluronate, or polaxamer 188.

An example of a protocol for using this agent is as follows: The blood is stored at 4° C. until processing. The tubes are spun at 1000 rpm for ten minutes in a centrifuge with braking power set at zero. The tubes are spun a second time at 1000 rpm for ten minutes. The supernatant (the plasma) of each sample is transferred to a new tube and spun at 3000 rpm for ten minutes with the brake set at zero. The supernatant is transferred to a new tube and stored at −80° C. Approximately two milliliters of the "buffy coat," which contains maternal cells, is placed into a separate tube and stored at −80° C.

iii. Plasma-Free Fetal DNA

Genomic DNA is isolated from the plasma using the Qiagen Midi Kit for purification of DNA from blood cells, following the manufacturer's instructions (QIAmp DNA Blood Midi Kit, Catalog number 51183). DNA is eluted in 100 mu.l of distilled water. The Qiagen Midi Kit also is used to isolate DNA from the maternal cells contained in the "buffy coat."

Finally, it is noted that, in certain embodiments, one may also use samples from tissue, saliva, urine, tear, vaginal secretion, breast fluid, breast milk, or sweat.

B. Distribution of DNA Molecules

In the illustrated method, the genomic DNA obtained from a maternal tissue as described above is diluted into multiple reaction samples, e.g. in multiwell plates, so that there is, on average, less than one genome equivalent per well. Thus, when the individual discrete samples are analyzed for the presence of the genetic abnormality to be tested, the DNA (chromosome) to be analyzed will, on average, either be present or absent, permitting so-called "digital analysis." A reaction sample in general will contain a single template molecule (haplotype), two target molecules (diploid) or three target molecules (trisomy).

The wells provide discrete reaction samples and may be implemented in a number of devices, such as a microtiter plates, beads in an emulsion, or a microfluidic device. These are described in detail below. The device must be capable of carrying out a large number of discrete amplification reactions. As described below, this number should be, at a minimum, 10,000 reactions, and preferably on the order of 100, 000 reactions. The reaction sample is preferably holds about 10-100 μL of a PCR reaction sample containing the genomic DNA, nucleotides (dNTPs), polymerase and appropriate PCR primers. The primers are used in conjunction with a label for rapid quantitative detection of PCR products. The type of labeling will depend on the amplification/detection system used, e.g., a "molecular beacon" fluorescent probe for microtiter plate based amplification. This type of probe is described, for example, in Vogelstein et al, supra. Alternatively, labeling may be done with SYBR Green, which has very low fluorescence in the absence of double stranded DNA and very high fluorescence in the presence of double stranded DNA.

Another form of parallel analysis useful in the present invention is single molecule analysis. Again, a sample is diluted to contain less than a nominal single genome equivalent of DNA, and the presence of the target of interest (i.e.,

chromosome 21 trisomy) can be determined in a large number of samples. By analyzing a large number of samples, the fetal DNA can be distinguished from the maternal DNA. This is termed a "digital analysis," because each well will have, on average, one genome equivalent per cell, and furthermore, the dilution may be read as a binary "yes-no" result as to the presence of the chromosome or other sequence to be counted.

Another method for single molecule analysis involves the use of site-specific fluorescent tags that are detected as the DNA is drawn through a microfluidic device in a single molecule, elongated flow. An example of this technique, described below, is termed "direct linear analysis," or DLA.

C. Detection and Quantification

Having isolated the sample DNA into a nominal genome equivalent, the presence of the DNA sequence or chromosome of interest must be quantified. This may be done either in single molecule mode, or with an amplified product.

While the preferred embodiment of the invention is described in terms of PCR, the invention is primarily directed to the use of multiple individual genetic sequence detections. In some embodiments, the method of amplification maybe, for example, self-sustained sequence reaction, ligase chain reaction, rapid amplification of cDNA ends, polymerase chain reaction and ligase chain reaction, Q-beta phage amplification, strand displacement amplification, or splice overlap extension polymerase chain reaction.

Also, while detection may be conveniently be carried out by a sequence specific probe, detection may also be carried out by directly sequencing a region of interest to determine if it is the target sequence of interest.

1. Digital PCR Methods

While the presently known PCR methods may be multiplexed, that is, run with multiple primers to multiple targets, it is preferred to limit the number of primer pairs in a given reaction. Generally, there will be two primer pairs: one for amplifying a test sequence, and another pair for amplifying a control sequence. Primers are designed according to known parameters for avoiding secondary structures and self-hybridization. Further, both primer pairs should anneal and melt at about the same temperatures.

Primers

Primers can be prepared by a variety of methods including but not limited to cloning of appropriate sequences and direct chemical synthesis using methods well known in the art (Narang et al., Methods Enzymol. 68:90 (1979); Brown et al., Methods Enzymol. 68:109 (1979)). Primers can also be obtained from commercial sources such as Operon Technologies, Amersham Pharmacia Biotech, Sigma, and Life Technologies. The primers can have an identical melting temperature. The lengths of the primers can be extended or shortened at the 5' end or the 3' end to produce primers with desired melting temperatures. Also, the annealing position of each primer pair can be designed such that the sequence and, length of the primer pairs yield the desired melting temperature. The simplest equation for determining the melting temperature of primers smaller than 25 base pairs is the Wallace Rule (Td=2(A+T)+4(G+C)). Computer programs can also be used to design primers, including but not limited to Array Designer Software (Arrayit Inc.), Oligonucleotide Probe Sequence Design Software for Genetic Analysis (Olympus Optical Co.), NetPrimer, and DNAsis from Hitachi Software Engineering. The TM (melting or annealing temperature) of each primer is calculated using software programs such as Oligo Design, available from Invitrogen Corp.

The annealing temperature of the primers can be recalculated and increased after any cycle of amplification, including but not limited to cycle 1, 2, 3, 4, 5, cycles 6-10, cycles 10-15,

13

14

cycles 15-20, cycles 20-25, cycles 25-30, cycles 30-35, or cycles 35-40. After the initial cycles of amplification, the 5' half of the primers is incorporated into the products from each loci of interest, thus the TM can be recalculated based on both the sequences of the 5' half and the 3' half of each primer. Any DNA polymerase that catalyzes primer extension can be used including but not limited to *E. coli* DNA polymerase, Klenow fragment of *E. coli* DNA polymerase 1, T7 DNA polymerase, T4 DNA polymerase, Taq polymerase, Pfu DNA polymerase, Vent DNA polymerase, bacteriophage 29, REDTaq™ Genomic DNA polymerase, or sequenase. Preferably, a thermostable DNA polymerase is used. A "hot start" PCR can also be performed wherein the reaction is heated to 95° C. for two minutes prior to addition of the polymerase or the polymerase can be kept inactive until the first heating step in cycle 1. "Hot start" PCR can be used to minimize nonspecific amplification. Any number of PCR cycles can be used to amplify the DNA, including but not limited to 2, 5, 10, 15, 20, 25, 30, 35, 40, or 45 cycles. In a most preferred embodiment, the number of PCR cycles performed is such that equimolar amounts of each loci of interest are produced.

A number of specific PCR primers are useful in the present process, such as those disclosed in technical literature of Qiagen. That literature describes a protocol where DNA was purified from peripheral blood and amniocyte cultures using the QIAmp DNA Blood Mini Kit. For amplification of the amyloid gene on chromosome 21, (NCBI gene ID 473931, accession NC_006488) primer and probe sequences for:

```
SEQ ID NO: 1:
forward primer,
5'-GGG AGC TGG TAC AGA AAT GAC TTC-3';

reverse primer,
SEQ ID NO: 10:
5'-TTG CTC ATT GCG CTG ACA A-3'; and
probe, SEQ ID NO: 2

5'-(FAM) AGC CAT CCT TCC CGG GCC TAG G (TAMRA)-3'.
```

For amplification of GAPDH, (GenBank locus 12p13.31-p13.1) primers and probe were: forward primer, SEQ ID NO: 3,5'-CCC CAC ACA CAT GCA CTT ACC-3'; reverse primer, SEQ ID NO: 4,5'-CCT ACT CCC AGG GCT TTG ATT-3'; and probe, SEQ ID NO: 5, 5'-(VIC) AAA GAG CTA GGA AGG ACA GGC AAC TTG GC (TAMRA)-3'. PCR was performed using the TaqMan system, with 2 µl of template DNA in each 25 µl reaction and final concentrations of 300 nmol/liter of each primer and 150 nmol/liter of each dual-labeled TaqMan probe. Cycling conditions were incubation at 50° C. for 2 minutes, then 95° C. for 10 minutes, followed by 40 cycles of 60° C., 1 minute and 95° C., 15 seconds.

Using the above exemplary protocol, the different ratio of the amyloid gene and the GAPDH gene in karyotypically normal and trisomy 21 samples was clearly distinguishable in the multiplex PCR assay, as reported in the Qiagen product literature. Assays using a dilution series of the DNA template showed that the difference remained clear over a wide range of template concentrations and with starting concentrations of DNA as low as 10 mg/liter. Of course, in a maternal blood sample, the concentration of fetal DNA would be much lower. Fluorescent In Situ Amplification

Fluorescent probe-based technologies, other than can be performed on the PCR products "in situ" (i.e., in the same wells), are particularly well suited for this application. This method is described in detail in Vogelstein PNAS 96:9236, above, and

Vogelstein et al. "Digital Amplification," U.S. Pat. No. 6,440,705, hereby incorporated by reference for its description of this amplification procedure.

The "digi-PCR" method of Vogelstein et al. is described in the above-mentioned patent. An exemplary protocol as set forth in that patent is as follows: PCR is performed in 7 µl volumes in 96 well polypropylene PCR plates (Marsh Biomedical Products, Rochester, N.Y.). The composition of the reactions is: 67 mM Tris, pH 8.8, 16.6 mM $NH_4 SO_4$, 6.7 mM $MgCl_2$, 10 mM β-mercaptoethanol, 1 mM dATP, 1 mM dCTP, 1 mM dGTP, 1 mM TTP, 6% DMSO, 1 µM primer F1, 1 µM primer R1, 0.05 units/µl Platinum Taq polymerase (Life Technologies, Inc.), and "one-half genome equivalent" of DNA.

To determine the amount of DNA corresponding to one-half genome equivalent,

DNA samples are serially diluted and tested via PCR. The amount that yielded amplification products in half the wells, usually about 1.5 pg of total DNA, is defined as "one-half genome equivalent" and used in each well of subsequent Digital Amplification experiments. Fifty µl light mineral oil (Sigma M-3516) is added to each well and reactions performed in a HybAid Thermal cycler at the following temperatures: denaturation at 94° C. for one min; 60 cycles of 94° C. for 15 sec, 55° C. for 15 sec., 70° C. for 15 seconds; 70° C. for five minutes.

MB, or molecular beacon probes, which become fluorescent on binding to the target sequence(s), as described in more detail below, may be used as follows:

For fluorescence analysis, 3.5 µl of a solution with the following composition is added to each well: 67 mM Tris, pH 8.8, 16.6 mM $NH_4 SO_4$, 6.7 mM $MgCl_2$, 10 mM β-mercaptoethanol, 1 mM dATP, 1 mM dCTP, 1 mM dGTP, 1 mM TTP, 6% DMSO, 5 µM primer, 1 mM MB-GREEN, 1 mM MB-RED, 0.1 units/µl Platinum Taq polymerase. The plates are centrifuged for 20 seconds at 6000 g and fluorescence read at excitation/emission wavelengths of 485 nm/530 nm for MB-GREEN and 530 nm/590 nm for MB-RED. The plates are then placed in a thermal cycler for asymmetric amplification at the following temperatures: 94° C. for one minute; 10-15 cycles of 94° C. for 15 sec, 55° C. for 15 sec., 70° C. for 15 seconds; 94° C. for one minute; and 60° C. for five minutes. The plates are then incubated at room temperature for ten to sixty minutes and fluorescence measured as described above.

MB probes are oligonucleotides with stem-loop structures that contain a fluorescent dye at the 5' end and a quenching agent (Dabcyl) at the 3' end. The degree of quenching via fluorescence energy resonance transfer is inversely proportional to the 6th power of the distance between the Dabcyl group and the fluorescent dye. After heating and cooling, MB probes reform a stem-loop structure, which quenches the fluorescent signal from the dye. If a PCR product whose sequence is complementary to the loop sequence is present during the heating/cooling cycle, hybridization of the MB to one strand of the PCR product will increase the distance between the Dabcyl and the dye, resulting in increased fluorescence.

The examples below use a PCR protocol, which also relies on MB type probes, except in connection with a microfluidic device.

The present digital PCR methods may be used with RNA as well as DNA. Isolation of plasma RNA is described below. In this case, cDNA copies are made and then amplified by DNA polymerase-based PCR. Different primers may be used for cDNA synthesis. Specific templates, based on genetic sequences in the chromosomes of interest are preferred. See, Bustina et al., "Pitfalls of Quantitative Real-Time Reverse-

US 8,008,018 B2

15

Transcription Polymerase Chain Reaction," Journal of Bio-molecular Techniques, 15:155-166 (2004). Use of mRNA from consitutively expressed, i.e., housekeeping genes, may be used for a control, and genes that are highly expressed in placenta (described below) are preferred. Currently four different chemistries, TaqMan® (Applied Biosystems, Foster City, Calif., USA), Molecular Beacons, Scorpions® and SYBR® Green (Molecular Probes), are available for real-time PCR. All of these chemistries allow detection of PCR products via the generation of a fluorescent signal and may be adapted to reverse-transcription PCR. Ambion's Messag-eSensor™ RT Kit includes an RNase H+ MMLV RT. Mes-sageSensor includes a total RNA control, a control human GAPDH primer set, RNase inhibitor, and nucleotides, as well as a buffer additive that enables detection with SYBR® Green dye. Ambion recommends using 18S rRNA as an internal control because it shows less variance in expression across treatment conditions than β-actin and GAPDH. A chromo-some 21-encoded gene (LOC90625) which shows strong expression in first trimester placenta similar to CSH1 (human placental lactogen) and was selected for plasma analysis in Oudejans et al., "Detection of Chromosome 21-encoded mRNA of Placental Origin in Maternal Plasma," *Clinical Chemistry* 49: 1445-1449, 2003. Specific primers for use with this gene are given in this paper. Uniquely expressed chro-mosome 21 transcripts are described at Gardiner et al., "Analysis of human chromosome 21: correlation of physical and cytogenetic maps; gene and CpG island distributions," *E.M.B.O.J.* 9(1):25-34 (1990), namely cDNA of identified products ETS2, MX1, MX2, CBS, COL6A1 and BCEI, which can be partially sequenced or mapped according to eh present methods.

2. Bead Emulsion PCR

Emulsion PCR has been used to prepare small beads with clonally amplified DNA—in essence, each bead contains one type of amplicon of a particular DNA. (Dressman et al, *Proc. Natl. Acad. Sci. USA.* 100, 8817 (Jul. 22, 2003)). By using specific primers for regions of chromosomes A and B while perform-ing emulsion PCR, one will create beads with digital ampli-cons from only these two chromosomes, and it is only neces-sary to count the number of positive beads of each type. There are many ways to do this; we will point out two of them. First, use two different species of beads (either in size or fluorescent labeling) to anchor the two amplicons respectively. Alterna-tively, one could label the non-anchored primers with differ-ent fluorophores and use a single bead type. After amplifica-tion, the positive beads (amplicons) of each type can be counted with methods such as flow cytometry or simply by counting them in a suitably equipped microscope.

This technique is further described in Dressman (su-pra) and Dressman et al. PCT publication WO2005010145, "METHOD AND COMPOSITIONS FOR DETECTION AND ENUMERATION OF GENETIC VARIATIONS," pub-lished 2005, Jan. 3, and hereby incorporated by reference for its description of a bead-based process. Briefly, in Step 1, Magnetic beads covalently coated with streptavidin are bound to biotinylated oligonucleotides ("oligos"). In Step 2, an aqueous mix containing all the necessary components for PCR plus primer-bound beads and template DNA are stirred together with an oil/detergent mix to create microemulsions. The aqueous compartments (which may be illustrated as small droplets in an oil layer) contain an average of <1 tem-plate molecule and <1 bead. Different templates (control and test) may be present in one or less droplets to represent two template molecules whose sequences differ by one or many nucleotides. In Step 3, the microemulsions are temperature cycled as in a conventional PCR. If a DNA template and a

16

bead are present together in a single aqueous compartment, the bead bound oligonucleotides act as primers for amplifi-cation. Then, one may picture straight lines corresponding to PCR products attached to the corresponding templates con-nected to the beads to represent extension products from the two different kinds of templates. In Step 4, the emulsions are broken and the beads are purified with a magnet. In Step 5, after denaturation, the beads are incubated with oligonucle-otides that can distinguish between the sequences of the dif-ferent kinds of templates. Fluorescently labeled antibodies are then used to label the bound hybridization probes. This renders the beads containing PCR product as different colors (e.g., red or green) upon appropriate laser excitation. In Step 6, flow cytometry is used to count the red and green beads. Preferably each bead is bound to at least 10, 50, 100, 500, or 1000 molecules of the same nucleic acid sequence.

For purposes of detailed description, the following example is taken from the above-quoted PCT publication: Detailed Exemplary Protocol Using Bead Emulsions

Step 1-Coupling oligonucleotides to beads. Superpara-magnetic beads of 1.05±0.1 um in diameter, covalently bound to streptavidin, are purchased from Dynal Biotech, Inc. (650.01, Lake Success, N.Y.). Beads are washed once with 1×PCR buffer (53286, Invitrogen, Carlsbad, Calif.) then sus-pended in Bind and Wash Buffer (BWB) (5 mMTris-HCl, 0.5 mM EDTA, 1.0 MNaCl, pH 7.5). Beads are incubated in BWB for 30 min at room temperature in the presence of 10 mM oligonucleotides. These oligonucleotides are modified with a dual biotin group at the 5' end with the biotin groups separated by a six-carbon linker (IDT, Coralville, Iowa). After binding, the beads are washed 3 times with 1×PCR buffer to thoroughly remove unbound oligonucleotides.

Step 2-Preparing microemulsions. Microemulsions for PCR are prepared in an oil phase that is composed of 4.5% Span 80 (S6760, Sigma, St. Louis, Mo.), 0.40% Tween 80 (Sigma S-8074), and 0.05% Triton X-100 (Sigma T-9284) in mineral oil (Sigma M-3516). The aqueous phase consists of 67 mMTris-HCl (pH 8.8), 16.6 mM NH4S04, 6.7 mMMgC12, 10 mM (3-mercaptoethanol, 1 mMdATP, 1 mMdCTP, 1 mMdGTP, 1 mMdTTP, 0.05 μM forward primer, 25 μM reverse primer, 45 units Platinum Taq (Invitrogen 10966-034), various amounts of template DNA, and ~108 oligonucleotide-coupled beads in a total volume of 300 μl. The forward primer is an oligonucleotide whose sequence is identical to the 3'20-22 nt of that described in step 1 and is not modified with biotin.

Water-in-oil microemulsions are prepared by drop wise addition of 200 microliters of the aqueous phase to 400 micro-liters of the oil phase previously placed in a 2 ml round bottom cryogenic vial (430661, Corning, Coming, N.Y.).

The drop wise addition is performed over-one minute while the mixture is being stirred at 1400 RPM with a mag-netic microstir bar (58948-353, VWR, Plainfield, N.J.) on a VWR model 565 Magnetic Stirrer. After the addition of the aqueous phase, the mixture continued to be stirred for a total time of 30 minutes. Two emulsions are made at once by placing two tubes in a rack placed at the center of the magnetic stirrer.

Step 3-PCR cycling. The emulsions are aliquotted into five wells of a 96 well PCR plate, each containing 100 μl. PCR is carried out under the following cycling conditions: 94° C. for 2 minutes; 40 cycles of 94° C. for 15 seconds, 57° C. for 30 seconds, 70° C. for 30 seconds. The PCR products analyzed in this study ranged from 189 to 239 bp.

Step 4-Magnetic capture of beads. After PCR cycling, the microemulsion from five wells of a PCR plate are pooled and broken by the addition 800 microliters of NX buffer (100

US 8,008,018 B2

17

18

mMNaCI containing 1% Triton X-100, 10 mMTris-HCl, pH 7.5, 1 mM EDTA) in a 1.5 ml tube (Corning 430909). After vortexing for—20 sec. the beads are pelleted by centrifugation in a microcentrifuge at 8000 rpm (5000 g) for 90 seconds. The top oil phase, and all but—300 microliters of the aqueous phase, is removed from the tube and 600 microliters of NX buffer is added. These steps are repeated. The tube is then placed on a magnet (Dynal MPC-S) and the rest of the supernatant is carefully pipetted off. The beads are washed an additional 3 times with 1×PCR buffer using magnetic separation rather than centrifugation and finally re-suspended in 100 microliters of 1×PCR buffer.

Step 5-Sequence differentiation. Two oligonucleotide probes are used for each reaction. One is 5'-labeled with 6-carboxyfluorescein (6-FAM) and is specific for one allele while the second is 5'-labeled with biotin and is specific for the other allele. Probes are synthesized by IDT. The 30 microliters hybridization reactions contained 10 μM of each probe and 5-25 million beads in1×PCR buffer. Reactions are performed in PCR plates on a thermal cycler by heating to 94° C. for 30 seconds then cooling to 75° C. at a rate of 0.5° C. per second, cooling to 45° C. at 0.2° C. per second, and finally cooled to 30° C. at 1° C. per second.

All subsequent steps are performed at room temperature. The reactions are transferred to a 96 well Costar plate (Corning 3797) and placed on a 96 well magnet. Beads are collected magnetically by exposing them to the magnet for 2 minutes. The supernatant is removed and the beads washed 3 times with 1×PCR buffer by pipetting them and collecting for two minutes. They are finally resuspended in 100 microliters B-PCR buffer (1 mg/mL BSA in 1×PCR buffer).

The beads are then incubated for 10 minutes in a total volume of 100 microliters B-PCR buffer containing 3 μg of Alexa-488 rabbit anti-fluorescein antibody (Molecular ProbesA-11090, Eugene, Oreg.) and 3 μg of Nutravidin labeled with R-phycoerytbrin (Molecular Probes A-2660) in B-PCR buffer. The beads are washed three times and resuspended in B-PCR buffer as described above. They are then incubated for ten minutes in a total volume of 100 microliters B-PCR buffer containing 6 μg of Alexa 488-conjugated chicken anti-rabbit antibody (Molecular Probes A-21441) and 3 μg of biotinylated goat anti-avidin antibody (BA-0300, Vector Laboratories, Burlingame, Calif.). The beads are washed three times and resuspended in B-PCR buffer as described above. They are then incubated for ten minutes in a total volume of 100 microliters B-PCR buffer containing 3 μg of an Alexa 488-conjugated goat anti-chicken antibody (Molecular Probes A-11039) and 3 micrograms of R-phycoerytbrin-labeled streptavidin (Molecular Probes S-866). This solution is then washed an additional 3 times with 1×PCR buffer and resuspended in 20 microliters of 1×PCR buffer.

Step 6-Flow Cytometry. The bead suspension is diluted to a concentration of—106-107 beads per ml in 10 mMTris-HCl, 1 mMEDTA (351-010-131, Quality Biological, Inc., Gaithersburg, Md.) and analyzed using a LSR instrument (BD Biosciences, Franklin Lakes, N.J.). The instrument is set up for standard two-color analysis using an argon laser and optical filters that distinguished between the two fluorescent dyes. No spectral deconvolution is required as the major bead populations are well separated. In some cases, scanning is performed with FACScan or FACSCalibur instruments (BD Biosciences).

3. Microfluidic Dilution with PCR

Another approach to digital PCR involves the use of microfluidics to achieve the digital PCR conditions used in the present method.

Generally, a DNA sample obtained as described above is diluted into an appropriate concentration, mixed with PCR reagents, primers, dNTPs, etc. and flowed through a number of channels which may be closed off in multiple segments, resulting in a number of discrete reaction samples, or chambers. The chambers may be subjected to PCR thermal cycling and the products quantitatively detected by florescence, as described above.

A suitable microfluidic device is produced by Fluidigm Corporation, termed the Digital Isolation and Detection IFC (integrated fluid circuit). A suitable device is also described in U.S. Pat. No. 6,960,437 to Enzelberger, et al., issued Nov. 1, 2005 entitled "Nucleic acid amplification utilizing microfluidic devices," hereby incorporated by reference for purposes of describing a microfluidic device capable of supporting multiple parallel nucleic acid amplifications and detections. As described in this patent, one exemplary microfluidic device for conducting thermal cycling reactions includes in the layer with the flow channels a plurality of sample inputs, a mixing T-junction, a central circulation loop (i.e., the substantially circular flow channel), and an output channel. The intersection of a control channel with a flow channel can form a microvalve. This is so because the control and flow channels are separated by a thin elastomeric membrane that can be deflected into the flow channel or retracted therefrom. Deflection or retraction of the elastomeric membrane is achieved by generating a force that causes the deflection or retraction to occur. In certain systems, this is accomplished by increasing or decreasing pressure in the control channel as compared to the flow channel with which the control channel intersects. However, a wide variety of other approaches can be utilized to actuate the valves including various electrostatic, magnetic, electrolytic and electrokinetic approaches. Another microfluidic device, adapted to perform PCR reactions, and useful in the present methods, is described in US 2005/0252773 by McBride, et al., published Nov. 17, 2005, entitled "Thermal reaction device and method for using the same."

The substantially circular central loop and the control channels that intersect with it form the central part of the rotary pump. The pump(s) that cause solution to be flowed through the substantially circular flow channel consist of a set of at least three control channels that are adjacent to one another and which intersect the substantially circular branch flow channel (i.e., the central loop). When a series of on/off actuation sequences are applied to the control channels, the fluid in the central loop can be peristaltically pumped in a chosen direction, either clockwise or counterclockwise. The peristaltic pumping action results from the sequential deflection of the membranes separating the control channels and flow channel into or out of the flow channel. In general, the higher the actuation frequency, the faster the fluid rotates through the central loop. However, a point of saturation is eventually reached at which increased frequency does not result in faster fluid flow. This is primarily due to limitations in the rate at which the membrane can return to an unactuated position. One system exemplified has two sets of pumps and (i.e., two sets of three control channels that overlay the substantially circular flow channel) a single pump can be utilized (i.e., a single set of three control channels overlaying the substantially circular flow channel). Furthermore, while each pump is shown as including three control channels, more control channels can be utilized. It should also be understood that the three control channels can be different segments of a single control channel that overlay the flow channel.

The detailed description of multiple sample analysis being carried out in wells does not mean that the target sequences need to be physically separated into wells, as the sequences

**19**

may be in samples which are isolated simply by being on different beads (as described above) or by adherence to different areas of a substrate (as described below).

4. Single Molecule Detection/Sequencing Methods

It should be appreciated that methods involving PCR or other amplification are not the only way to detect or enumerate the molecules in a given discrete sample. It is possible to use single molecule flow cytometry to count single molecules that have been labeled with a sequence-specific fluorescent probe. It is also possible to sequence the target sequence in the reaction sample directly, either after amplification or at the single molecule level.

Fluorescent Nucleotide Incorporation by DNA Polymerase

As described in the above-referenced PNAS publication by Braslavsky et al., DNA polymerase may be employed to image sequence information in a single DNA template as its complementary strand is synthesized. The nucleotides are inserted sequentially; only the time resolution to distinguish successive incorporations is required. After each successful incorporation event, a fluorescent signal is measured and then nulled by photobleaching. This method lends itself to massive parallelism.

Briefly, this technique permits observations of single molecule fluorescence by a conventional microscope equipped with total internal reflection illumination, which reduces background fluorescence. The surface of a quartz slide is chemically treated to specifically anchor DNA templates while preventing nonspecific binding of free nucleotides, and a plastic flow cell is attached to the surface to exchange solutions. DNA template oligonucleotides are hybridized to a fluorescently labeled primer and bound to the surface via streptavidin and biotin with a surface density low enough to resolve single molecules. The primed templates are detected through their fluorescent tags, their locations are recorded for future reference, and the tags are photobleached. Labeled nucleotide triphosphates and DNA polymerase enzyme are then washed in and out of the flow cell while the known locations of the DNA templates are monitored for the appearance of fluorescence. The technique uses a combination of evanescent wave microscopy and single-pair fluorescence resonance energy transfer (spFRET) to reject unwanted noise. The donor fluorophore excites acceptors only within the Forster radius, thus effectively creating an extremely high-resolution near-field source. Because the Forster radius of this fluorophore pair is 5 nm, the spatial resolution of this method exceeds the diffraction limit by a factor of 50 and conventional near-field microscopy by an order of magnitude.

The genomic DNA from the tissue taken from the mother, i.e. the mixture of fetal and maternal genetic material, may be distributed into discrete samples which are anchored to a surface and sequenced or monitored by labeled probes to detect a target specific sequence, e.g., a unique region of chromosome 21, e.g., AML1. Further guidance for the preparation of chromosome 21-unique sequences may be found, for example, in Fuscoe et al., "An Efficient Method for Selecting Unique-Sequence Clones from DNA Libraries and Their Application To Fluorescent Staining of Human Chromosome 21 Using in Situ Hybridization," *Genomics*, vol. 5, 1989, pp. 100-109. A methodology useful in the present invention platform is based on massively parallel sequencing of millions of fragments using attachment of randomly fragmented genomic DNA to a planar, optically transparent surface and solid phase amplification to create a high density sequencing flow cell with millions of clusters, each containing ~1,000 copies of template per sq. cm. These templates are sequenced using four-color DNA sequencing-by-synthesis technology. See, products offered by Illumina, Inc., San Diego Calif.

**20**

Also, see US 2003/0022207 to Balasubramanian, et al., published Jan. 30, 2003, entitled "Arrayed polynucleotides and their use in genome analysis."

Sequencing may be combined with amplification-based methods in a microfluidic chip having reaction chambers for both PCR and microscopic template-based sequencing. Only about 30 bp of random sequence information are needed to identify a sequence as belonging to a specific human chromosome. Longer sequences can uniquely identify more particular targets. An algorithm for designing unique sequences is described in Yamada, et al. "PrimerStation: a highly specific multiplex genomic PCR primer design server for the human genome," *Nucleic Acids Res.*, Jul. 1, 2006; 34(Web Server issue): W665-W669, illustrative of software methods that can be used to identify a sequence in comparison to the known genome sequence. See, also Zhu et al., "Single molecule profiling of alternative pre-mRNA splicing," *Science.* 2003 Aug. 8; 301(5634):836-838, describing a single-molecule-based technology for studying mRNA.

Direct Linear Analysis (DLA)

Another method of determining the identity of genomic DNA from the present samples is termed direct linear analysis, and is described in Chan et al. "DNA Mapping Using Microfluidic Stretching and Single-Molecule Detection of Fluorescent Site-Specific Tags," *Genome Research* 14:1137-1146 (2004). In this method, a microfluidic device is used for stretching DNA molecules in elongational flow that is coupled to a multicolor detection system capable of single-fluorophore sensitivity. Double-stranded DNA molecules are tagged at sequence-specific motif sites with fluorescent bisPNA (Peptide Nucleic Acid) tags. The DNA molecules are then stretched in the microfluidic device and driven in a flow stream past confocal fluorescence detectors. DLA can provide the spatial locations of multiple specific sequence motifs along individual DNA molecules, and thousands of individual molecules can be analyzed per minute.

A microchip configuration and operating conditions may be prepared according to this publication that are adequate for stretching 50-kb long DNA. The chip includes a post field, a funnel with a 10:1 taper reduction ratio, a taper shape providing $W(x)$ $1/x^2$ profile (W is the channel width, and x is the coordinate along the flow direction), and a 5 μm-wide interrogation channel. The interrogation channel has uniform cross-section to ensure constant solution velocity, which was 10-15 μm/msec. Once inside the channel, stretched and tagged DNA molecules travel through spots of focused laser light that excites fluorescence. Epi-illumination of the sample and confocal detection are arranged within a fluorescence microscope.

The excitation laser beams are directed into the microscope objective with a dichroic mirror that reflects the light with 532 nm (beam ExI) and 633 nm (beams ExII and ExIII) wavelengths, but is transparent to the fluorescence emission excited by these beams. The emission is further split by another dichroic mirror and bandpass filters. Fluorescence excited by the green laser is delivered by optical fiber to the photon-counting avalanche photodiode (APD) for signal detection in data channel 1. Fluorescence excited by red beams ExII and ExIII is directed to the APDs of data channels 2 and 3, respectively.

The above-described device may be configured with larger path lengths in order to accommodate larger DNA strands, presumably up to entire chromosome lengths. The genomic sample is probed with a chromosome 21 specific probe threaded through the interrogation channel, and the presence of one or more chromosomes is detected.

US 8,008,018 B2

21                                          22

D. Quantitative Evaluation

Digital PCR allows the detection of aneuploidy merely by counting transcripts, as illustrated by the following calculation. Suppose that fetal DNA is present in maternal blood at a fraction level of $\epsilon$, and that we are trying to discover an aneuploidy of order $\alpha$ relative to euploidy $e$ (in the example relating to Down Syndrome in humans, $e=2$ is euploidy and the Down Syndrome trisomy $\alpha=3$). If chromosome A is euploid and represents an internal control, and chromosome B is aneuploid and is the target to be measured, then one can amplify representative segments from both chromosomes via digital PCR. In comparing the amplicons of each type, one expects to find that for every $e$ amplicons from chromosome A there are $e(1-\epsilon)+\epsilon\alpha$ amplicons from chromosome B. In the case of a trisomy and $\epsilon=3\%$, then for every 2 amplicons from chromosome A one expects 2.03 amplicons from chromosome B. While this difference is small, it can be measured. For example, if one amplifies a sample from 1,000 cell equivalents, then one expects 2,000 amplicons from chromosome A and 2,030 from chromosome B. The difference of 30 amplicons is in principle detectable.

The requisite statistical confidence to resolve the difference in proportions can be estimated as follows. There is a random statistical variation associated with the initial sample size, which goes roughly as the square root of the number of samples taken. It is in fact often difficult to precisely start with a fixed number of cell equivalents, and in the previous example we expect statistical error of order 32 amplicons ($32\sim$square root$(1,000)$) for most sample preparation techniques. This is the same size as the signal we are trying to detect and thus in practice one requires more than 1,000 cell equivalents for robust detection. Precisely how many one requires depends on the statistical certainty that is required. If one would like a result that is significant to k standard deviations, then

$$kN=N(e(1-\epsilon)+\alpha\epsilon-e)=N\epsilon(\alpha-e)$$

or $N=(k/(\epsilon(\alpha-e)))^2$

Using the values of the previous example, if we require k=3 standard deviations, then the number of amplicons N must be at least 10,000 for Down Syndrome detection. However, as discussed above, the number of target sequences needed for statistical sequences may be reduced by using controls sequences, and, in addition, the sample may be enriched for fetal DNA.

III. Specific Applications

The present invention is particularly adapted to detecting genetic abnormalities that involve quantitative differences between maternal and fetal genetic sequences. These genetic abnormalities include mutations that may be heterozygous and homozygous between maternal and fetal DNA, and to aneuploidies. For example, a missing copy of chromosome X (monosomy X) results in Turner's Syndrome, while an additional copy of chromosome 21 results in Down Syndrome. Other diseases such as Edward's Syndrome and Patau Syndrome are caused by an additional copy of chromosome 18, and chromosome 13, respectively. The present method may be used for detection of a translocation, addition, amplification, transversion, inversion, aneuploidy, polyploidy, monosomy, trisomy, trisomy 21, trisomy 13, trisomy 14, trisomy 15, trisomy 16, trisomy 18, trisomy 22, triploidy, tetraploidy, and sex chromosome abnormalities including but not limited to XO, XXY, XYY, and XXX.

Other chromosome specific primers are disclosed in United States Patent Application 20050164241 to Hahn,

Sinuhe, et al., published Jul. 28, 2005, entitled "Non-invasive detection of fetal genetic traits," hereby incorporated by reference in its entirety for describing methods of sample preparation and certain PCR primers, described as follows:

The primers for the genes are prepared on the basis of nucleotide sequences obtained from databases such as Gen-Bank, EMBL and the like. The names of the polymorphic primers and the sequences of the primers for the genes will be shown for the respective chromosomes in the following examples (#2, Example 1; #4, Example 6, #14, Example 9; #22, Example 2). The following genetic markers and polymorphic makers (Polymorphic STS Primer Pairs: D2S207, D2S177, D2S156 and D2S159, BIOS Laboratories, Inc.) are used to identify chromosome #2.

There are more than 1,000 chromosome 21 specific PCR primer sets listed at the NIH UniSTS web site, which can be located at http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?db=unists and found with the search phrase "human[organism] AND 21[chr]". UniSTS is a comprehensive database of sequence tagged sites (STSs) derived from STS-based maps and other experiments. STSs are defined by PCR primer pairs and are associated with additional information such as genomic position, genes, and sequences. Similarly, primer sequences for other human chromosomes can be found by appropriately modifying the search query.

Examples of diseases where the target sequence may exist in one copy in the maternal DNA (heterozygous) but cause disease in a fetus (homozygous), include sickle cell anemia, cystic fibrosis, hemophilia, and Tay Sachs disease. Accordingly, using the methods described here, one may distinguish genomes with one mutation from genomes with two mutations.

Sickle-cell anemia is an autosomal recessive disease. Nine-percent of US blacks are heterozygous, while 0.2% are homozygous recessive. The recessive allele causes a single amino acid substitution in the beta chains of hemoglobin.

Tay-Sachs Disease is an autosomal recessive resulting in degeneration of the nervous system. Symptoms manifest after birth. Children homozygous recessive for this allele rarely survive past five years of age. Sufferers lack the ability to make the enzyme N-acetyl-hexosaminidase, which breaks down the GM2 ganglioside lipid.

Another example is phenylketonuria (PKU), a recessively inherited disorder whose sufferers lack the ability to synthesize an enzyme to convert the amino acid phenylalanine into tyrosine Individuals homozygous recessive for this allele have a buildup of phenylalanine and abnormal breakdown products in the urine and blood.

Hemophilia is a group of diseases in which blood does not clot normally. Factors in blood are involved in clotting. Hemophiliacs lacking the normal Factor VIII are said to have Hemophilia A, and those who lack Factor IX have hemophilia B. These genes are carried on the X chromosome, so primers and probes may be used in the present method to detect whether or not a fetus inherited the mother's defective X chromosome, or the father's normal allele.

A listing of gene mutations for which the present method may be adapted is found at http://www.gdb.org/gdb, The GDB Human Genome Database, The Official World-Wide Database for the Annotation of the Human Genome Hosted by RTI International, North Carolina USA.

A. Preparation for Trisomy with Frequency Analysis

In this protocol, the number of positive reaction samples is used, disregarding increased intensity from three versus two chromosomes in a reaction sample. That is, as described above, trisomy can be detected either by looking for an increased signal from a single well having multiple chromo-

US 8,008,018 B2

23

somal DNA copies, or by diluting a sample and counting the frequency of responses of the trisomic marker versus a control diploid marker.

Fetal DNA circulating in maternal plasma is here used to provide sufficient material for chromosomal analysis. DNA is extracted from a blood sample and aliquotted to different reaction chambers on the basis of genome equivalents, i.e., the entire genomic content of a single normal cell (46 chromosomes). This weighs about 6.6 pg. The term "nominal genome equivalent" is used to refer to the calculated distribution of sample DNA based on a calculated genome size and DNA weight. In practice, there will be some experimental variation in DNA sample size, and, due to random fragment distribution, a given genome equivalent will not contain exactly the DNA fragments corresponding only to a single complete diploid genome, but a large number, on average, will.

For each panel on the Digital Array chip, 10 ul of reaction mix is required. To achieve ~⅓ panel filled, the required final concentration of template in reaction mix should be approximately 48 copies/μl (every 0.33 template per 7 nl chamber). Thus for a 10 μl reaction volume (1 panel), 480 copies (~240 genome equivalents, "GE") of total free-floating DNA is required. These calculations are based on Chiu et al., "Effects of Blood-Processing Protocols on Fetal and Total DNA Quantification in Maternal Plasma," *Clinical Chemistry,* 47:9. 1607-1613. 2001, where real time quantitative PCR was used to estimate plasma DNA isolated under different protocols, and Li Y, Zimmermann et al., "Size Separation of Circulatory DNA in Maternal Plasma Permits Ready Detection of Fetal DNA Polymorphisms," *Clinical Chemistry,* 50:6. 1002-1011. 2004.

Assuming 55% blood volume is plasma, one may obtain 80% recovery from gel extraction with a DNA preparation such as with a QIAEX II kit. If there is 20 ml of blood collected, the volume of plasma=20 ml blood*0.55=11 ml. The total free-floating DNA=11 ml*1000 GE/ml=11000 GE. Therefore, one may calculate the amount of DNA<300 bp, in that 11000 GE*0.27=2970 GE. The amount of DNA<300 bp after recovery=2970 GE*0.8=2376 GE=4752 copies.

Thus, a 20 ml blood draw should contain enough total DNA less than 300 bp (which is about 85% fetal DNA) for about 10 panels, enough, as shown below, to achieve statistical significance.

B. Sample Protocol

The following sample protocol provides a procedure for use in preparing a sample from maternal plasma and increasing the signal from chromosome 21.

Plasma Collection: collect 20 ml peripheral blood from the pregnant subject. This is collected in 2 tubes with EDTA as anticoagulant. Process blood within 2 hours of sample collection. The blood is processed first by centrifugation at 1600 g for 10 min. One aliquots plasma to polypropylene tubes (1 ml each), with care not to disturb buffy coat layer. Next, the supernatant is microcentrifuged at 16000 g (full speed) for 10 min to remove residual maternal cells. Then, one extracts DNA from plasma with QIAamp Blood Mini Kit ("body fluid protocol"). 800 μl of plasma is applied per column and eluted in 40 μl buffer.

Depending on actual DNA concentration in plasma, one may need to process all plasma in a single column (with Midi

24

or Maxi kit) to achieve a higher final concentration of DNA. Then, the DNA is subjected to gel electrophoresis (Li et al Clin. Chem. 50:6 1002-1011 2004) to separate smaller sized DNA fragments. A UV gel tray is prepared with 1% agarose gel with 0.5 mg/L ethidium bromide. 100 bp ladder and HindIII digested Lambda phage DNA is used as markers. The extracted DNA is loaded on a gel; the gel is run at 80V for 1 hour. The DNA is extracted from the gel by first excising DNA<300 bp with clean razor blade. This band is recovered with QIAEX II Gel Extraction Kit (Qiagen) and eluted 40 ul in elution buffer.

Total DNA Quantitation with Real Time PCR:

The amount of total free-floating DNA can be quantified using primers and Taqman probe designed for GAPDH gene (Chromosome 12). Real time PCR is run with GAPDH and Amyloid (Chromosome 21) primers and probes before running with Digital Array to confirm that the amplification regions are intact. To increase the signal from Chromosome 21, an additional set of primers and probes can be used.

One possible candidate is the following (See Blood 104(1): 149-158 (2004):

```
DSCR1 (Downs Syndrome Critical Region 1) Chr 21
SEQ ID NO: 6:
5' (probe) -AGG TTG TGA AAA CAG CAG CAA TGC AAT GT-
(quencher)

P3'
Forward:
(SEQ ID NO: 7)
5'CCA CAG GAA GCC GCC TAG T 3'

Reverse:
(SEQ ID NO: 8):
5'TGA GGG AAG AAA GGA AAC GCT 3'
```

Amplification region (with primers underlined) SEQ ID NO: 9):

CCACAGGAAGCCGCCTAGTGCAGAGAGGTTGTGAA AACAGCAGCAATGCAATGTGG           AAATTGT AGCGTTTCCTTTCTTCCCTCA. An additional set of primers and probes can be designed to increase signal from the control (these primers can be for chromosome 12 or any other chromosomes except Chromosome 21).

If an automated microfluidic device is used, appropriate channels and valves are provided for introduction of PCR reactants and, if used, a probe.

In the Examples below, a Fluidigm prototype DID chip was used. The Digital Isolation and Detection (DID) chip works by partitioning a sample/assay (TaqMan® assays) mixture into hundreds to tens of thousands of reaction chambers, where real-time QPCR reactions are continuously monitored by a dynamic array reader. The DID chip described here contains inputs for 12 sample/assay mixtures, and its architecture partitions 7.5 μL of fluid for each input into 1,200 reaction chambers. These are shown as 12 panels in FIGS. **2** and **3**. Instrumentation is used to drive the sample/assay mixtures from the wells in the carrier into the appropriate reaction chambers. As shown in FIGS. **2** and **3**, white spots indicate the location of reaction chambers positive for the indicated primer and dye. The sum of the positive wells in each section will be consistent with the gene/chromosome copies that were measured in the sample. The number of light spots shown represents the number of positive reaction chambers;

US 8,008,018 B2

**25**

no quantification was used in these experiments, and the results do not depend on quantization of a signal from an individual (discrete) sample mixture. Such quantization can be used, but can also be a source of error in methods that depend on this.

This chip is further described in Ottesen et al., "Microfluidic Digital PCR Enables Multigene Analysis of Individual Environmental Bacteria," *Science* 314:1464-1467 (Dec. 1, 2006). As discussed there, the DNA sample is suspended in a PCR reaction buffer and loaded into the microfluidic device. The present work was done a more recent version of that microfluidic device. This device is further described below. As an alternative to the above protocol, one may use a kit with pre-optimized reagents, such as the Qiagen QuantiTect Multiplex PCR Kit, which contains QuantiTect Multiplex PCR Buffer, having synthetic factor MP and an optimized combination of KCl and $(NH_4)_2SO_4$, which promote specific and stable annealing of primers to templates. This kit also contains HotStarTaq DNA Polymerase: Since this polymerase requires incubation at 95° C. for activation, misprimed products and primer-dimers, which can compete for reactants, are not formed during reaction setup.

One also uses the following anti-contamination procedures:
1. Use aerosol resistant pipette tips
2. Preamplification treatment by use of uracil N-glycosylase, which destroyed uracil-containing PCR products/RNA
3. Negative water blank
4. Negative blank gel slices
5. Negative control panel on Digital Array

After extraction from blood and purification, the preferred concentration of DNA sample should be ~140-240 copies/μl, i.e., ~70-120 GE/μl. This corresponds to ~3.4 to 2 μl of required template volume in a digital PCR reaction volume of 10 μl.

In this protocol and the following examples, the mixture of maternal and fetal genetic material obtained from the mother is diluted to achieve a high likelihood that only one target sequence will be present in a given sample to be analyzed. As shown in FIG. **1A**, it is also possible to carry out this process with less dilution and less empty sample sites if quantitation is used to distinguish a number of target sequences in a sample.

## IV. Examples

Presented below are data obtained from genomic DNA extracted from a normal human cell line and from a Down Syndrome cell line (trisomy 21). These cell lines were purchased from ATCC. Taqman PCR primers specific for chromosome 21 and chromosome 12 were adapted from a reference: Zimmermann B et al, "Novel Real-Time Quantitative PCR Test for Trisomy 21". Clinical Chemistry. 48 (no. 2). 2002. 362-363. HEX (hexachloro-6-carboxyfluorescein) and FAM (6-carboxy-fluorescein) are well known fluorescent dyes; BHQ® quencher is black hole quencher dye (BHQ, Biosearch Technologies, Novato, Calif.).

```
Amyloid Forward:
5'GGG AGC TGG TAC AGA AAT GAC TTC 3' (SEQ ID NO: 11)

Amyloid Reverse:
5'TTG CTC ATT GCG CTG ACA A 3'     (SEQ ID NO: 12)
```

**26**

```
-continued
Amyloid Probe:
5' (FAM) AGC CAT CCT TCC CGG GCC TAG (SEQ ID NO: 13)
G (BHQ)3'

GAPDH Forward:
5'CCC CAC ACA CAT GCA CTT ACC 3'    (SEQ ID NO: 14)

GAPDH Reverse:
5'CCT AGT CCC AGC AGG GCT TTG ATT 3' (SEQ ID NO: 15)
```

GAPDH Probe: 5' (HEX)AAA GAG CTA GGA AGG ACA GGC AAC TTG GC (BHQ)3' (SEQ ID NO: 16) primers and probes were synthesized by IDT (Integrated DNA Technologies)). DNA samples were analyzed by digital PCR using microfluidic Digital PCR on a Fluidigm® microfluidic chip having 12 panels with 765 (wells) partitions each. Various mixtures of normal and Downs DNA (representing a mixture of fetal and maternal cells in a blood sample) were analyzed. Small amounts of each template were pipetted directly into each PCR mix; alternatively, a mixture of templates could be prepared first, then pipetted into the PCR mix, which should yield more accurate results. The alternate method was used in these experiments. In these examples, trisomy is detected based on the number of wells showing the triplicate chromosomal marker, i.e., the analysis illustrated in FIG. 1C. Intensity data of the triplicate chromosome are not used, except as a ratio to a normal chromosome marker. Because the sample is dilute many of the wells will have no chromosome of interest (or marker fragment), as can be seen in FIGS. **2** and **3**, which show photographs of chips from Example 2.

Protocol: combine Primers 300 nM; Probes 150 nM; iTaq supermix with ROX and iQ supermix. Tween20 (0.1%); DNA template (2 μl, premixed with the desired percentage of Downs DNA); Water (make up to total reaction volume of 10 μl).

Each panel was loaded with reaction mix of 10 μl, and PCR was performed on a thermal cycler similar to the commercially available BIOMARK System from Fluidigm according to manufacturer's instructions. Cycling conditions were: 98° C. 30 s, 97° C. 30 s, 95° C. 2 min, [56° C. 30 s, 58° C. 30 s, 60° C. 30 s, 98° C. 15 s]×40 cycles, 60° C. for 10 min.

A MATLAB program was written to subtract the image of the chip taken before cycling from that taken at cycle 40 for each fluorescent channel. The number of positive wells in each fluorescent channel was counted.

Experiments were done with samples that contained 100% Downs, 60% Downs, 50% Downs, 40% Downs, 30% Downs, and 0% Downs (i.e., 100% Normal) DNA. The results from these experiments are shown in FIG. **4**, where each bar and data point represents a different concentration of Down's DNA.

The data from the Data were analyzed as follows:

$X^*$=number of HEX counts(Chromosome 12)

$Y^*$=number of FAM counts(Chromosome 21)

There is a characteristic response for digital PCR. At low copy number, as described further in Warren L, Bryder D, Weissman I R, Quake S R. Transcription factor profiling in

27

individual hematopoietic progenitors by digital RT-PCR. See, PNAS 2006. 103: 17807-17812).

X=actual input copy number of Chromosome 12

Y=actual input copy number of Chromosome 21

$X=\log(1-X^*/N)/\log(1-1/N)$

$Y=\log(1-Y^*/N)/\log(1-1/N)$

N=total number of partition per panel=765

Confidence interval $k=(Y-X)/\mathrm{sqrt}(Y)$

In FIG. 4, the confidence level obtained for a single chip was plotted against percent downs DNA and compared to the predicted confidence interval (line). The observed confidence interval at, for example 30% DNA, was less than predicted, but none the less showed a confidence interval of >1 for only one panel.

This calculation was done as follows:

For 1 genomic equivalence,

Copy number of Chromosome $12=2(1-\epsilon)+2\epsilon=2$

Copy number of Chromosome $21=2(1-\epsilon)+3\epsilon=2+\epsilon$

Difference between copy numbers of Chr21 and Chr12=ε

Where $\epsilon$=fetal DNA/total free floating DNA*100%

For m genomic equivalence

Y=copy number of Chromosome 21

X=copy number of Chromosome 12

Difference between copy numbers of Chr21 and Chr12=$D=D=Y-X=m\epsilon$

$D=k\sigma_y=k^*\mathrm{sqrt}(Y)$, assuming that the distribution of $Y$ follows that of a Poisson(mean standard deviation=$Y$)

$k=m\epsilon/\mathrm{sqrt}(Y)$

$m=Y/(2+\epsilon)$

$k=\mathrm{sqrt}(Y)^*\epsilon/(2+\epsilon)$

If ⅓ of the panel is used (i.e., 1 positive compartment in every 3 compartments)

N=number of compartments

$Y^*=N/3$

$Y=\log(1-Y^*/3)/\log(1-1/N)=\log(⅔)/\log(1-1/N)$

k varies with N as shown in the graph.

The confidence interval k corresponds to the standard deviation, where a higher standard deviation indicates a greater difference between the normal and the Down's DNA. Even at the lowest concentration used (30%) and with only 10 panels analyzed, statistical analysis showed the feasibility of the present method.

FIGS. 2 and 3 show results from 100% Downs samples, for easy of visual analysis. In each panel, the number of white spots indicates the positive wells for the markers tested. Chromosome 21 can be seen to have more spots by simple visual observation, distinguishing the trisomic from the normal

28

chromosome. In a 30% mixture (representing an enriched maternal blood sample), the results were analyzed statistically.

Table 1 below shows the results for each panel (numbered as in FIGS. 2 and 3) in a single experiment using 30% Down's DNA.

TABLE 1

| Panel | Sample | FAM | HEX | Ratio |
|-------|-----------|-----|-----|-------|
| 1 | Normal | 221 | 213 | 1.04 |
| 2 | Normal | 254 | 264 | 0.96 |
| 3 | Normal | 271 | 252 | 1.08 |
| 4 | Normal | 246 | 257 | 0.96 |
| 5 | Normal | 241 | 238 | 1.01 |
| 8 | 30% Downs | 270 | 222 | 1.22 |
| 9 | 30% Downs | 219 | 194 | 1.13 |
| 10 | 30% Downs | 249 | 234 | 1.06 |
| 11 | 30% Downs | 230 | 223 | 1.03 |
| 12 | 30% Downs | 216 | 189 | 1.14 |

The "FAM" column shows the compartments (wells) positive for chromosome 21, and the "HEX" column shows the compartments positive for chromosome 12. The significance of the higher ratios in the Downs cases is shown in FIG. 4, and was also analyzed in a Student's T-test, with a value of 0.036599344.

The above analysis shows that the statistical reliability of the present method can be dramatically improved simply by increasing the number of wells tested. Since about 240 genome equivalents is required per panel, and about 4,700 genome equivalents are found in a 20 ml sample, it is possible, given the present description, to simply run additional analyses to increase statistical significance.

CONCLUSION

The present examples, methods, procedures, specific compounds and molecules are meant to exemplify and illustrate the invention and should in no way be seen as limiting the scope of the invention, which is defined by the literal and equivalent scope of the appended claims. Any patents or publications mentioned in this specification are indicative of levels of those skilled in the art to which the patent pertains and are intended to convey details of the invention which may not be explicitly set out but would be understood by workers in the field. Such patents or publications are hereby incorporated by reference to the same extent as if each was specifically and individually incorporated by reference and for the purpose of describing and enabling the method or material referred to. The exemplary protocols given are for the convenience of the reader and are not to be construed as necessary to one of ordinary skill in the art, given the teachings of the present specification regarding the various methods and materials to be used.

US 8,008,018 B2

```
                          SEQUENCE LISTING


<160> NUMBER OF SEQ ID NOS: 16

<210> SEQ ID NO 1
<211> LENGTH: 24
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 1

gggagctggt acagaaatga cttc                                            24


<210> SEQ ID NO 2
<211> LENGTH: 22
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      probe

<400> SEQUENCE: 2

agccatcctt cccgggccta gg                                              22


<210> SEQ ID NO 3
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 3

ccccacacac atgcacttac c                                               21


<210> SEQ ID NO 4
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 4

cctactccca gggctttgat t                                               21


<210> SEQ ID NO 5
<211> LENGTH: 29
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      probe

<400> SEQUENCE: 5

aaagagctag gaaggacagg caacttggc                                       29


<210> SEQ ID NO 6
<211> LENGTH: 29
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      probe

<400> SEQUENCE: 6
```

US 8,008,018 B2

**31**                                                        **32**

-continued

```
aggttgtgaa aacagcagca atgcaatgt                             29


<210> SEQ ID NO 7
<211> LENGTH: 19
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
     primer

<400> SEQUENCE: 7

ccacaggaag ccgcctagt                                        19


<210> SEQ ID NO 8
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
     primer

<400> SEQUENCE: 8

tgagggaaga aaggaaacgc t                                     21


<210> SEQ ID NO 9
<211> LENGTH: 84
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
     primer

<400> SEQUENCE: 9

ccacaggaag ccgcctagtg cagagaggtt gtgaaaacag cagcaatgca atgtggaaat    60

tgtagcgttt cctttcttcc ctca                                  84


<210> SEQ ID NO 10
<211> LENGTH: 19
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
     primer

<400> SEQUENCE: 10

ttgctcattg cgctgacaa                                        19


<210> SEQ ID NO 11
<211> LENGTH: 24
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
     primer

<400> SEQUENCE: 11

gggagctggt acagaaatga cttc                                  24


<210> SEQ ID NO 12
<211> LENGTH: 19
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
     primer

<400> SEQUENCE: 12
```

US 8,008,018 B2

| 33 | 34 |
|---|---|

-continued

```
ttgctcattg cgctgacaa                                            19


<210> SEQ ID NO 13
<211> LENGTH: 22
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 13

agccatcctt cccgggccta gg                                        22


<210> SEQ ID NO 14
<211> LENGTH: 22
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 14

ccccacacac atggcactta cc                                        22


<210> SEQ ID NO 15
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 15

cctagtccca gggctttgat t                                         21


<210> SEQ ID NO 16
<211> LENGTH: 29
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      primer

<400> SEQUENCE: 16

aaagagctag gaaggacagg caacttggc                                 29
```

What is claimed is:

1. A method for determining presence or absence of fetal aneuploidy in a maternal tissue sample comprising fetal and maternal genomic DNA, wherein the method comprises:
   a. obtaining a mixture of fetal and maternal genomic DNA from said maternal tissue sample;
   b. conducting massively parallel DNA sequencing of DNA fragments randomly selected from the mixture of fetal and maternal genomic DNA of step a) to determine the sequence of said DNA fragments;
   c. identifying chromosomes to which the sequences obtained in step b) belong;
   d. using the data of step c) to compare an amount of at least one first chromosome in said mixture of maternal and fetal genomic DNA to an amount of at least one second chromosome in said mixture of maternal and fetal genomic DNA, wherein said at least one first chromosome is presumed to be euploid in the fetus, wherein said at least one second chromosome is suspected to be aneuploid in the fetus, thereby determining the presence or absence of said fetal aneuploidy.

2. The method of claim 1 wherein said maternal tissue sample is a maternal plasma sample.

3. The method of claim 1 wherein said massively parallel DNA sequencing comprises i) attaching said DNA fragments to a planar optically transparent surface; ii) conducting solid phase amplification of the attached DNA fragments to create a high density sequencing flow cell, and iii) sequencing of the amplified DNA fragments in the high density sequencing flow cell by a four-color DNA sequencing by synthesis process.

4. The method of claim 2 wherein said massively parallel DNA sequencing comprises i) attaching said DNA fragments to a planar optically transparent surface; ii) conducting solid phase amplification of the attached DNA fragments to create a high density sequencing flow cell, and iii) sequencing of the amplified DNA fragments in the high density sequencing flow cell by a four-color DNA sequencing by synthesis process.

* * * * *